```
 1              IN THE UNITED STATES DISTRICT COURT

 2             FOR THE EASTERN DISTRICT OF TEXAS

 3                      MARSHALL DIVISION

 4   ANTHONY BLACKSHIRE        )(

 5                             )(   CIVIL DOCKET NO.

 6                             )(   2:09-CV-329-TJW

 7   VS.                       )(   MARSHALL, TEXAS

 8                             )(

 9   TYSON FOODS, INC.         )(   AUGUST 23, 2010

10                             )(   11:20 A.M.

11                          TRIAL

12           BEFORE THE HONORABLE JUDGE T. JOHN WARD

13                UNITED STATES DISTRICT JUDGE

14                      VOLUME 1 OF 2

15   APPEARANCES:

16

17   FOR THE PLAINTIFFS:  MR. MICHAEL E. PIERCE
                          MR. MATTHEW PAUL SKRABANEK
18                        Arnold & Itkin, LLP
                          1400 McKinney, Suite 2550
19                        Houston, TX 77010

20   APPEARANCES CONTINUED ON NEXT PAGE

21   COURT REPORTER:     MS. SHELLY HOLMES, CSR
                         Deputy Official Court Reporter
22                       2593 Myrtle Road
                         Diana, Texas  75640
23                       (903) 663-5082

24
     (Proceedings recorded by mechanical stenography,
25   transcript produced on a CAT system.)
```

```
 1                              MR. CHAD NEWMAN
                               Erskine & McMahon
 2                              521 N. Second St.
                               P.O. Box 3485
 3                              Longview, TX 75606

 4   FOR THE DEFENDANTS:        MR. ZACHARY THOMAS MAYER
                               Kane Russell Coleman & Logan
 5                              1601 Elm St., Suite 3700
                               Dallas, TX 75201
 6
                               MR. STAYTON L. WORTHINGTON
 7                              Coghlan Crowson, et al
                               1127 Judson Road, Suite 211
 8                              P.O. Box 2665
                               Longview, TX 75606-2665
 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                    I N D E X

2   August 23, 2010
                                            Page
3
      Appearances                           1
4

5     Witnesses:

6         Anthony Blackshire

7             Direct Examination by Skrabanek    41
              Cross Examination by Mayer          70
8             Redirect Examination by Skrabanek  93

9
          Jack Madeley
10
              Direct Examination by Pierce       95
11            Cross Examination by Mayer        115
              Redirect Examination by Pierce    126
12

13        Kenneth Lee, M.D.

14            Direct Examination by Pierce      128
              Cross Examination by Mayer        157
15            Redirect Examination by Pierce    166

16
          Patricia Williams
17
              Direct Examination by Mayer       173
18            Cross Examination by Pierce       183
              Redirect Examination by Mayer     195
19            Recross Examination by Pierce     196

20
          Larry Howard
21
              Direct Examination by Mayer       198
22            Cross Examination by Skrabanek    210
              Redirect Examination by Mayer     215
23

24

25

4

1                                          Page

2         Jessica Gatlin

3
              Direct Examination by Mayer        216
4             Cross Examination by Skrabanek     234
              Redirect Examination by Mayer      253
5

6
      Court Reporter's Certificate              260
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          LAW CLERK:  All rise.

2          THE COURT:  All right.  Everyone please be

3     seated.  Well, I got y'all sort of up and down like

4     jumping jacks.  At this time, you're going to need to

5     take the oath of office.  So you'll stand while

6     Ms. Andrews -- the jurors -- she's going to administer

7     the oath of office.  Raise your right hand, please.

8          (Jurors sworn.)

9          THE COURT:  Please be seated.

10          Ladies and gentlemen, you now constitute the

11     jury in this case, and I -- the first thing I need to do

12     is give you some preliminary instructions.

13          Schedule-wise, we're going to hear opening

14     statements before we break for lunch.  We may break a

15     little after 12:00 today, but, ordinarily, we'll break

16     right at 12:00.  We'll take a mid after -- and we'll

17     have about an hour and 15 minutes for lunch when we

18     break, and then we'll come back and go until not later

19     than 5:30.  We'll break between 5:00 and 5:30.  And then

20     we'll start in the morning, start -- we'll start the

21     trial at 8:30 in the morning.  And we'll go 8:30 until

22     12:00 with a midmorning break and then the afternoon.

23     So that's the way -- we come a little earlier than some

24     courts, but we get more done, we think, that way.

25          My preliminary instructions.  First thing I

1  want you to know that -- you're going to hear first

2  thing here in just a few minutes, opening statements

3  from the attorney for the plaintiff, and he will tell

4  you what he expects to prove in this case.  After he has

5  concluded his opening statement, then the attorney for

6  the defendant will give his opening statement and his

7  version of the facts and what he believes he will prove.

8  Or if the attorney for the defendant so desires, he may

9  make his opening statement at the conclusion of the

10  plaintiff's presentation of evidence.

11          It's important that you remember that these

12  statements are not evidence in the case.  The only

13  evidence which will be before you will be that from the

14  witness stands, the stipulations from the party, and the

15  exhibits that are received into evidence.

16          Do we have any video -- any depositions that

17  we're going to use at all?

18          MR. MAYER:  No, Your Honor.

19          MR. PIERCE:  No, Your Honor, I don't believe

20  so.

21          THE COURT:  Okay.  Now, following the

22  opening statements, that's when you'll begin hearing the

23  actual evidence.  After -- the plaintiff will, of

24  course, present their evidence first.  After he's

25  concluded with his presentation of the evidence, then

1    the defendant will do the same.

2           At the close of the defendant's testimony,

3    the plaintiff has the right to bring in rebuttal

4    testimony, and the defendant may desire to offer

5    rebuttal testimony to the plaintiff's rebuttal

6    testimony.  But after all of the evidence has been

7    presented here in Court, the Court will recess for the

8    purpose of preparing my final instructions and

9    final charge.  Thereafter, the Court will return, and

10   the attorneys will then present to you their arguments.

11   Plaintiff will argue first, then the defendant, and then

12   the plaintiff will present his final closing arguments.

13          Following the arguments, I will give you

14   instructions as to the law, after which you will retire

15   for the purpose of deliberating on your verdict.

16          Now, I'm going to give you some general

17   instructions and definitions that will apply to the

18   trial of this suit.  I notice that during voir dire,

19   several of you had served in state court in -- in

20   juries.  One of the major differences that you're going

21   to observe is that all of my instructions -- the charge

22   will be oral.  It's important that you listen to me and

23   try to remember what I say.  Sometime during the

24   deliberation you need some of them repeated, I'll bring

25   you back and repeat them, but what you will receive at

1  the end of the evidence and after my final instructions

2  are a series of questions to be answered, and that will

3  be your verdict form.  So that's one big difference.

4          And these initial instructions, they're an

5  important phase, and so I do ask that since you will be

6  called upon to recall what I've said to you in the way

7  of instructions, apply them to the evidence, I ask that

8  you pay close attention to the remarks.

9          You as jurors are the triers of the facts,

10 and to that extent, you are the exclusive judges of the

11 facts.  The law you will receive from the Court, and you

12 will be bound by the law as I give it to you.  It is not

13 your province to decide whether it's a good law or a bad

14 law.  Nor will you deliberate upon the correctness of

15 the law, but you will accept the law as given to you by

16 the Court and be bound thereby.  However, you are the

17 exclusive judges of the facts, the credibility of the

18 evidence, and the weight to be given the testimony of

19 the witnesses.

20         Now, by this term "credible testimony," we

21 simply mean such testimony as may be deemed worthy of

22 your belief.  You have the exclusive right to decide the

23 facts under the credible testimony, and you may believe

24 all of the testimony, you may believe none of the

25 testimony, or you may believe any portion of it which

1  you believe to be credible and worthy of belief.

2          Another way of saying this is that you are

3  the searchers of the true facts.  And after you have

4  found the true facts, then, of course, you will be

5  governed by your discovery in reaching your verdict in

6  this case.

7          Now, generally speaking, there's two types

8  of evidence from which a jury may properly find the

9  truth as to the facts of a case.  One is direct

10  evidence, such as the testimony of an eyewitness.  The

11  other is indirect or circumstantial evidence.  That is

12  the proof of a chain of circumstances pointing to the

13  existence or nonexistence of certain facts.

14          An example is -- I know we came to work this

15  morning.  I came through a shower, so I know it rained

16  over on the route that I took from Longview over here

17  this morning, avoiding I-20 since it's under

18  construction.  But it was dry when I got to Marshall.

19  Let's say when we go out here at lunch, there's water on

20  the sidewalk.  We haven't heard any thunder, but there

21  is -- it's wet.  Somebody looks around and says, well,

22  you know, there's a water hose there and there's more

23  water in the flower bed that didn't come from rain, I

24  don't believe.  You know, they were watering, and they

25  let the water run too long.  That would be sort of

1   circumstantial evidence where you could come to a
2   conclusion.
3              I just give you that as an example of a
4   chain of circumstances pointing to the existence or
5   nonexistence of certain facts.  But as a general rule
6   the law makes no distinction between direct and
7   circumstantial evidence, but it simply requires a jury
8   to find the facts in accordance with the preponderance
9   of the evidence, both direct and circumstantial.
10             Now, talk a little bit about preponderance
11  of the evidence.  I believe maybe that counsel has been
12  listening to -- or watching me before about giving
13  examples, but the burden is on the plaintiff in a civil
14  action such as this to prove every essential element of
15  his claim by a preponderance of the evidence.
16             Now, if the proof should fail to establish
17  any essential element of the plaintiff's claim by a
18  preponderance of the evidence in the case, the jury
19  should find for the defendant.  To establish by a
20  preponderance of the evidence means to prove that
21  something is more likely so than not so.  In other
22  words, a preponderance of the evidence in the case means
23  such evidence as when considered and compared with that
24  opposed to it has the more convincing force and produces
25  in your minds a belief that what is sought to be proved

1    is more likely true than not true.

2             Counsel mentioned the scales of justice as

3    they are on this statue right here in front of me, and

4    he has -- I've given this example many times to

5    visualize the preponderance of the evidence.  If at the

6    end of the case when you weigh and decide what you

7    believe and don't believe, if you believe that more

8    likely so than not that the scales are tipped every so

9    slightly in terms of the plaintiff after you have

10   weighed the evidence, that he is -- the plaintiff has

11   met their burden of proof by a preponderance of the

12   evidence because it's the greater weight.  So if the

13   scales tip ever so slightly, the plaintiff has, in fact,

14   met their burden of proof.

15            But in determining whether any fact and

16   issue has been proved by a preponderance in the case,

17   the jury may, unless otherwise instructed, consider the

18   testimony of all witnesses regardless of who may have

19   called them and all exhibits received in evidence

20   regardless who -- who may have produced them.

21            Now, statements and arguments of counsel are

22   not evidence in the case unless they're made as an

23   admission or stipulation of a fact.  When the attorneys

24   on both sides stipulate or agree to the existence of a

25   fact, the jury must, unless otherwise instructed, accept

1   the stipulation as evidence and regard that fact as

2   conclusively proved.

3           Any evidence as to which an objection is

4   sustained by the Court and any evidence ordered stricken

5   by the Court must be entirely disregarded.

6           Anything you may have heard or seen outside

7   the courtroom touching the merits of the case is not

8   evidence and must be entirely disregarded.

9           Now, you are to consider only the evidence

10  in the case, but your consideration of the evidence, in

11  that consideration, you are not limited to the bald

12  statements of what the witnesses say.  In other words,

13  you're not limited solely to what you see and hear as

14  the witnesses testify.  On the contrary, you are

15  permitted to draw from facts which have been proved such

16  reasonable inferences as seem justified in light of your

17  experience.

18          Counsel mentioned your common sense.  Your

19  collective wisdom as jurors and your collective common

20  sense is the best tool you have for resolving this case.

21  That's what separates you from the rest of the

22  participants in the case, including myself, because you

23  have your -- the collection of ten of you to apply your

24  common sense to the evidence and decide what the most

25  credible version of the facts is.  That's up to you.  So

1    whatever you do, don't leave your common sense outside

2    this courtroom.  Bring it in with you.  It's the best

3    tool you have.

4              You as jurors are the sole judges of the

5    credibility of the witnesses and the weight their

6    testimony deserves.  You should carefully scrutinize

7    all the testimony given, the circumstances under which

8    each witness has testified and every matter in

9    evidence which tends to indicate whether a witness is

10   worthy of belief.  Consider each witness's intelligence,

11   motive, and state of mind and demeanor and manner while

12   on the stand.  Consider also any relation each witness

13   might bear to either side of the case, the manner in

14   which each witness might be affected by the verdict,

15   and the extent to which, if at all, such a witness is

16   either supported or contradicted by other evidence in

17   the case.

18             Now, inconsistencies or discrepancies in the

19   testimony of different witnesses may or may not cause

20   the jury to discredit such testimony.  Two or more

21   persons witnessing an incident or transaction may see

22   or hear it differently.  And innocent misrecollection,

23   like failure of recollection, is not an uncommon

24   experience.  In weighing the effect of a discrepancy,

25   always consider whether it pertains to a matter of

1   importance or whether it's an unimportant detail and

2   whether the discrepancy results from innocent error or

3   intentional falsehood.

4           After making your own judgment, you will

5   give the testimony of each witness such credibility, if

6   any, as you may think it deserves.

7           Now, the rules of evidence ordinarily do not

8   permit witnesses to testify as to opinions or

9   conclusions.  An exception to this rule exists as to

10  those whom we call expert witnesses.  These are

11  witnesses who by reason of their education and

12  experience have become expert in some art, science,

13  profession, or calling and may state an opinion as to

14  relevant and material matter in which they profess to

15  be expert and may also state their reasons for the

16  opinion.

17          You should consider each expert opinion

18  received in evidence in this case and give it such

19  weight as you may think it deserves.  If you should

20  decide that the opinion of an expert witness is not

21  based upon sufficient education and experience or if you

22  should conclude that the reasons given in support of the

23  opinion are not sound, you may reject the opinion

24  entirely.

25          You know, it's the duty of each attorney to

1    object when the other side offers testimony or other

2    evidence which that attorney believes is not properly

3    admissible.

4          Now, upon allowing testimony or other

5    evidence to be introduced over the objection of an

6    attorney, the Court does not, unless expressly stated,

7    indicate any opinion as to the weight or the effect of

8    such evidence.  I tell you again, you, the jury, are the

9    sole judges of the credibility of the witnesses and the

10    weight and effect of the evidence.

11          Now, in the event the Court sustains an

12    objection to a -- addressed to a witness, the jury must

13    disregard the question entirely and may draw no

14    inferences from the wording of it or speculate as to

15    what the witness would have said if permitted to

16    answer.

17          It's important that you consider all the

18    evidence in the case, which means you need to be sure

19    that you don't make up your mind about this case until

20    you've heard evidence on both sides, you've heard the

21    arguments of counsel, and you've heard my final

22    instructions.

23          Judge David Folsom, who is a judge up in

24    Texarkana -- he comes down here twice a year -- he gives

25    an example that I like to use.  I didn't -- I had never

 1  used it until I heard Judge Folsom give it.  Remember
 2  that a lawsuit is something like making a pancake.
 3  There's just always two sides to it.  So just be sure
 4  you wait until we get both sides in before we make any
 5  decisions.
 6          Finally, I want to tell you that the law of
 7  the United States permits the judge to comment to the
 8  jury on the evidence in the case.  However, such
 9  comments are only expressions of the judge's opinions
10  as to the facts, and the jury may disregard these
11  comments since you, the jury, are the sole judges of the
12  facts.
13          Is the witness to be -- I mean, the rule on
14  witnesses to be invoked in this case?
15          MR. PIERCE:  Your Honor, it hasn't been
16  invoked.
17          MR. MAYER:  We would ask for it to be, Your
18  Honor.
19          THE COURT:  Okay.  Do we have any witnesses
20  other than the parties in the courtroom at this time?
21          MR. PIERCE:  We have our expert witness,
22  Mr. Madeley, in the back there.
23          THE COURT:  All right.  Well, I
24  traditionally excuse those witnesses, but no -- no
25  others?

1          MR. PIERCE:  No others, Judge.

2          THE COURT:  Okay.  Let me explain to the

3    jury what the rule is and give you some instructions

4    from the Court.

5          When we say the rule has been invoked, what

6    that simply means is that other than the parties or the

7    representatives of the parties, and I have excluded

8    experts from the application of the -- of the rule, any

9    other witness must remain outside the courtroom while

10   the case is going on until they are called to testify.

11   They cannot hear any other witness testify.

12         And the lawyers are instructed to be sure

13   that -- to explain to the witnesses that from this

14   point forward, they can only discuss their testimony

15   with the lawyer.  And the lawyer has the duty and

16   obligation, as well as the witness, to be sure that

17   they are outside of earshot of any other witness when

18   they're discussing their testimony.  The lawyers can

19   certainly talk to them, but they cannot talk to them

20   with other witnesses present.  And so they -- that's the

21   lawyer's duty to be sure that the witnesses realize

22   that.

23         All right.  Who will be the plaintiff's

24   first witness?

25         MR. SKRABANEK:  Plaintiff is going to call

1   Mr. Anthony Blackshire.

2            THE COURT:  All right.  Mr. Blackshire, come

3   up here and take the oath, please.

4            Oh, I haven't given you opening statements.

5   Sorry.  No, Mr. Blackshire, have a seat.  We've got

6   opening statements.

7            The Court's just moving them a little faster

8   than I should have.  That's the Court's fault.

9            You're going to make an opening statement,

10  Counsel?

11           MR. SKRABANEK:  Yes, Your Honor.

12           THE COURT:  From the podium, please.  I'll

13  give you a five-minute warning if you need it.

14           MR. SKRABANEK:  May it please the Court.

15           THE COURT:  Counsel.

16           MR. SKRABANEK:  Good morning.  My name is

17  Paul Skrabanek.  I'm here with Michael Pierce and

18  co-counsel, Chad Newman.  And we're proud to represent

19  Anthony Blackshire.

20           Mr. Blackshire was born just south of here

21  in Carthage, Texas.  He finished the 11th grade before

22  he went to work.  He didn't get a GED.  He has no

23  college education beyond high school.  I say this all

24  not to belittle the man but because it's going to be

25  very important in this case.

1        Ultimately, in 2002, Mr. Blackshire went to

2    work for the -- for Tyson in the Carthage facility, in

3    their Carthage facility.  He worked at a number of

4    positions as he worked his way through the company.  He

5    started out in the dump tub station, which is dumping

6    chickens onto a line.  Moved into the Marination

7    Department.  Moved his way into the Mix Department,

8    which is mixing ingredients into the chickens so they

9    can be put out to the public at large.

10        Ultimately, he was promoted to the cooler

11    area in what is called a stack off position in the

12    cooler area in 2007.  It's important to note that he

13    worked without incident up until October of 2007 when he

14    was struck by a runaway pallet jack.

15        Now, I'm going to show you kind of what

16    we've been talking about.  You've heard a lot about

17    it in voir dire, what this pallet jack looks like.

18    There we go.  It's got a couple of forks on the front

19    there, and these are motorized pallet jacks.  And how

20    they're designed to work is that you've got a handle

21    on these pallet jacks.  And here's a picture of the

22    handle.

23        And what you do is you pull the handle down,

24    and you -- it walks behind you, and you walk in front of

25    it as it moves.  And there's a little twist handle, as

1   you can see right here.  It's kind of like a motorcycle.

2   When you twist it, it moves with your motion.

3          And under ideal conditions, when you let one

4   of these handles go, it snaps back with a spring and

5   stops the pallet jack dead in its tracks.  That's how

6   it's supposed to work under ideal conditions.

7          You're going to hear testimony from

8   Mr. Blackshire that there were a number of incidents at

9   the Tyson facility involving pallet jacks before his

10  incident.  You're going to hear him talk about a

11  co-worker of his named Jose who he personally witnessed

12  being run over, his ankle and foot, with a pallet jack,

13  a runaway pallet jack.

14         You're also going to hear testimony from

15  Mr. Blackshire that he had a conversation with his

16  supervisor --

17         MR. MAYER:  Objection, Your Honor.  Calls

18  for hearsay, argumentive.

19         THE COURT:  Overruled.

20         MR. SKRABANEK:  You're also going to hear

21  from Mr. Blackshire that he had a conversation with his

22  direct supervisor, Patricia Williams, who you will meet

23  here as a witness.  And what Mr. Blackshire told her is

24  that he -- he warned her and put her on notice about

25  some problems he was having personally with pallet

1   jacks.

2           Specifically as he would move his pallet

3   jack into an area in the stack off area, he would let it

4   go.  And when you let go, it's supposed to stop, but it

5   would continue to move even after it sprang back.

6           So Tyson -- he put Tyson on notice, and what

7   you're going to hear is they did nothing.

8           In fact, back in 2007, Tyson kept

9   maintenance records for each of their pallet jacks.

10  You're not going to see a single maintenance record in

11  this case.  I have not seen a maintenance record.  Ask

12  yourself why.  It's because they conveniently

13  disappeared sometime after this accident.

14          So let me back up to the actual incident

15  itself.  It happened in October 2007.  Ms. Williams

16  comes into Mr. Blackshire that morning and says, "I need

17  you to move a pallet of chickens in -- within the cooler

18  area."  So he stacks his pallet jack full of boxes of

19  chickens, and he goes to move it, pulls the handle down,

20  and he's walking within the cooler.  He sees a co-worker

21  coming from behind him in the loading area, and what

22  he's supposed to do at that point is yield the way so

23  they can unload these trucks.

24          So what he does is he lets go of the handle.

25  It snaps back.  It stops.  Takes four or five steps back

1    from the pallet jack, looks over his right shoulder back

2    to the area where he will next be working, thinking

3    about what he's going to be doing.  His co-worker passes

4    him, and not a split second later as he's turning back,

5    over his shoulder, he sees the handle down and the

6    pallet jack coming at him.

7           It strikes him in the midsection, the handle

8    does, and it pins him up against a concrete barrier

9    that's in the hallway of this Tyson facility, bends him

10   back over the concrete barrier.  Ultimately, later down

11   the line he learns he has a fractured vertebrae.

12          He immediately reports this incident to

13   Tyson.  Goes in to see the nurse.  This is a Friday.

14   He's going to try to tough it out over the weekend.  But

15   he wakes up Saturday in so much pain, he goes to the

16   emergency room.  Ultimately, comes back to Tyson on

17   Monday and has a sit-down with the nurse medic who

18   you're going to meet.  Her name is Jessica Gatlin.

19          Ms. Gatlin presents Mr. Blackshire with a

20   prepackaged stack of documents.  It's the workplace

21   injury settlement program that Tyson has.

22          You're going to hear from Mr. Blackshire.

23   He doesn't understand a bit of what this was.  They go

24   through these documents or -- and there's some doctors

25   on these lists, and Ms. Gatlin helps him pick a doctor

1    that's on Tyson's list to go see, a doctor named

2    Dr. Nielsen.

3              Mr. Blackshire goes and sees Dr. Nielsen and

4    a set number of days later is called back into

5    Ms. Gatlin's office.  At this -- and let me back up for

6    a second.  On this first meeting, they actually filled

7    out an accident report.

8              I'm going to show you this.  This was filled

9    out, and it talks about Mr. Blackshire's incident

10   itself.  You're going to hear from Ms. Gatlin that she

11   actually -- that her handwriting is actually found 1, 2,

12   and No. 3, those words written in there by her.  And

13   you're going to hear her testify that the reason that

14   she had to write these words in here is because she

15   thought that Mr. Blackshire did not understand what this

16   form meant.  Something so basic as, No. 2, "Describe

17   what you were doing when the accident happened."  Did

18   not think he could understand that, so had to help him

19   fill it out.  That happens on the first meeting with him

20   and Ms. Gatlin.

21             When he's called back the next time, he's

22   presented with another stack of papers, and this is

23   called a waiver form.

24             Now, you're going to hear Tyson's lawyer get

25   up here and talk about this waiver form and say

 1   Mr. Blackshire signed it, and therefore he has no right

 2   to come into court today and talk to you folks and have

 3   you decide his case.

 4            What you're going to hear from Mr. -- what

 5   you're going to have to answer at the end of the day,

 6   though, is, one, did he voluntarily sign it?  Two, did

 7   he sign it with knowledge of what that document did to

 8   his legal rights?

 9            You're going to hear from him that they

10   said -- that Tyson, Ms. Gatlin, other folks at Tyson

11   told him, "If you do not sign this document, you will

12   not be able to see a doctor under our plan."

13            So the first question you've got, did he

14   sign it voluntarily?  Did he sign it voluntarily knowing

15   that they were hanging his medical care over his head at

16   that point?  You're going to hear that he did not

17   understand this document when they presented it to him.

18   As you can see, it's full of legal jargon.

19            And what I submit to you is it is not going

20   to make a whole lot of sense at the end of the day.  On

21   the one hand, they're going to tell you -- their own

22   witness, Ms. Gatlin, is going to tell you that

23   Mr. Blackshire couldn't even understand how to fill in

24   the part about, "Describe how your accident happened,"

25   but on the other hand, Tyson is going to tell you

1   crystal clear understood what all of this legal jargon

2   says in this waiver.

3          Mr. Blackshire and Tyson ultimately parted

4   ways.  And he went a number of months without being able

5   to see a doctor because he could not afford it on his

6   own.  Ultimately, he ended up seeing a doctor who you

7   will meet here today, Dr. Kenneth Lee.  Dr. Lee put

8   Mr. Blackshire through a conservative course of

9   treatment which included physical therapy and steroid

10  injections into his back.  And you will hear a lot about

11  his care through Dr. Lee -- from Dr. Lee.

12         As you sit here, I'd ask that you consider

13  two things -- keep two things in mind, actually.  One,

14  when Tyson gets up here and says, "You can't show there

15  was anything wrong with the pallet jack," ask yourself

16  where are these records.  Where are the maintenance

17  records?

18         MR. MAYER:  Objection, Your Honor.  That

19  violates the motion in limine.

20         THE COURT:  Well, let's move on.  I'll take

21  that up outside the presence of the jury.

22         MR. SKRABANEK:  Second, I'd like you to

23  think about the circumstances under which that waiver

24  was signed, while his medical care was hung over his

25  head, when he didn't understand these legal documents.

1               I thank you for your time, and I look

2       forward to presenting this case to you.

3               THE COURT:  All right.  From the defendant?

4               MR. MAYER:  Yes, Your Honor.  May it please

5       the Court.  Counsel.

6               Ladies and gentlemen of the jury,

7       Mr. Worthington introduced me awhile ago.  My name is

8       Zach Mayer, and I have the privilege of representing

9       Tyson and the Carthage plant who is being represented

10      here today by Ms. Vicki Amy.  On behalf of the Tyson

11      Carthage plant, I want to thank each of you for your

12      time as a juror on this case.

13              The Judge referenced the fact that other

14      than serving in the military, serving on the jury might

15      be the greatest civic duty.  I believe that

16      wholeheartedly.  It is -- it is the basis of our

17      judicial system.  None of us likely will have the honor

18      of being called by the President to give our advice on

19      something.  None of us want to be called by Congress to

20      testify.  We're seeing how that -- that shakes out for

21      people.  But this Court has called each of you to serve

22      on this case, and for that, I thank you and Tyson thanks

23      you.

24              Now, this case is about two simple rules.

25      First, accepting responsibility for your own actions.

1  Second, and the most important, is living up to a

2  promise.

3        Mr. Worthington in voir dire talked to you

4  about how we raise our children.  I have two young

5  girls, and I always try to instill basic principles.  I

6  think if it's basic, they're going to understand it.

7  And that's what this case is about.  It's about, No. 1,

8  applying basic principles, but then most importantly,

9  like the Honorable Court said, using your common sense.

10        I think that in this case, that might be the

11  greatest evidence is that is common sense.  If you use

12  that tool when you're judging the credibility of the

13  witnesses and you're judging the credibility of the

14  testimony, in the end, your own common sense will lead

15  you to the decision that, number one, there was

16  certainly nothing wrong with that pallet jack that day.

17  That, number two, Tyson did not act negligent, that they

18  were certainly reasonable.  And then lastly, that

19  Mr. Blackshire, when he was employed by Tyson, promised

20  he would not sue them if he accepted benefits.

21        Now, we'll get all that -- into it -- into

22  it in a second.  But first what I want to talk to you

23  about is Mr. Blackshire's employment with Tyson.  You

24  heard that he was employed at the Carthage -- our

25  Carthage plant on three different occasions.  He had

1    several different jobs while he worked for Tyson.  But

2    during those jobs, he was a pallet jack operator.  That

3    was part of his job.  And in order for Tyson to allow

4    him to do that job, he had to complete a certification.

5            Now, it was -- it was interesting during

6    voir dire, several people raised their hands that said,

7    "Yes, I had -- I had operated pallet jacks in the past,"

8    but I believe only one person, Mr. Reed, it was, from

9    Wal-Mart, said that he was actually certified.  He

10   described for you that certification process, and it is

11   the same type of certification that Tyson requires.

12           They made sure that Mr. Blackshire watched a

13   video on how to operate that pallet jack.  They also

14   made sure that he sat through a classroom training and

15   he took a test.  Part of that classroom training was

16   obviously in writing.  That test was in writing, as

17   well.  He passed the test, but it didn't stop there.

18           The next thing is he had to go out on the

19   floor and with his supervisor, Patricia Williams, he had

20   to operate the pallet jack and prove to Tyson that he

21   could do it safely.  Well, Mr. Blackshire proved that he

22   could operate the pallet jack safely, and you'll find

23   out in the testimony that part of his job

24   responsibilities was, in fact, operating a pallet jack.

25           But Tyson didn't stop there.  You can

1    imagine these hand-held pallet jacks, they are no cheap

2    investment on the part of the company.  So when

3    something as important as a pallet jack that they have

4    on the floor, they make sure that they maintain it.

5            You're going to hear from Mr. Howard, who is

6    the manager -- the maintenance manager at Tyson, and

7    what he's going to talk to you about is how they

8    maintain it.  We'll talk about it more in a second.  But

9    remember that not only just like Wal-Mart, Tyson also

10   requires the operator, the person in charge of the

11   pallet jack, before they even move that -- that

12   machinery, to make sure that it's operating properly,

13   first and foremost.  Then there's also weekly, monthly,

14   and quarterly servicing.

15           What the testimony from the Tyson employees

16   in this case is going to show, they had a maintenance

17   program in place and never once was any issue raised

18   about a runaway or accelerating pallet jack.

19           So let's talk about the facts in the case,

20   the credible facts, the convincing facts.  First of all,

21   on October 26, 2007, Mr. Blackshire shows up for work.

22   When he does, he learns that the scheduled pallet jack

23   operator had called in sick.  So Ms. Williams, his

24   supervisor, came to Mr. Blackshire and said, "We need

25   you to fill in as the pallet jack operator that day."

1          Mr. Blackshire did not raise any concern,

2     any complaint, or any issue about operating that pallet

3     jack that morning.  Shift starts at about 6:00 a.m.

4     Ms. Williams, knowing that Mr. -- Mr. Blackshire had

5     operated the pallet jack in the past, was comfortable

6     with him being out on the floor.

7          Around midday -- and this is important --

8     around midday, Mr. Blackshire came to Ms. Williams and

9     reported to her that as he was operating the pallet

10     jack, he pinned himself against the pole.  That's what

11     he told Ms. Williams, that he pinned himself against the

12     pole.  Well, Ms. Williams, because she was the

13     supervisor, learning that there was something that

14     occurred, said, "You need to go see the nurse,

15     Ms. Gatlin."  She's the plant nurse, and she will also

16     testify, that when Mr. Blackshire came into his

17     office -- or her office, he said to her, "Ma'am, I was

18     operating the pallet jack, and I pinned myself against

19     the pole."  Nothing about a runaway jack, nothing about

20     an accelerating jack, and certainly nothing about a

21     malfunctioning jack.

22          What's interesting is the first time that

23     anyone from Tyson ever heard anything about the runaway

24     jack was when Mr. Blackshire hired a lawyer and sued

25     Tyson in this Court.  That was the first time Tyson ever

1   figured out that Mr. Blackshire was alleging somehow

2   some way that the jack accelerated towards him and

3   pinned him on its own.

4           So let's -- let's talk about these jacks for

5   a second and how Tyson gets them.  First of all, they

6   buy them new from the manufacturer, Crown, every three

7   years.  So they replace the jacks consistently every

8   three years, whether they need it or not, just to make

9   sure they've got new jacks on the floor.

10          Secondly, Larry Howard, he is the man in

11  charge of maintenance at Tyson.  What he will testify

12  is, number one, we stress to our employees who are

13  operating any piece of machinery, but especially pallet

14  jacks, to properly inspect it before they ever start

15  operating that day.  And if they find anything out, just

16  like Mr. Reed said, Lockout/Tagout, don't use that

17  machinery.  Mr. Howard is going to say, if -- if anyone

18  had brought a problem to his attention, he would have

19  made sure that that pallet jack was not being operated.

20  But no one did.

21          Secondly, he's going to say, "My crew -- my

22  maintenance crew makes it a point to do a weekly and a

23  monthly inspection of the pallet jacks to make sure

24  there's nothing wrong with them."  Then they do a

25  quarterly servicing of the pallet jacks.  And at that

1   time, they actually pull it out of service.  They check

2   the fluids.  They check the battery.  They check the

3   wheels, make sure that that breaking device that we were

4   just talking about, that it's operating properly.  And

5   Mr. Howard will say that there are at least four safety

6   devices that would have had to have failed for

7   Mr. Blackshire's version of the incident to be true.

8          He'll also say that he's never heard of any

9   of those four mechanisms failing and having a pallet

10  jack run out of control into an employee.  It's never

11  reported.  Mr. Howard says that that is virtually

12  impossible, based upon his involvement with the pallet

13  jacks at Tyson.

14         So let's go back to Mr. Blackshire's injury.

15  He reported the injury on October 26th.  At that point

16  in time, he completed his shift and he left for the day.

17  He didn't come back to work for a few more days, and

18  actually started on November 1st.  When he came back to

19  work on November 1st, he reported the injury to

20  Ms. Gatlin again.  He said, "While I was on the job, I

21  was injured."

22         Now, there was some discussion during voir

23  dire about a nonsubscriber.  And I think we need to

24  explain in a little bit more detail what that means.

25  Basically, Tyson, on their own, said that "We are going

1    to provide our employees with a work injury settlement

2    program."  It's similar to the Texas Workers' Comp

3    program, but it's actually better.  What you're going to

4    hear is that the benefits that Tyson provides to their

5    employees, number one, is higher than the State program.

6    They get a larger percentage of their lost wages.  And,

7    number two, that the benefits kick in earlier than what

8    the Texas Workers' Comp program does.

9            So Tyson takes it upon themselves to manage

10    their own program, but also provides their employees

11    with greater protection.  And you will find that in

12    exchange for accepting these benefits, for getting your

13    lost wages paid and your medical benefits paid, that the

14    employee has to live up to one promise.  And that is

15    after accepting the benefits, they won't turn around and

16    sue Tyson.  Can't have it both ways.  You can't accept

17    the benefits, have Tyson pay for the medicals, and then

18    turn around and sue them.

19            Now, I understand that according to the

20    plaintiff's contention in this case is that this waiver

21    is somewhat confusing.  And what I'd like to do is look

22    at one section of that waiver.  In the middle of the

23    document it says:  "I understand that I must accept the

24    rules and conditions of the program and waive my right

25    to sue the company."

1              That was the promise that Mr. Blackshire is

2    saying was confusing.  That was the promise that he

3    broke when he first brought this lawsuit and for the

4    first time alleged this runaway pallet jack.

5              You see, what's also important is that as of

6    that November 1st date, Mr. Blackshire went to see a

7    couple of different doctors.  One of the doctors was

8    through the East Texas Medical Center, and they treated

9    him for a hairline fracture in his vertebrae.  How did

10   they treat it?  They gave him some pain medication.

11   They gave him some physical therapy, and he's going to

12   say all that treatment helped, that was -- it was

13   helpful, and Tyson paid for all of it.  They paid for

14   every dollar of that medical care, even though Tyson did

15   not believe they did anything wrong or anything to cause

16   his injuries.  Because they had this program in place,

17   it was their deal, if you accept the benefits, it

18   doesn't matter whether we believe we're responsible for

19   the incident or not, we're going to pay for it.  But you

20   have to live up to your promise and then not turn around

21   and sue.

22             So when you're listening to the credible

23   evidence in this case, what you're going to find is for

24   three months after this incident, Tyson paid for his

25   medical benefits.  At that time, the physical therapy

1   was working.  What Tyson is not willing to pay for in

2   this case is a doctor that's been hired by the

3   plaintiff's attorneys who is currently treating

4   Mr. Blackshire some two, almost three years after the

5   incident.

6           Here's what's remarkable is that when he was

7   injured after the incident, he had that hairline

8   fracture.  Well, like most fractures or sprains, it

9   heals.  And what the doctor is going to say is he's no

10   longer treating him for a hairline fracture.  That has

11   gone away.  After that three months of treatment, it's

12   over.  He's now treating him for something new, a

13   different problem, a disk bulge.  A disk bulge that was

14   not referenced in any of the medical records for those

15   three months.  He went through a CT scan.  He went

16   through an X-ray.  No one said anything about a disk

17   bulge.  But now, three years after the injury, it is

18   that that Mr. -- that Dr. Lee is treating him for.

19           Tyson is simply saying that is not in any

20   way related to the incident.  And since Mr. Blackshire

21   accepted those benefits, he doesn't have the right to

22   sue.

23           Another element that they're going to talk

24   about in this case is future medical expenses.  Now, we

25   all can agree that what -- what's going to happen in the

1    future, none of us know.  And -- and the Court doesn't

2    allow a doctor to come in and talk about possibilities

3    or what might be expected.  They have to talk about

4    probabilities, that which probably will occur, and it

5    takes a doctor to say, "Based on reasonable medical

6    probability, that this future care will occur."

7            So I want you to listen to that evidence,

8    scrutinize that evidence, and find out if it is

9    convincing about his future medical care some three

10   months -- three years after the incident for a

11   completely different problem.

12           We talked about the burden of proof, and I'm

13   going to be the third or fourth person who's talked

14   about it.  Obviously, the burden is on the plaintiffs to

15   prove their case.  That burden is real.  The Court

16   referenced it, the plaintiffs have referenced it, and we

17   have referenced it.

18           They talked about the scales of justice, but

19   what's really important is that as the defendant in this

20   case, we don't have a burden.  Anyone can file a

21   lawsuit.  So we don't have to prove our case, but we

22   will.  We will prove our case by convincing evidence

23   that those simple rules that I talked about in the

24   beginning, living up to your own responsibilities and

25   making sure that you live up to a promise, those simple

1    rules will be proven in this case by the defense.

2         What we will show is that Mr. Blackshire did

3    indeed waive his right to sue.  We will also show that

4    Tyson had a training program that was in place that made

5    Mr. Blackshire a certified pallet jack operator.  They

6    had a maintenance program in place that took care of

7    these pallet jacks, that they had no knowledge of any

8    prior -- prior incidents with this pallet jack, and they

9    were certainly reasonable as an employer for

10   Mr. Blackshire.

11        In the end, that's what the credible

12   evidence will show.  Again, on behalf of Tyson, we

13   certainly thank you for your time.  We look forward to

14   working with you in this case.

15        THE COURT:  Thank you, Counsel.

16        All right.  Ladies and gentlemen, we're

17   moving along a little quicker.  I guess they thought I

18   wasn't going to give them an opening statement.  They

19   decided they'd use their time wisely.

20        We'll go ahead and take our lunch break.

21   Come back at five after the hour -- five after 1:00

22   o'clock, and we'll -- we'll start hearing the evidence

23   in this case.

24        Now, it's very important to not discuss the

25   case among yourselves.  Of course, right now you've

1    heard no evidence, but you shouldn't be speculating

2    about what the case is about or anything.  Just don't

3    discuss the case during these breaks at all.  And if

4    you'll do that, have a nice lunch, and I'll see you back

5    at five after the hour.  You may leave the courtroom at

6    this time.

7              LAW CLERK:  All rise for the jury.

8              THE COURT:  Right out this way, ladies and

9    gentlemen.  This door should be unlocked.  Let's hope it

10   is.

11             (Jury out.)

12             THE COURT:  All right.  Everyone please be

13   seated.

14             All right.  Now, Counsel, we agreed to our

15   motion in limine, and we went over this at pretrial.

16   You're bumping up against it awful -- are there -- are

17   there or are there not maintenance records?  What are we

18   talking about?

19             MR. SKRABANEK:  Your Honor, you'll hear

20   testimony from Larry Howard, their maintenance guy, that

21   they kept maintenance records and then they changed the

22   system, and they disposed of those records, the paper

23   records afterwards.  So that's all I was referring to.

24             THE COURT:  Well, you need to -- you know,

25   all I asked you to do is make sure you approach, and so

1   all you're -- what you're arguing is that they -- it's

2   not they haven't produced them, you're just saying

3   they're not in existence at this time?

4           MR. SKRABANEK:  Disposed of, yes, Your

5   Honor.

6           MR. PIERCE:  And, Judge, I don't want to

7   interrupt Mr. Skrabanek, but we're not -- we're not

8   claiming they spoliated these documents.  We're not --

9           THE COURT:  I understand that, but I'm not

10  going to give you any further instructions at this time,

11  but I'm telling you, you need to be real careful about

12  getting into something that's covered.  You know, it

13  would be hard to say that at this stage, that you hadn't

14  indicated that they had failed to do something, at least

15  that was the in -- certainly the indirect comment.

16          And you don't want me talking to this jury

17  in this case about your conduct and failing to comply

18  with my order.  So all I ask you to do at the pretrial

19  is -- is approach the bench if you want to go into

20  something.

21          Anything from the defendant at this stage?

22          MR. WORTHINGTON:  Your Honor, I mean, I

23  think the Court's made the point, but I recall Counsel

24  saying the records had conveniently disappeared, and

25  that's pretty close --

```
 1              THE COURT:  Well --

 2              MR. WORTHINGTON:  -- to spoliation.

 3              THE COURT:  Well, there's not a claim of

 4    spoliation, but they're not here.  That's argumentative

 5    at best.  I'm not saying they couldn't say that in

 6    closing statement.  We'll take that up, but we don't

 7    want to hear anymore of it.

 8              MR. SKRABANEK:  I apologize, Your Honor.

 9              THE COURT:  That's -- you just -- you know,

10    y'all agreed to all these motions in limine.  I didn't

11    even know this was on the radar, because when he said he

12    violated the motion in limine, I -- I couldn't remember

13    that coming up at pretrial, so I read it.  But you got

14    about three paragraphs you might be violating by that

15    comment.

16              And, Ms. Johnson, I guess you need to

17    explain to them how serious they're about to get into

18    trouble here.

19              MS. JOHNSON:  Yes, sir, I can do that.

20              THE COURT:  She's heard this -- she's seen

21    this where -- she's seen this where, you know, it starts

22    getting red right here, and it comes right up.  You

23    don't want that, I promise.  I'll see you at five after.

24              MR. SKRABANEK:  Yes, Your Honor.

25              THE COURT:  Okay.  I'll see you at five
```

1    after.

2              LAW CLERK:  All rise.

3              (Recess.)

4              (Jury out.)

5              LAW CLERK:  All rise.

6              THE COURT:  Please be seated.

7              We've got something about the exhibits now?

8              MR. SKRABANEK:  Your Honor, I would just

9    like to get a ruling on the record about the plaintiff's

10   exhibits, getting them pre-admitted before we started.

11   We've met and conferred and gone over the numbers, and

12   I'd like at this time to offer Plaintiff's 1, 3, 5, 6,

13   8, 9, 11, 12, 14, 18, 19, and 20.

14             THE COURT:  Any objection to those?

15             MR. MAYER:  No objection, Your Honor.

16             THE COURT:  All right.  Those are received

17   into evidence.

18             Have y'all got a list on the defendants yet

19   or --

20             MR. MAYER:  We re-submitted an agreed list,

21   as well.

22             THE COURT:  All right.  Those are -- you

23   agree to those on the defendant's list?

24             MR. SKRABANEK:  Yes, Your Honor.

25             THE COURT:  All right.  They're -- they're

1   received into evidence.

2           Let's bring in the jury, please.

3           LAW CLERK:  All rise for the jury.

4           (Jury in.)

5           THE COURT:  All right.  Jury be seated.

6           All right.  Counsel, y'all be seated.

7           And Mr. Blackshire is your first witness?

8           MR. SKRABANEK:  Correct, Your Honor.

9           THE COURT:  All right.  Come around, sir.

10  Right here -- no, right here, right by Ms. Andrews.

11          (Witness sworn.)

12                  ANTHONY BLACKSHIRE,

13  Having first been duly sworn, testified as follows:

14                  DIRECT EXAMINATION

15  BY MR. SKRABANEK:

16      Q.  Will you go ahead and introduce yourself to the

17  jury?

18      A.  My name is Anthony Blackshire.

19      Q.  Mr. Blackshire, where were you born?

20      A.  Carthage, Texas.

21      Q.  And where did you grow up at?

22      A.  Dallas, Texas.

23      Q.  Where did you go to high school at in Dallas?

24      A.  W. H. Adamson.

25      Q.  Did you do any school activities there?

```
 1      A.  I played football there.

 2      Q.  What position did you play?

 3      A.  Middle linebacker.

 4      Q.  Now, how far did you go in school,

 5  Mr. Blackshire?

 6      A.  Eleventh grade.

 7      Q.  What kind of grades did you get when you were in

 8  school?

 9      A.  Cs and Bs mostly.

10      Q.  Did you ever go back and get your GED?

11      A.  No, sir.

12      Q.  Why not?

13      A.  I was working most of the time.

14          THE COURT:  Mr. Blackshire, you need to get

15  a little closer to the microphone a little bit.  That's

16  good.

17      Q.  (By Mr. Skrabanek)  Why don't we try that last

18  one again?  Why didn't you get your GED?

19      A.  I was working, and most of the time I was

20  planning on going back and getting the GED.

21      Q.  Have you ever done any type of college?

22      A.  No, sir.

23      Q.  Do you like to read at all?

24      A.  No, sir.

25      Q.  Do you read the newspaper at all?
```

1     A.  No, sir.

2     Q.  When did you start with Tyson?

3     A.  2002.

4     Q.  And what position did you start in with Tyson?

5     A.  Stacking off chickens.

6     Q.  Just tell the jury a little bit what that -- what

7  that's about.

8     A.  You get the product -- the chicken -- whole bird

9  product comes down in a tub, about 60, 70 pounds, you

10  stack it up on a skid, put it on a pallet, and you stack

11  it about five high.  It would be 25 on a skid.

12     Q.  Did you move departments within Tyson?

13     A.  Yes, sir.

14     Q.  What was your -- what was your next department at

15  Tyson?

16     A.  I -- I -- I went to marination.

17     Q.  Tell the jury a little bit about what marination

18  does.

19     A.  They do process chickens -- the same thing in a

20  box, and it mostly be in the tub and the box.  They

21  process it into the box to get ready to go to the -- to

22  a -- to the company who pay for the chicken.  You

23  process it.

24     Q.  Did you move to another department after

25  marination?

```
 1      A.  I have got a promotion to mix man.

 2      Q.  What year was that?

 3      A.  Say 2004.

 4      Q.  Okay.  What did you do as a mix man?

 5      A.  Made sure all the ingredients be -- cold

 6   temperature within the chicken, like we put lemon

 7   pepper, onion pepper, or stuff like that and take care

 8   of your paperwork and make sure -- you document all your

 9   chemicals that you put in the paperwork.

10      Q.  How long did you stay as a mix man?

11      A.  I done it for a year.

12      Q.  And then where did you go?

13      A.  I got a promotion to the deep freezer.

14      Q.  And what were you doing in the deep freezer?

15      A.  My job was clicking -- was to back off the -- the

16   product coming off the line, the chicken off the line

17   into another plastic skid to go on the truck.

18      Q.  Let's talk a little bit about pallet jacks,

19   Mr. Blackshire.  Can you tell the jury what a pallet

20   jack is?

21      A.  It's an instrument to move all the heavy loads

22   around when a person can't pick it up.  It's too heavy

23   for a person to pick it up because you have a lot of

24   weight on it -- on the skid.

25      Q.  Do you see the screen?
```

1       A.  Yes, sir.

2       Q.  Is -- what's on the screen up there, does that

3   look like what a pallet jack is?

4       A.  Yes, sir.

5       Q.  Does that look like the pallet jacks you used at

6   Tyson?

7       A.  Yes, sir.

8       Q.  Tell the jury a little bit about how you operate

9   one of those pallet jacks.

10       A.  To operate the pallet jack, you have to control

11   it by the handle up in the front right there.  You got

12   to throttle it.  You got to move the -- like a

13   motorcycle, varoom, varoom, and you got to throttle it.

14   And you can go forward, or you can move the throttle

15   back and go backwards.  You operate -- you control the

16   whole jack with the handle in front of you there.

17       Q.  Does this look like a picture, as well?

18       A.  Yes, sir.

19       Q.  Let me just show you -- this is a close-up

20   picture of the handle.

21       A.  Yes, sir.

22       Q.  Tell the jury how -- explain to them how this

23   handle works and how you move the pallet jack with it.

24       A.  The two bar -- like the grip right there on right

25   and left side, the grip, that's what make the jack go

1   forward.  When you twist the grip going backwards, it

2   will make the jack go backwards.  The handle would make

3   it turn right and left at -- when you did it like this,

4   it will go right or go left with you.

5       Q.  How do you walk with the pallet jack as you're

6   moving it?

7       A.  In front of the pallet jack.

8       Q.  Well, when you say in front of it, you see the

9   fellow pictured in this?

10      A.  Correct.

11      Q.  Is that what you're calling in front of it?

12      A.  He's backing up.

13      Q.  Okay.  You don't push the pallet jack forward,

14  though, do you?

15      A.  No.

16      Q.  You pull it and you walk along with it?

17      A.  Correct.

18      Q.  Did you have any training at Tyson with respect

19  to operating pallet jacks?

20      A.  Yes, sir.

21      Q.  Can you tell the jury a little bit about that

22  training?

23      A.  I went to see a film, and I passed a written test

24  on the film -- on the film we studied, and that was

25  about it.

1    Q.  Do you remember how long that film last?

2    A.  About an hour and 15 minutes at the most.

3    Q.  Did you say you took a test?

4    A.  Yes, sir.

5    Q.  How did you do on the test?

6    A.  Done pretty high on the test.

7    Q.  Did you ever have any of your supervisors come

8    and tell you that there was any problem with the way you

9    were operating pallet jacks in the past?

10   A.  No, sir.

11   Q.  Now, in the area where you were working -- and

12   you called it the cooler?

13   A.  Yeah, the cooler.

14   Q.  Am I understanding that right?

15   A.  Yes, sir.

16   Q.  What -- how big is this cooler?

17   A.  About as big as this courtroom.

18   Q.  And what's stored in that cooler?

19   A.  Live chickens and shipped -- the chicken getting

20   ready to get shipped out.

21   Q.  When you say "live chickens," they're not alive?

22   A.  They whole bird chickens.  They ain't live.  They

23   already been cleaned and everything, processed.

24   Q.  About how many folks work in that department with

25   you?

1    A.  I say about five.

2    Q.  How many pallet jacks are assigned to your cooler

3  area in that department?

4    A.  One.

5    Q.  Now, let me go back to talking about how to

6  operate this pallet jack a little more.  How do you

7  understand that you go about stopping a pallet jack, one

8  of these motorized pallet jacks?

9    A.  You let the handle up and -- you know, lock

10 itself up, and it will cut the power jack off.  It will

11 stop, completely stop.

12   Q.  Do you have to physically push the handle back up

13 in place?

14   A.  Yes, you do, or it will snap up by itself.  When

15 you let the handle go, it will snap automatic up.

16   Q.  Is there some type of spring in there that

17 springs it back?

18   A.  Yeah.  Yes, sir.

19   Q.  And once that handle springs back up, what

20 happens?

21   A.  It will cut the machine off.

22   Q.  Is there any neutral position on the pallet jack?

23   A.  No, sir.

24   Q.  Is there any key on the pallet jack when you

25 normally operate it?

1    A.  There's a key.  The key never in there.

2    Q.  Why not?

3    A.  When they cut the jack on, somebody take the key

4    out the jack.  I don't know who done that, who -- who do

5    that.

6    Q.  Did you personally witness one of your co-workers

7    being injured with the pallet jack -- a pallet jack?

8    A.  Yes, I did.

9    Q.  Can you tell us who that co-worker was?

10    A.  Jose.

11    Q.  Can you tell me when that was?

12    A.  It was in 2007 before I did.

13    Q.  Can you tell me what happened to Jose from what

14    you saw?

15    A.  He was putting the chicken up off the skid, and

16    he got between the -- the other pallet -- between two

17    pallets.  He was pulling it in, and he was on his way

18    out.  When he got out, the jack hit him, pushed him

19    against the other skid, and the jack ran over his foot,

20    and it messed up his ankle.

21    Q.  Do you know if that got reported at Tyson?

22    A.  Yeah, he reported it.

23    Q.  Do you know -- have any idea what happened with

24    him reporting that?

25    A.  I know he eventually went to the doctor.  He was

1   on light duty.

2      Q.  Did you -- did you ever personally have

3   conversations with your supervisors about problems with

4   pallet jacks?

5      A.  Correct, I did.

6      Q.  Can you tell me who you had a conversation with?

7      A.  Patricia William.

8      Q.  And can you tell me when that was in relation to

9   your incident we're here to talk about?

10      A.  Oh, couple weeks before I got hurt.

11      Q.  And what did you tell Ms. Williams?

12      A.  The jack didn't want to stop.  It want to keep

13   going.  It kept -- keep going and was hitting against

14   the line and slamming the chickens and stuff against the

15   wall and knocking all the chickens on the floor.

16      Q.  What part of the facility was that in?

17      A.  The freezer, from my reconsation (sic).

18      Q.  Was -- were you -- at the time, were you using

19   the same pallet jack --

20      A.  Correct.

21      Q.  -- that's assigned to the freezer area?

22      A.  Correct.

23      Q.  Can you describe what the pallet jack was

24   actually doing for the jury when you -- and what you

25   told Ms. Williams the pallet jack was doing?

1    A.  When you -- when you go up to get the skid for

2    the chicken, about 25 tubs on the skid, it's kind of

3    heavy.  When you go get it and pick it up with a fork,

4    still it's coming back toward you, it keep going and

5    pushing up.  It keep pushing up that line belt against

6    the wall and knock the chicken on the floor.

7    Q.  What --

8    A.  It wouldn't ever stop.

9    Q.  What did Ms. Williams tell you when you told her

10   about this?

11   A.  She wrote it up.

12   Q.  Do you know what happened after that?

13   A.  No.  She said she was going to take care of it.

14   She put it in a work pad, and she was doing -- she have

15   a pad where you explain, she'll write it down the

16   proceeding of that day.  She'll check on it later on

17   that day.  I don't know what happened at that time.

18   Q.  Do you know whether she ever checked up on it?

19   A.  No, I don't.

20   Q.  Had you heard about any other employees being

21   injured while operating pallet jacks at the Tyson

22   facility?

23           MR. MAYER:  Objection, Your Honor, calls for

24   hearsay.

25           THE COURT:  Sustained.

1      Q.  (By Mr. Skrabanek)  What day did your incident

2   occur, Mr. Blackshire?

3      A.  The 10th, the 26th of 2007.

4      Q.  October 26th; is that what you were saying?

5      A.  Yes, sir.

6      Q.  Tell me about what happened that morning when you

7   started to work.

8      A.  Well, I went to work.  My job was to sign -- my

9   job -- my regular job was stack off the freezer.  I went

10  to -- worked all the way up to about second break.

11          Patricia came in, told me -- Jose was

12  already on doctor release.  She didn't have nobody to

13  operate the jack.  She wanted me on the jack.  I said,

14  "Why?  This is my job.  I bid for this.  This is what I

15  supposed to do."

16          She said, "If you don't get on the jack at

17  the time that you -- you ain't following my order, and

18  I'm going to have to write you up for disciplinary

19  action on that."

20          And then I had to do -- use the jack because

21  I didn't want get fired or whatever she was going to do

22  to me.

23      Q.  Was the reason that you were having to operate

24  the jack because Jose wasn't there?

25      A.  Jose was there.

1      Q.  Was or wasn't there?

2      A.  He was.

3      Q.  Okay.  Why wasn't Jose operating the pallet jack?

4      A.  He was hurt.

5      Q.  Was -- had he been -- do you know if he had been

6      restricted from operating it at that point?

7      A.  He was on light duty.

8      Q.  So when Ms. Williams comes and tells you about

9      moving the chicken, what do you do?

10      A.  I start moving the chickens, doing my job I had

11      to do that day.

12      Q.  Was the pallet jack empty, or was it full of

13      chickens at the point you started?

14      A.  It was empty.

15      Q.  So what did you do?

16      A.  Loaded -- load my -- get the -- the skid that I

17      have to load to move.  I picked the skid up that I need

18      to move the pallet.  I need to move it immediately for

19      the line to keep going, put it back -- back in the back,

20      though I had a co-worker coming out.

21      Q.  Okay.  Any problem with the way you loaded up the

22      chicken?

23      A.  No.

24      Q.  And did you pull the handle down to begin moving

25      the pallet jack?

1      A.  Yeah, correct.

2      Q.  And you said something about a co-worker?

3      A.  Yeah, it was a co-worker coming in.  When I got

4  my load, he was coming out with a load to load on the

5  truck getting ready to get shipped out.

6      Q.  What are you supposed to do when you see a

7  co-worker unloading a truck?

8      A.  Give him the right-of-way.

9      Q.  Do you remember what co-worker that was?

10      A.  No, I don't remember his name.  He worked in the

11  freezer department.  The back dock -- he worked on the

12  back dock.

13      Q.  Can you kind of describe this area that you're in

14  for the jury where he would be passing you?

15      A.  It was in the room -- it's -- it's -- the freezer

16  is about the size of this court, and I'm in the back of

17  the corner of the court and the chicken is against that

18  wall.  And you got a little line to come out -- I have a

19  line to put a chicken in order like 50s.  He's coming

20  out.  I stop.  When I stop, I let go of the handle of

21  the -- the chicken set the handle up, and I had to let

22  him through.  I had to stop the jack to let him through.

23      Q.  Okay.  So when you stopped the jack, did you let

24  go of the handle?

25      A.  Yes, I did.

1    Q.  What happened to the handle after you let go?

2    A.  It's locked.  It stayed there for a minute, and

3    then I had to look back and see what I had to do for my

4    next load, where it go, like I got 62 --

5    Q.  Okay.  Hold on, Mr. Blackshire.  We're going to

6    get there.

7              But when you let the handle go, did it pop

8    back up or did it stay where it was?

9    A.  It went up.

10   Q.  Did the pallet jack stop, or did it continue to

11   move?

12   A.  It stopped.

13   Q.  And how many -- did you step away from the pallet

14   jack controls at that point?

15   A.  Yes.

16   Q.  About how -- how far away?

17   A.  Four or five feet.

18   Q.  And what did you do next?

19   A.  Looked to my right.

20   Q.  And why did you do that?

21   A.  I have to look on my line to see where I get --

22   the next chicken I got to get off the line for it

23   won't -- for it won't -- they can keep stacking on the

24   line.

25   Q.  Did your co-worker ultimately pass you?

       1      A.   Yeah, he passed me.

       2      Q.   What's the next thing you remember happening?

       3      A.   When I looked over -- when I get hit, I turned

       4   back around, the jack, it was coming full speed.  And

       5   when I looked back, it got me.  And the co-worker that

       6   just passed me, he didn't get to make it through those

       7   two doors right there.  He stopped and get the jack off

       8   of me.

       9      Q.   What position was the handle in when you turned

      10   your head back and saw the jack coming at you?

      11      A.   Down.

      12      Q.   Do you have any idea how it got down?

      13      A.   No, sir.

      14      Q.   Describe for the jury how the jack struck you.

      15      A.   Right in the front -- it struck me in the front

      16   of my -- where my hip bone at.  And all the chicken that

      17   I had on it came with it, and it bent me on a big beam

      18   up in the ceiling against this concrete pole.  It

      19   slapped me down and all that pressure was on me.

      20      Q.   Tell us where -- what the barrier looks like.  Is

      21   it -- is it between poles in the hallway?

      22      A.   The barrier was straight up to the ceiling.  It's

      23   a beam.  And it cut off right there like that, and it's

      24   concrete.  It was like that.  It was concrete in the

      25   beam.  It bent me between the beam and the concrete.  I

     1    was laying on top of the beam with all that -- with all
     2    that weight on me.
     3        Q.  So where was your lower body versus your upper
     4    body at this point?
     5        A.  On top off the concrete beam off the floor.  My
     6    foot was off the floor.
     7        Q.  Describe for the jury what it felt like to be
     8    hit.
     9        A.  Like a car just ranned (sic) over me.
    10        Q.  Anything else you remember about -- did the horn
    11    go off, something like that?
    12        A.  The horn stuck about 15 minutes.  My wind went
    13    out of my -- my stomach, knocked the wind completely out
    14    of me, and the horn was jammed, and it took them about
    15    five, six minutes to unjam -- the impact on the horn was
    16    so hard, it took them about 5, 15 minutes just to unstop
    17    the horn.  And the gentlemen who were working --
    18    co-worker work with me, helped me get the jack off
    19    because I was pinned backwards.  I was all the way back.
    20        Q.  Just on a side note real quick, were you in a
    21    union when you were at Tyson?
    22        A.  Yes, sir.
    23        Q.  Do you remember what local you were in?
    24        A.  540.
    25        Q.  How long had you been a member of that union?

1    A.  Ever since they came.

2    Q.  What -- how did you get the pallet off you?

3    A.  The gentlemen -- my co-worker got it off.  I

4  couldn't get it off.  I was pinned.  My -- my arms were

5  pinned backwards behind me.

6    Q.  And what co-workers helped you?

7    A.  John Edmond, Jessica, and a guy who just -- the

8  reason I had the jack -- I don't know his name, the guy

9  who just passed me, he worked up at the dock.  It took

10  three men to get that jack off of me.

11    Q.  Do you remember how long it took them to get the

12  pallet jack off you?

13    A.  I say about four minutes at the most.

14    Q.  Did you report your incident to Tyson?

15    A.  Yes, I did.

16    Q.  What did you do after you reported it?

17    A.  I reported -- I went to the emergency room.  I

18  reported it, and I went to finish my course up.  I

19  thought I wasn't going to make it.  I went home, and my

20  back just went out.  And I got scared, and I said,

21  "Well, something's wrong," and we go to the emergency

22  room.

23    Q.  Did you at all see Tyson's medic on the same --

24  on the day of your injury?

25    A.  Yes, sir.

1    Q.  And is that medic's name Jessica Gatlin?

2    A.  Yes, sir.

3    Q.  What did she do for you?

4    A.  She sent me to the doctor -- sent me to the

5    doctor, gave me some paperwork to sign the first time,

6    and -- and sent me to the doctor.

7    Q.  I want to -- we're talking about the day of your

8    injury now.

9    A.  She said -- she sat down -- the first day she sat

10    down, gave me some paperwork to see the doctor, though I

11    didn't never get to go to the doctor or something.

12    Q.  What day of the week was your incident on?

13    A.  Friday.

14    Q.  Were you going to try to tough it out over the

15    weekend, see if you couldn't come back to work?

16    A.  Correct.

17    Q.  What happened on Saturday?

18    A.  My back just went out.  I couldn't get out of

19    bed.  I couldn't -- I couldn't feel nothing.  I got kind

20    of nervous about it.

21    Q.  What did you do when that happened?

22    A.  Went to the emergency room.

23    Q.  Where at?

24    A.  Carthage, Texas.

25    Q.  What did they do for you?

```
 1     A.  They gave X-rays, gave me some pills, blood

 2   tested me, and told me to go back down to Tyson and tell

 3   them about the accident.  I had already had done that,

 4   though.

 5     Q.  Did you go back to Tyson?

 6     A.  Yes, sir.

 7     Q.  Did you go back to Tyson on Monday?

 8     A.  Yes, sir.

 9         MR. SKRABANEK:  Mind if I step away from the

10   podium and grab something, Your Honor?

11         THE COURT:  That's fine.

12     Q.  (By Mr. Skrabanek)  Do you remember whether you

13   went back to talk to Ms. Gatlin the next week?

14     A.  I went that Monday, and I went back the next

15   following week.

16     Q.  Do you remember whether y'all filled out an

17   incident report?

18     A.  Yes, we did.  Yes, we did.

19     Q.  Does this look like the incident report that

20   y'all talked about?

21     A.  Yes, sir.

22     Q.  Do you see No. 1, it says, "State exactly where

23   the accident happened."  Is that your handwriting below

24   that?

25     A.  No.
```

1    Q.  You see No. 2 where it says, "Describe what you

2  were doing when the accident happened."  Is that your

3  handwriting?

4    A.  No.

5    Q.  Do you see No. 3 where it says, "Describe fully

6  how the accident happened."  Is that your handwriting?

7    A.  No, sir.

8    Q.  Do you know whose handwriting that is?

9    A.  Jessica.

10    Q.  Was she helping you to fill out this accident

11  report?

12    A.  Yes, sir.

13    Q.  Were you giving her information at that time to

14  help her fill out that accident report?

15    A.  I can't recall.

16    Q.  You see where it says, "jack ran"?

17    A.  Yes, sir.

18    Q.  Did you tell Ms. Gatlin that the jack had ran?

19    A.  Yeah, I told it all.

20    Q.  Is that consistent with the story you've told

21  here today?

22    A.  Yes, sir.

23    Q.  Did you ever tell Ms. Williams that you had

24  pinned yourself up against the pole while operating the

25  pallet jack?

1    A.  No, sir.

2    Q.  Did you ever tell Ms. Gatlin that you had pinned

3  yourself up against the pole while operating the pallet

4  jack?

5    A.  No, sir.

6    Q.  Now, did you -- you see down at the bottom here

7  where there's a picture of a little man?

8    A.  Correct.

9    Q.  And there's some dots on that man?

10   A.  Correct.

11   Q.  Did someone ask you to fill -- put those marks on

12  there?

13   A.  Yes, she had me to show where I was -- I was

14  hurting at the moment.

15   Q.  Did you put those marks on there, or did

16  Ms. Gatlin?

17   A.  Oh, I think I put the marks on there.

18   Q.  And why did you put the marks on there?

19   A.  To show her where I was hurting at.

20   Q.  And where were you hurting on that day?

21   A.  On my lower back and the front of my gut and my

22  top right shoulder.

23   Q.  Now, in this -- when you -- the same day you

24  filled out this accident report with Ms. Gatlin, did she

25  hand you a stack of other documents?

1     A.  Correct.

2     Q.  Do you have any -- can you remember what those

3  documents were?

4     A.  Not really.

5     Q.  Was there a list of doctors that y'all went

6  through at all?

7     A.  She showed me a list of doctors to pick out,

8  though she picked it out.

9     Q.  Do you remember which doctor she picked out?

10    A.  Dr. Nielsen.

11    Q.  Did you go see Dr. Nielsen?

12    A.  Yes, sir.

13    Q.  And what did he do for you?

14    A.  He -- he ran away (sic) my bones for a little and

15  made sure I can flex a little bit.  He sent me to a --

16  he really couldn't tell me.  He sent me to a spine

17  specialist up in Shreveport.

18    Q.  Did he send you back to the Tyson office?

19    A.  Yes.

20    Q.  Do you know why?

21    A.  He had me going back to Tyson on light duties

22  and, for my prescription, he show what kind of

23  medication I was taking.

24    Q.  How was your back feeling at that point?

25    A.  Still hurting real bad.

1    Q.  Did you go back and see Ms. Gatlin a third time?

2    So you have the initial day of the injury, the next

3    week, and now I'm talking about a third time.  Did you

4    go see her a third time?

5    A.  Yeah, I went back to see her again.

6    Q.  Did she have another stack of documents with her?

7    A.  Yes, sir.

8    Q.  Did she tell you what any of those documents

9    meant?

10   A.  She was trying to put me in a plan.  I didn't

11   understand the plan.

12   Q.  Did they tell you -- I'm going to show you a

13   document.  Do you remember seeing that document?

14   A.  No, sir.

15   Q.  Do you understand what this document is as we sit

16   here today?

17   A.  No, sir.

18   Q.  Did Ms. Gatlin attempt to explain to you anything

19   in this document, what it meant?

20   A.  No, sir.

21   Q.  Did Ms. Gatlin tell you that you might want to

22   get a lawyer on your side to take a look at this?

23   A.  No, sir.

24   Q.  Did anyone else at Tyson tell you you might want

25   to get a lawyer to look at this?

1    A.  No, sir.

2    Q.  Did Ms. Gatlin explain to you anything about your

3   legal rights when she handed you this document?

4    A.  No, sir.

5    Q.  Did -- and I'll just show you a second page.

6   That's your signature at the bottom, though, right?

7    A.  Correct, sir.

8    Q.  So why did you sign it?

9    A.  She told me if I signed some paperwork, I can go

10   straight to the doctor.  That's the only way I can be

11   able to get some help to the doctor.

12   Q.  Did she ever tell you that if you signed the

13   document, that you couldn't sue or bring a lawsuit

14   against Tyson thereafter?

15   A.  No, sir.

16   Q.  Did your supervisor ever tell you that if you

17   signed this document, that you couldn't bring a lawsuit

18   thereafter?

19   A.  No, sir.

20   Q.  Anyone at Tyson tell you if you signed --

21   A.  No.

22   Q.  -- the document --

23   A.  No, sir.

24   Q.  Did you have knowledge of what the affect of this

25   document would be on your legal rights when you signed

     1  it?

     2      A.  No, sir.

     3      Q.  Now, you saw Tyson's doctor for a little while

     4  after this last meeting with Ms. Gatlin, correct?

     5      A.  Correct.

     6      Q.  And, ultimately, you and Tyson parted ways at

     7  some point?

     8      A.  Correct.

     9      Q.  At that point, could you personally afford your

    10  own doctor to treat your back?

    11      A.  No, sir.

    12      Q.  Did Tyson's doctor recommend that you actually

    13  see a specialist?

    14      A.  The -- the Spine Institute in Louisiana did.

    15      Q.  And did you ever get to see that specialist?

    16      A.  No, sir.

    17      Q.  Did you start any kind of physical therapy while

    18  you were under the care of Tyson's doctor?

    19      A.  Yes, I did.

    20      Q.  Did you get to finish that physical therapy?

    21      A.  No, sir.

    22      Q.  What were you doing in between the time that you

    23  and Tyson parted ways and the next time you saw a

    24  doctor?

    25      A.  In pain.

1    Q.  Were you trying to get through it?

2    A.  I was trying to get through it.  I was in pain.

3    I couldn't really get no assistance -- to -- to get no

4    assistance.  I was calling Tyson trying to get my

5    benefits, and the lady said I couldn't get the

6    benefits.

7    Q.  Did you ultimately see a doctor named Dr. Kenneth

8    Lee?

9    A.  Yes, I have.

10   Q.  And, I mean, I referred you to him, right?

11   A.  That's right.

12   Q.  No secrets there.  How do you like Dr. Lee's

13   treatment?

14   A.  Dr. Lee was fair, and he telling me what's --

15   what was wrong with me, because I couldn't understand

16   because I was in so much pain when I got to him, and he

17   kind of scared me, told me I needed some shots.  I ain't

18   never had shots before in my life like the -- the way he

19   was describing.  I was kind of nervous.  He calmed me

20   down.  I was still kind of nervous, though.

21   Q.  Did you get those shots?

22   A.  Yes, sir.

23   Q.  Did they make you feel any better?

24   A.  Yeah.  For a little while, yes, sir.

25   Q.  Did -- did he prescribe you any physical therapy?

     1     A.  Yes, sir.

     2     Q.  Did you do the physical therapy?

     3     A.  Yes, sir.

     4     Q.  Did you feel like you were getting benefit from

     5     the physical therapy?

     6     A.  Yes, sir.

     7     Q.  Did -- has Dr. Lee given you any kind of

     8     restrictions --

     9     A.  Yes, sir.

    10     Q.  -- on the ability of movement and things like

    11     that?

    12     A.  Yes, sir.

    13     Q.  What -- do you know what those are?

    14     A.  Don't lift over 30 pounds.  I can't lift -- I

    15     know I can't lift over 30 pounds.  Can't lift over 30

    16     pounds.  Don't overstrain yourself trying to do

    17     something, you know, activity or stuff like that or

    18     trying to work real hard or something like that.

    19     Q.  I noticed in meeting with you, that you have a

    20     little unit.  Can you hold that up?

    21     A.  Yeah.

    22     Q.  What is that?

    23     A.  It's an electric shock treatment.  It -- it

    24     massages the lower part of my back most of the time.

    25     Q.  Who prescribed that for you?

1    A.  My therapy lady because she told me -- when I got

2    there, she said I walk kind of funny.  My walk ain't

3    right, and -- and my -- my right side is -- is right --

4    kind of right, and my left side is not right.

5    Q.  How are you doing -- how is that unit helping you

6    out?

7    A.  A lot.

8    Q.  How are you doing just on a day-to-day basis as

9    we sit here today?

10   A.  I be in pain.  I be in pain.

11   Q.  Have you tried to work at all after you and Tyson

12   parted ways?

13   A.  Yes, sir.

14   Q.  Where did you work at?

15   A.  The government helped me out getting a job to

16   get -- a kind of flag -- temporary job -- helped them

17   flag on traffic on the freeway.

18   Q.  Were you able to complete that temporary

19   assignment?

20   A.  Yeah, I did, but I couldn't really just work

21   there.

22            MR. SKRABANEK:  Pass the witness, Your

23   Honor.

24            MR. MAYER:  Cross examination, Your Honor?

25            THE COURT:  Yes, please.

                        CROSS EXAMINATION

 1
 2    BY MR. MAYER:
 3        Q.  Mr. Blackshire, my name is Zach Mayer.  You and
 4    I -- you and I have met in the past, true?
 5        A.  Correct.
 6        Q.  All right.  I'm going to be asking you a few
 7    questions.  Can you -- can you listen to my questions
 8    and let me know if you don't understand them, okay?
 9        A.  Correct.
10        Q.  Mr. Blackshire, what I'd like to do first of all
11    is talk about the training that you received while you
12    worked at Tyson, okay?
13        A.  Correct.
14        Q.  I understand that you worked there on several
15    different occasions in the past few years, basically
16    from 2002 until 2007?
17        A.  2002 to 2007, that's correct.
18        Q.  There were a few times in there that you left the
19    employment, but you came back after a break?
20        A.  Correct.
21        Q.  And during those approximately five years, you
22    worked in different departments?
23        A.  Correct.
24        Q.  And whenever you would start a new job in a
25    different department, would you receive training from

1   Tyson?

2      A.  Correct.

3      Q.  In other words, when you went from marination to

4   stack off, they -- they taught you how to complete your

5   job duties to do stack off?

6      A.  Correct.

7      Q.  And isn't it true that while you worked for

8   Tyson, you felt like you were properly trained?

9      A.  Correct.

10      Q.  Let's talk about the pallet jack specifically.

11   You said that you went through a class, right?

12      A.  That's correct.

13      Q.  And the class lasted about an hour and a half?

14      A.  Yeah, hour and 15 minutes.

15      Q.  During the class, you were provided some written

16   material, weren't you?

17      A.  A test.

18      Q.  Yeah.  You were provided some written material

19   that you reviewed, and then after reviewing the written

20   material, you took a test, right?

21      A.  Correct.

22      Q.  You also watched a video?

23      A.  Correct.

24      Q.  And there was an instructor there who was going

25   through the written material and also was there to show

1    you the video?

2        A.  Correct, Ms. Cheryl.

3        Q.  I'm sorry?

4        A.  Ms. Cheryl.

5        Q.  Ms. Cheryl.  And while you were going through the

6    training on the pallet jack, did you also see the Tyson

7    operator handbook?

8        A.  That right there?  I didn't see that.

9        Q.  They -- did they go over written material with

10   you during the class?

11       A.  Yeah, they did.

12       Q.  All right.  And then afterwards, once they went

13   through the written material and once -- once they went

14   through the video, did you take a test?

15       A.  Yes, sir.

16       Q.  Was the test in writing?

17       A.  Yes, sir.

18       Q.  You actually said that from your counsel you did

19   a good job on that test?

20       A.  Yes, sir.

21       Q.  You passed it?

22       A.  Yes, sir.

23       Q.  So in order to pass the test, you had -- you had

24   to read the test?

25       A.  Yes, sir.

1    Q.  Had to understand the questions?

2    A.  Yes, sir.

3    Q.  And then you filled out -- was it a multiple

4  choice quest -- questions?

5    A.  I don't remember no math on there.

6    Q.  No, no.  Like A, B, C, and you had to circle

7  different answers?

8    A.  I think so, correct.

9    Q.  And then once you were done, you passed that test

10  and you got a certification from Tyson to operate the

11  pallet jack?

12    A.  Correct.

13    Q.  And then you went out onto the floor and you

14  actually operated the pallet jack on the floor?

15    A.  No.

16    Q.  Did you use the pallet jack in your job?

17    A.  Yeah, I used the pallet jack on my job.

18    Q.  And when you were using it on the floor, did

19  someone watch you, your supervisor?

20    A.  No.

21    Q.  Did you ever have a supervisor by the name of

22  Patricia Williams?

23    A.  Patricia Williams, yes, sir, I did.

24    Q.  And Ms. Williams was your supervisor on the day

25  in question, right?  October 26th, two thousand --

          1      A.  Not in class -- not -- not in -- in that

          2    training.

          3      Q.  No, no, I understand.  After you completed the

          4    training --

          5      A.  Uh-huh.

          6      Q.  -- you got a certification?

          7      A.  Correct.

          8      Q.  And once you got that certification, you were

          9    then able to go out and operate the pallet jack in your

         10    job?

         11      A.  Correct.

         12      Q.  And then you would -- you would actually operate

         13    the pallet jack to move product around the plant?

         14      A.  Correct.  It wasn't my job, though.

         15      Q.  Right.  On October 26th, 2007, was Ms. Williams

         16    your supervisor that day?

         17      A.  Say it again.

         18      Q.  On October 26th, the day that you were injured,

         19    was Ms. Williams your supervisor?

         20      A.  Yes, she was.

         21      Q.  All right.  And you understand that that day

         22    they -- they were short one pallet jack operator?

         23      A.  No, they wasn't.  Jose was there.  He was there.

         24    They had a guy there.  They weren't short.

         25      Q.  Okay.  But Mr. -- but Jose was not operating the

1  pallet jack that day, true?

2      A.  That's correct.

3      Q.  And Ms. Williams asked you to operate the pallet

4  jack?

5      A.  Correct.

6      Q.  And by that point in time, you had already

7  completed your certification?

8      A.  Correct.

9      Q.  So you were certified to operate the pallet jack?

10     A.  Correct.

11     Q.  Did you feel like you could operate it

12 comfortably?

13     A.  Well, I was telling them about the jack because

14 it was already hurting peoples --

15     Q.  Well --

16     A.  -- the jack.

17     Q.  Did -- did you ever tell Ms. Williams anything

18 about your hesitancy to use the jack?

19     A.  Yes, I did.

20     Q.  Okay.  Let me ask you this, on October 26th when

21 she asked you to use the jack that day, did you inspect

22 the jack before using it?

23     A.  No.

24     Q.  You never looked it over?

25     A.  No.

     1      Q.  Okay.  You just started using it to move product
     2  over by the cooler?
     3      A.  I didn't inspect the jack that day.  The jack --
     4  the inspections on the jacks start in the morning.
     5      Q.  But this was the first time you were using the
     6  jack that day, wasn't it?
     7      A.  Correct.
     8      Q.  All right.  So before you used it, did you
     9  inspect it?
    10      A.  Oh, I checked it.  I made sure it stopped and
    11  everything, yeah, correct.
    12      Q.  And you didn't find any problems with it at that
    13  point?
    14      A.  Correct.
    15      Q.  Then you're moving the product over by the cooler
    16  you said, right?
    17      A.  Yes, sir.
    18      Q.  And you see another person coming out, and you
    19  stopped and waited?
    20      A.  Correct.
    21      Q.  Did you stand to the side of the pallet jack?
    22      A.  No, sir.
    23      Q.  Do you remember in your training when they showed
    24  you the different training material that one of the
    25  things they trained you on was to walk to one side of

1  the pallet jack?

2     A.  That's when you're moving the freight.

3     Q.  And you're saying that you let go and stepped

4  away from --

5             MR. SKRABANEK:  Your Honor, objection.  May

6  I approach?

7             THE COURT:  Yes.

8             (Bench conference.)

9             MR. SKRABANEK:  Object to relevance here,

10  Your Honor, because it's going to contributory

11  negligence which is --

12             MR. MAYER:  He's saying that the proximate

13  cause was --

14             THE COURT:  Well, he's going -- it goes to

15  causation.  We're not going to submit -- you know, we're

16  going to submit the questions of proximate cause.  It

17  goes to causation.

18             MR. SKRABANEK:  Okay.

19             THE COURT:  We're not going to submit

20  negligence.

21             MR. SKRABANEK:  Thank you, Your Honor.

22             THE COURT:  Okay.  Overruled.

23             (Bench conference concluded.)

24             THE COURT:  Let's proceed.

25     Q.  (By Mr. Mayer)  So, Mr. Blackshire, did you step

1   to one side of the pallet jack before what you claim it

2   became out of control and hit you?

3     A. No, I stopped the jack and walked back from the

4   jack.

5     Q. And you said you were four or five feet away from

6   the pallet jack?

7     A. Correct.

8     Q. And you said that you turned to your right and

9   then suddenly the jack came at you?

10     A. Correct.

11     Q. Now, you talked about this injury with Jose,

12   right? This other individual who you said was injured

13   while using a pallet jack?

14     A. He was hurt -- he was in the front. He was

15   somewhere else in another department.

16     Q. When -- when he was hurt, his foot got run over,

17   right?

18     A. Correct.

19     Q. Okay. And were you by him when that occurred?

20     A. I was like at the end of the line at the -- at

21   the time on the shift.

22     Q. So -- so the incident occurs on one side of the

23   line and you're on the other side of the line?

24     A. We was -- we was in the cooler -- open space like

25   this right here.

1    Q.  The line is actually even bigger than this room,

2  isn't it?

3    A.  No.

4    Q.  About the size of this room?

5    A.  No.

6    Q.  How big is the line?

7    A.  From right here to where -- that gentleman in the

8  coat right there.

9    Q.  All right.  And then there's -- are there other

10  lines in the plant, as well?

11    A.  There's one right here where the Judge at --

12  coming off to that desk right there.  That's just for

13  the KFC.  There's two lines in there.  They ain't long.

14  They're short lines.

15    Q.  And what you're saying, you were at one side of

16  the line when Jose was -- hits foot was run over by the

17  pallet jack on the other side of the line?

18    A.  No, no.  Jose in the freezer.  This is a freezer.

19  This is an open freezer.

20    Q.  Okay.

21    A.  The line on this wall, and Jose was right down

22  here where this lady in the black jacket -- right there.

23    Q.  All right.

24    A.  And I'm at the end of the line.

25    Q.  He was over by the freezer?

1    A.  Yeah, because we have to move the -- no, we in

2    the freezer.  This is -- this court would be the

3    freezer.  The whole court is just a big walk-in freezer.

4    Q.  Okay.

5    A.  And Jose was right there where that lady with the

6    black -- the blue jacket on, and I'm at the end, and

7    he's got to come get these head quarters -- these front

8    half off right here.  That's why I look down there.

9    When I look down there, I seen -- boom.

10    Q.  And he ran over his foot?

11    A.  Yeah.

12    Q.  Okay.  Now, when Ms. Williams asked you to

13    operate the pallet jack that day, I'm understanding you

14    to say that you were able to take it from Point A to

15    Point B without any problems?

16    A.  No problem.

17    Q.  And then you said you let go of the handle, and

18    it went up into the locking position?

19    A.  Correct.

20    Q.  And you stepped away from it, and all a sudden it

21    accelerates on its own?

22    A.  Correct.

23    Q.  And it comes towards you?

24    A.  Correct.

25    Q.  And it's your testimony to this jury that you

1  told Ms. Williams that?

2     A.  I told Ms. Williams what happened.  She knows

3  what happened.

4     Q.  No, no, sir.  Did you tell Ms. Williams that you

5  had stepped away from the jack and that it accelerated

6  on its own and pinned you?

7     A.  I couldn't talk when Ms. Williams came up.  I

8  couldn't talk when Ms. Williams came up because I ain't

9  have no wind.  I told her when I went to the nurse

10  station what happened.

11     Q.  All right.  And it's your testimony that you told

12  her that you were four or five feet away from the jack,

13  and it accelerated on its own, and it pinned you?

14     A.  Correct.

15     Q.  And then after that, you were sent to the nurse,

16  also, right?

17     A.  She went to the nurse with me.

18     Q.  And when you were in the nurse's station, did you

19  talk with Ms. Gatlin?

20     A.  Yes, I did.

21     Q.  Ms. Gatlin is the plant nurse?

22     A.  Yes, sir.

23     Q.  And is it your testimony that you told

24  Ms. Plant -- Ms. Gatlin the same thing, that this pallet

25  jack accelerated while you were four or five feet away?

1    A.  Correct, I did.

2    Q.  Now, also in this process, you also completed an

3  injury report form, right?

4    A.  Correct.

5    Q.  We just looked at that injury report form.  Now,

6  to begin with, on this injury report form, there's a

7  signature at the bottom.  Do you see that?

8    A.  Yes, sir.

9    Q.  Is that your signature?

10    A.  Yes, sir.

11    Q.  And directly above your signature it says

12  there -- read along with me.  "By my signature below, I

13  hereby declare under penalty of perjury that the above

14  responses are mine, true, correct and complete, and made

15  of my own free will."  Do you see that?

16    A.  Okay.  That's correct.

17    Q.  And you read that with me?

18    A.  On that -- on -- by the yellow, yeah.

19    Q.  All right.  And then you signed that document

20  below it, didn't you?

21    A.  Yes, sir.

22    Q.  Okay.  Looking up above, Question No. 2 says,

23  "Describe what you were doing when the accident

24  happened."  What's your response there?

25    A.  I told the nurse.  I didn't read that.  She wrote

1  that.

2     Q.  I understand, sir.  You signed the document,

3  didn't you?

4     A.  Yes, sir.

5     Q.  And you reviewed the document before you signed

6  it, didn't you?

7     A.  Well, I -- I didn't -- at the time, I couldn't

8  because I was in pain.

9     Q.  Sir, are you telling the members of the jury

10  that you did not review this document before you signed

11  it?

12     A.  The nurse was writing what happened down on the

13  paper.

14     Q.  My question is very specific.

15     A.  No.

16     Q.  Did you review this document --

17     A.  No.

18     Q.  -- before signing it?

19     A.  No.

20     Q.  Sir, you understand that I had the opportunity to

21  take your deposition in this case, right?

22     A.  Correct.

23     Q.  And I asked you a bunch of questions, true?

24     A.  Correct.

25           MR. MAYER:  May I approach, Your Honor?

1           THE COURT:  Yes.

2     Q.  (By Mr. Mayer)  And we talked about this

3  document, didn't we?

4           MR. SKRABANEK:  What page are you on?

5           MR. MAYER:  Yeah, Page 63, Line 24.

6           May I approach, Your Honor?

7           THE COURT:  Yes.

8     Q.  (By Mr. Mayer)  During your deposition, we had an

9  opportunity to speak about this document, didn't we?

10     A.  I think so.

11     Q.  All right.  And I asked you on there -- I said,

12  "Now, you see where you -- you signed it there.  Is that

13  your signature?"  And what's your response?

14     A.  I signed it.

15     Q.  That's your signature at the bottom.  Then I

16  asked you, "Did you look over the report before you

17  signed it?"

18           And what did you say there?  "Yes, I did,"

19  right.

20     A.  Yeah, I -- I think I did.

21     Q.  And then -- and then I asked you, "And by signing

22  it, you said that it was accurate?"

23           And your response is, "Accurate," true.

24     A.  I don't remember that.

25     Q.  You don't remember me taking your deposition in

1   this case?

2       A.  I remember the deposition.

3       Q.  You just don't remember telling me at that time

4   that you reviewed the document to make sure it was

5   accurate?

6       A.  I don't -- I remember seeing that paper.

7       Q.  You don't remember seeing the paper?

8       A.  I remember seeing that paper.

9       Q.  All right.  And -- and before you signed it, you

10  reviewed it to make sure that it was accurate?

11      A.  No, I -- I'm saying I did because the nurse was

12  writing it --

13              THE COURT:  Counselor, we've been over this

14  several times, and you read his -- you know, the rules

15  of the game are that you're supposed to confront him

16  with what he testified to.  You never asked him, "Did

17  you say that you looked over the document?"

18              Now, looking over the document and reviewing

19  the documents are two different things.  So now I'm

20  instructing you, if you're going to try to impeach him

21  with the deposition, you ask him the question you asked

22  him in the deposition.  That's improper impeachment.

23  You said you read the question to him, did he look over

24  the document, correct?

25              MR. MAYER:  Yes, Your Honor.

1          THE COURT:  All right.  What -- that was the

2    proper question to ask him before you showed him the

3    deposition.  Let's move on now.

4          MR. MAYER:  Yes, Your Honor.

5    Q.  (By Mr. Mayer)  Now, let's look at the

6    description, if we can here, of how the incident

7    occurred.  No. 3, do you see that?

8    A.  No. 3?

9    Q.  Where it says, "Describe fully how the accident

10   happened."  Do you see where I'm reading there?  Can you

11   not see?  There we go.

12   A.  Right.  That was -- the nurse -- the nurse wrote

13   that.

14   Q.  Okay.  I understand.  And can we read it to the

15   jury?  I want to see if you -- if you agree with this.

16   "Driving jack, backing up against pole and jack ran and

17   pinned him against the pole."  Did I read that

18   accurately?

19   A.  On the paper you did, but it ain't what I said.

20   Q.  All right.  So it's your testimony you did not

21   tell Ms. Gatlin that description?

22   A.  I told Ms. Gatlin what happened.

23   Q.  But it's different than what she wrote?

24   A.  She wrote down, correct.

25   Q.  Now, after you went in and talked to Ms. Gatlin,

1   you then went to the emergency room on Sunday night

2   which was --

3       A.  Saturday.

4       Q.  -- Saturday, October 28th?

5       A.  That Saturday.

6       Q.  And when you went there, I understand that you've

7   got high blood pressure?

8       A.  Yes, I do.

9       Q.  Was your blood pressure high that evening?

10      A.  No.  They gave me a drug test when I first went

11  there.

12      Q.  A drug test?

13      A.  Yes, sir.

14      Q.  Okay.  And then they gave you some pain medicine?

15      A.  Correct.

16      Q.  And then they told you to follow back up with

17  Tyson?

18      A.  Correct.

19      Q.  Now, did you follow back up with Tyson?

20      A.  Correct.

21      Q.  And did Tyson eventually then send you to go see

22  Dr. Nielsen?

23      A.  Yes, sir.

24      Q.  And did Dr. Nielsen do some treatment for you?

25      A.  Yes, sir.

 1     Q.  And then did Dr. Nielsen refer you to a
 2  specialist, Dr. Kerr?
 3     A.  Yes, sir.
 4     Q.  And Dr. Kerr was the Spine Institute of
 5  Louisiana?
 6     A.  That's correct.
 7     Q.  And while you were under the treatment of
 8  Dr. Kerr, you also went through physical therapy?
 9     A.  Physical therapy -- yeah, correct.  Correct.
10     Q.  Did you find that the physical therapy helped?
11     A.  No, not at the time, no, because it was
12  aggravating me.
13     Q.  It didn't help you at the time?
14     A.  No, sir.
15     Q.  Did you feel that Dr. Kerr's treatment was
16  helpful?
17     A.  Dr. Kerr was -- he -- he told me I needed to see
18  a specialist.
19     Q.  All right.
20     A.  That's all I remember.  That's been awhile back.
21     Q.  When you went -- I understand.  It's been three
22  years now.
23     A.  Yeah.
24     Q.  When you went to the emergency room, you went to
25  see Dr. Nielsen and you went to see Dr. Kerr.  Did Tyson

1   pay for all of that?

2       A.  I don't know.

3       Q.  Have you ever paid for it?

4       A.  No.

5       Q.  So if the evidence in this case is that Tyson

6   paid for it, you don't know otherwise?

7       A.  I don't know about that.

8       Q.  Now, let's talk about the next visit that you

9   went in with Jessica Gatlin where you talked about

10  getting benefits under the Worker Injury Settlement

11  Program.  Do you remember going in and speaking with

12  Ms. Gatlin about the WISP program?

13      A.  No.  She was -- talked to me about it.

14      Q.  Do you remember when she was speaking with you

15  about it?

16      A.  Correct.

17      Q.  Do you remember her telling you that there is a

18  program in place at Tyson that if -- if you accept the

19  benefits, that is, the medical payments and going to see

20  Tyson's doctor, that you can't sue them then?

21      A.  No, she didn't say it like that.

22      Q.  Okay.  You don't remember having that

23  conversation?

24      A.  No.

25      Q.  Do you recall signing the WISP waiver in this

1   case?

2       A.  I can't -- I can't recall.

3       Q.  You just don't remember one way or the other?

4       A.  It's been -- it's been awhile.  It's been too

5   long for me.

6       Q.  Okay.  Do you recall Ms. Gatlin showing you a

7   copy of the WISP waiver?

8       A.  I can't really say.  I -- I don't -- I can't

9   really say.  I got to see it.

10      Q.  Well --

11      A.  I know she had a lot of documents.  That's all I

12  can tell you at the time she wanted me to sign.  And she

13  told me to -- to sign it -- to sign the document -- I

14  have to sign the document to get to a doctor.  That's

15  what she told me.

16      Q.  I -- I'm going to show you what's been marked as

17  Defendant's Exhibit No. 15.  Up top it's Exhibit A.  It

18  says, "Tyson's workplace injury settlement program."  Do

19  you see that up top?

20      A.  Yeah, I see it.

21      Q.  All right.

22      A.  I see it.

23      Q.  And then on the back of this document when it was

24  presented, it's a one page, but we've got two pages

25  copied.  My question is, is that a copy or is that a --

1  your signature on the back of this document?

2    A.  It looks like it.

3    Q.  Now, were you given the opportunity to review

4  this document before you signed it?

5    A.  I don't -- I don't -- I don't -- I don't believe

6  so.

7    Q.  Are you saying that Ms. Gatlin wouldn't have

8  given you the chance to review the document before you

9  signed it?

10    A.  I ain't never seen the document.  She -- I don't

11  think she told me to sign this last paper before I can

12  go to the doctor.

13    Q.  Okay.

14    A.  That's it.

15    Q.  You just don't remember seeing the document

16  itself?

17    A.  No.

18    Q.  When you signed this document at the bottom,

19  which we just looked at, did you read the first page?

20    A.  Like I said, I didn't never have the papers in my

21  hand.

22    Q.  I guess I'm confused, sir.  When you signed the

23  document, did you review it before signing it?

24    A.  No, sir.

25    Q.  And it's your testimony that Ms. Gatlin did not

1   describe for you the effects of signing that document?

2      A.  Well, she told me I had to sign this paperwork to

3   go to the doctor, and I was in pain.  That's why I did,

4   to get assistance for my back.

5      Q.  Okay.  Did you read the first paragraph where it

6   says, "I understand that I must accept the rules and

7   conditions of the program and waive my right to sue the

8   company"?

9              MR. SKRABANEK:  Object, Your Honor.  This is

10  getting argumentive in that he's already said he hadn't

11  read the document.

12             THE COURT:  Sustained.

13     Q.  (By Mr. Mayer)  Did you have any follow-up

14  conversation with any human relations devel -- or

15  manager there?

16     A.  No, sir.

17     Q.  Someone from HR?

18     A.  No, sir.

19     Q.  Is Jessica Gatlin the only person that you talked

20  about signing the document?

21     A.  I don't remember talking.  I know she told me to

22  sign the paper that I have to go sign to go see -- to

23  get to the doctor.  That's it.

24     Q.  Mr. Blackshire, are you aware of a Maintenance

25  Department at Tyson?

1    A.  In the back of the plant, yes, sir.

2    Q.  And at the Maintenance Department, is that where

3    they fix different machinery, including the pallet

4    jacks?

5    A.  The pallet jacks have a room where they fits

6    inside the plant.

7    Q.  Okay.  So a pallet jack has its own room?

8    A.  They -- they use both of them if they want to.

9    Q.  All right.  Did you ever have an occasion to

10   speak with anyone over at the Maintenance Department?

11   A.  Well, the one in -- in the freezer I have.  The

12   one in the back of the cooler, I have talked to them --

13   one of them.

14   Q.  Is the Maintenance Department there for you if

15   you ever have a problem with the pallet jack?

16   A.  The one in the -- in the -- in the freezer might

17   be, if they in there, depending if they ain't working.

18   Q.  And that's where they work on the pallet jacks?

19   A.  Yes, sir.

20        MR. MAYER:  Your Honor, no further questions

21   at this time.  I pass the witness.

22        THE COURT:  Any redirect?

23        MR. SKRABANEK:  Just real short, Your Honor.

24                 REDIRECT EXAMINATION

25   BY MR. SKRABANEK:

1     Q.  Mr. Blackshire, I kind of glossed over this when

2 I was talking to you earlier.  How's your home life

3 today as we sit here today with regard to your injury?

4     A.  Pitiful.

5     Q.  Are you -- do you have a girlfriend?

6     A.  Yeah.

7     Q.  Does she have a couple of kids?

8     A.  Yes, sir.

9     Q.  And do y'all live together?

10     A.  Yes, sir.

11     Q.  And how -- how old are those children?

12     A.  Four -- five and four.

13     Q.  And are they active?

14     A.  Yeah, they real active.

15     Q.  Are you able to pick them up and play with them

16 at all?

17     A.  Not that much.

18     Q.  Did you play any pick-up sports before this

19 injury?

20     A.  Yeah, basketball and stuff like that.

21     Q.  Have you played any basketball since this?

22     A.  No, sir.

23     Q.  I understand that you also like to ride your

24 four-wheeler around?

25     A.  Yes, sir.

    1     Q.  Do you still have a four-wheeler?

    2     A.  No.

    3     Q.  Have you ridden a four-wheeler since this

    4  incident?

    5     A.  No, sir.

    6     Q.  I just want to give you one last opportunity to

    7  tell this jury how this has all affected your life.

    8     A.  Fixing to be married.  I want to be married.

    9  Can't support my church like I need to be, you know,

   10  paying my tithe in church.  My income -- I don't have no

   11  income.  I couldn't get assistance when I need food

   12  stamps to eat.  It's hard.

   13          MR. SKRABANEK:  No further questions, Your

   14  Honor.

   15          MR. MAYER:  Nothing further.

   16          THE COURT:  You may step down.

   17          THE WITNESS:  Uh-huh.

   18          THE COURT:  Who be your next witness?

   19          MR. PIERCE:  Your Honor, the plaintiff calls

   20  Jack Madeley.

   21              (Witness sworn.)

   22          THE COURT:  Proceed.

   23                  JACK MADELEY,

   24  having first been duly sworn, testified as follows:

   25                  DIRECT EXAMINATION

BY MR. PIERCE:

Q.  Good morning, Mr. Madeley.  How are you?

A.  Good afternoon.

Q.  Yeah, good afternoon.  Can I get you to introduce yourself to the jury?

A.  My name is Jack Madeley.  I'm a consulting safety engineer.  I live in College Station.  I have my own engineering firm, Madeley Safety Engineering Consultants.

I have a Bachelor of Science degree from Texas A&M and got that in 19 -- I guess 1975, and that was in industrial engineering with a specialty in industrial safety engineering.  I have a Master of Science degree in safety engineering obtained in 1996, also from A&M.

I went to work for Marathon Oil Company in 1975 in Anchorage, Alaska, in offshore production -- offshore and onshore production operations as division safety engineer and worked for them implementing safety programs, developing their policies, doing field inspections, train -- doing training for the field workers and doing some design work in safety engineering and fire protection.

I went to work -- was transferred with Marathon to the Gulf of Mexico, worked offshore there for about eight years as a safety engineer, part of the time as a

1   construction engineer.  So I did design work, hired and

2   pushed construction crews, welding crews, and did some

3   of the designs.

4        I then went to work for a consulting firm in

5   College Station.  Well, I transferred to Shreveport and

6   onshore operations for about three years in safety

7   engineering.  And I was also a crane operator/trainer --

8   certified crane operator.  I've operated a number of

9   types of cranes offshore in the Gulf of Mexico on fixed

10  platforms on -- and some cherry picker RT cranes -- they

11  call them rough terrain.  I've operated forklifts over

12  the years, set up certification programs for various

13  types of training for crane operators, forklift

14  operators.

15       Went to work for Biotechnics as a risk -- as a

16  risk management consulting firm in College Station.

17  Worked with them for about a year.  Then went to work

18  for Nelson & Associates for about five or six years

19  doing safety consulting, much what I do now.  And

20  started my own firm in 1996.

21  Q.  I think you've eliminated half the questions I

22  have for you.

23       Let -- let me ask you this, sir.  Could you tell

24  the jury, are there any professional licenses you hold?

25  A.  I am a licensed and registered professional

1    engineer in the State of Texas, and I'm a board

2    certified safety professional which is a national

3    organization and certification by examination.

4        Q.  And, sir, you've sat through part of the

5    testimony this morning.  You've heard us already talk to

6    the jury a little bit about pallet jacks; is that right?

7        A.  Yes.

8        Q.  And have you had occasion in -- during the time

9    that you've worked as an expert witness, to testify in

10   cases involving pallet jacks?

11       A.  Yes, I have.

12       Q.  And, sir, I'm not sure if you mentioned this yet

13   or not, but what -- what is OSHA?

14       A.  OSHA is the federal safety organization.  It

15   stands for the Occupational Safety and Health

16   Administration.

17       Q.  And, sir, you -- you mentioned in your discussion

18   with the jury a moment ago that you -- you have

19   experience in operating and in writing policies about

20   forklift operation; is that right?

21       A.  Yes.

22       Q.  And are there sections of OSHA that apply to

23   forklift operation?

24       A.  Yes, there are.  Under the general industry

25   standards, Section 178 addresses forklifts.  It also

1   has -- deals with what they call motorized pallets and

2   motorized hand trucks which would be what we call pallet

3   jacks.

4      Q.  And, sir, that's what I was going to ask you.

5   Those same standards that you were talking about under

6   OSHA applying to forklifts, would they also apply to

7   motorized pallet jacks?

8      A.  Yes.  It specifically states that in the

9   description section of the standards.

10      Q.  And, Mr. Madeley, in your professional

11   experience, have you had to deal with those OSHA

12   standards?

13      A.  Yes.  As a safety engineer, all -- any safety

14   program should be very familiar with all of the OSHA

15   standards because they are federal safety laws that's

16   the regulations that the federal government requires for

17   all construction -- all work sites where there's more

18   than I believe 15 employees.

19           And the government does its best to set

20   forth a number of regulations to help -- help keep

21   people from getting hurt or killed on the job.  They

22   don't cover everything, but they cover most things and

23   certainly they do address the specifics of pallet jacks.

24      Q.  And, Mr. Madeley, in -- can you tell the jury on

25   how many occasions you have been asked to offer expert

1   opinions in cases involving pallet jacks?

2       A.  I don't really keep track of them like that, but

3   probably 8 or 10 different cases over the last 10 to 15

4   years.

5       Q.  And, Mr. Madeley, in any of those cases, have

6   your opinions either been excluded or limited by courts?

7       A.  No.

8           MR. PIERCE:  Your Honor, at this time, we

9   would tender Mr. Madeley as an expert in workplace

10  safety and also in the OSHA regulations applicable to

11  the operation of pallet jacks.

12          THE COURT:  We'll allow him to give his

13  opinion.

14      Q.  (By Mr. Pierce)  Mr. Madeley, I want to -- I want

15  to kind of jump in.  I'm going to show you a couple of

16  pictures.  Sir, I'm not sure -- are you able to make

17  that out?

18      A.  Yes.

19      Q.  Okay.  Tell us what that is.

20      A.  It's a silhouette of a pallet jack.

21      Q.  And just for the record, so we can identify it,

22  this is Page 1 of Plaintiff's Exhibit 18.

23          Mr. Madeley, what -- what are these types of

24  devices used for.

25      A.  They are used to assist employees in moving

1  palletized materials.  A lot times, depending on the

2  nature of the warehouse and so forth, you may use a

3  forklift, you may use a -- what -- a pallet jack, or you

4  may use a manual version of this where somebody -- you

5  think you've heard -- referred to earlier a hydraulic

6  one where you actually pump it up like a car jack-type

7  thing.

8          And it actually -- it's got the forks on it.

9  It raises the pallet up, and then you manually tow it.

10  This is a motorized one or powered one so that you can

11  move heavier things without slipping on the floor and

12  having to push it into unusual areas where you might get

13  injured by pushing or pulling a heavy weight.  It's got

14  a motor on it, and so by dialing forward and

15  backwards --

16  Q.  Let me interrupt you, actually.  I'm going to --

17  as you're going through this, I'm going to put up

18  another picture.  This is Plaintiff's Exhibit 18, Page

19  2.  We're going to talk about the controls.

20          Sir, what -- what's this a picture of?

21  A.  This is the hand control on that lever or arm

22  sticking out at the back of the other picture, and this

23  is how you actually -- you kind of -- you move it from

24  side to side to steer it, and then you've got a -- the

25  two grips on it, you can dial it forward or backward to

1   go -- to move it forward or in the reverse direction.

2            And it's also got two controls for raising

3   and lowering the -- the forks themselves because

4   normally you don't really need to move the pallets very

5   far vertically.  This is not like a forklift where

6   you're trying to pick something up or put something on a

7   shelf way high.  That's where you use a different

8   device.  This is just for a pallet that's on the floor.

9   It's stacked.  It's heavy.  And you just need to raise

10   it just enough so that you can move it around.

11   Q.  Okay.  Now, Mr. Madeley, I'm going to show you

12   another document that was previously admitted.  This is

13   from Exhibit 18 -- Plaintiff's Exhibit 18, Page No. 3.

14            Now, just a second ago, you were talking to us

15   about the throttle operations and some of the other

16   things.  Can you tell us what's depicted in this

17   picture?

18   A.  This is the range of motion of the control handle

19   itself that sticks out.  The operator would grab the end

20   of it out here, and then if you -- if it's going to be

21   up at a slight angle, so -- so you can dial it.  It

22   says, "Operating position with the brake off."  And if

23   he pushes it all the way down to horizontal, it will

24   stop with the brake on, or if you turn it loose, it's

25   like what we call a dead man control.

1          If you accidentally slip and fall and the

2     thing is moving, you don't want it to run over you, so

3     it's got a spring load on it.  It flops back and stops

4     it.  So if you do happen to slip on the floor, the

5     machine doesn't run over you.  And so that's the

6     position it would be with -- if you turn loose of the

7     handle.

8          Q.  And, Mr. Madeley, just to point this out for the

9     folks on the jury, the documents you and I have been

10    looking at come from a broader document that's called

11    the operator's handbook; is that right?

12         A.  Yes, it is.

13         Q.  Okay.  Now, you referenced something -- I'm going

14    to show you -- this is Plaintiff's Exhibit 19, Document

15    No. 15.  It's got some bad highlighting on it, but I'm

16    going to talk to you about a different portion of it.

17    There are two things I put boxes around, sir.  The first

18    thing is identifying the document.  What's that document

19    identified as?

20         A.  This is the instructor's guide for -- and I

21    believe it's the Tyson training program for pallet jack

22    operators.

23         Q.  Okay.  And then we -- let's see how you --

24    there's a section here that I put a block around.

25    You -- you made a reference to the handle being spring

1    loaded; is that right?

2      A.  Yes.

3      Q.  Okay.  And what's being described there?

4      A.  This is a description of that.  It says that the

5    control arm is spring loaded.  Releasing it allows it to

6    swing up to the stop position.

7      Q.  And -- and, sir, just based on your experience

8    with pallet jacks and in dealing with other cases

9    involving pallet jacks, what's -- what's the practical

10   reason that you would have this arm be spring-loaded?

11     A.  It is basically as -- like I said, it's -- we

12   call it a dead man switch.  If for some reason you lose

13   control, all you have to do is literally nothing.  Turn

14   it loose.  It will stop on its own.  It's a safety

15   feature.

16     Q.  And, sir, just to make sure I've got this.  If

17   I'm -- if I'm operating the pallet jack -- if I'm the

18   operator, based on what we've seen in these different

19   manuals, if I let the handle go, this thing ought to

20   stop?

21     A.  Yes.

22     Q.  Okay.  Is there --

23     A.  Assuming it's adjusted and not malfunctioning.

24     Q.  Okay.  Is there anything -- and let me just ask

25   the question this way.  In these documents that you and

1    I have gone through, if I'm the pallet jack operator and

2    I let this arm go, is there anything to indicate to me

3    or is there anything to make me suspect that this thing

4    is going to keep moving?

5        A.  No.

6        Q.  Now, sir, you -- you were actually retained by my

7    law firm in this case; is that correct?

8        A.  Yes.

9        Q.  And you and I have worked together on cases

10   before; is that right?

11       A.  Yes.

12       Q.  Okay.  Anything about the fact that you and I

13   have worked together before that makes you give me a

14   different opinion than you give somebody else?

15       A.  No.  I've given you good news, and I've given you

16   bad news in the past, so --

17       Q.  I was going to say, it seems like you've given me

18   more bad news than good news.

19           What were you asked to do in this case?

20       A.  I was asked to evaluate the -- the various

21   documents.  Initially, I think I wrote a report.  I

22   didn't have any documents.  Depositions had not been

23   taken.  I had not seen a number of documents that I had

24   seen later.

25               I have reviewed Mr. -- or Mr. Blackshire's

1    deposition.  I've reviewed depositions of Mr. Howard, a

2    Ms. Williams, and I believe the plant nurse.  And I've

3    looked at the instruction manuals, the training manuals

4    for the -- for the pallet jack.  I've seen

5    Mr. Blackshire's personnel file which had the accident

6    report in it that you've seen already.

7        Q.  Let me -- let me ask you -- let's start off with

8    just Mr. Blackshire.  Based on what you've reviewed from

9    him, what's your understanding of how he claims this

10   accident occurred?

11       A.  As I understand it, the way he described it, he

12   is walking with the unit -- with the pallet raised

13   slightly going to a different part of the plant, and he

14   has to stop to allow someone to exit the freezer or the

15   cooler area, and he released the handle.  He watched it

16   go up to the up position, and I think he stepped away so

17   that he could -- he wanted to kind of get a better view

18   of some -- what he was going to do next.

19           There's several different things, you know,

20   where you're trying to plan ahead for after I deliver

21   this, I've got to go somewhere else.  And at -- when he

22   went to turn back to -- through the pallet jack, he said

23   that it was coming towards him.  And at that point, he

24   couldn't get out of the way, and it pinned him up

25   against a -- a column.

1    Q.  And, sir, you also -- you referenced another

2  document that you reviewed as part of his file.  It's

3  Plaintiff's Exhibit No. 20.  And let me -- I'll -- I'll

4  zoom it out and see if you can identify this for us.

5      Mr. Madeley, have you seen that document before?

6    A.  Yes, I have.

7    Q.  What is that document?

8    A.  That is the injury or accident report that we've

9  been discussing today.

10    Q.  Okay.  And I'm going to try and zoom in on a

11  portion of this.  And, specifically, I want to talk to

12  you about this one, about item No. 3.  Do you see that?

13    A.  Yes.

14    Q.  Mr. Madeley, can you -- can you read the

15  description that's recorded there under Item No. 3 on

16  Tyson's accident report?

17    A.  It says, "Driving jack, backing up against pole,

18  and jack ran and pinned him up against," something,

19  "pole."

20    Q.  Okay.  Now, sir, but my -- my co-counsel,

21  Mr. Skrabanek, used this same document a minute ago, and

22  he -- he highlighted these words "jack ran."  Do you see

23  that?

24    A.  Yes.

25    Q.  And, Mr. Madeley, what's the significance to you

1    of the description provided where you're saying that the

2    jack ran?

3        A.  It implies that the jack -- he didn't say, "I --

4    I ran the jack," or "he ran the jack."  You know, the

5    jack basically was coming toward him on its own is what

6    I interpret that as.

7        Q.  Let me ask you about that.  I want to go back a

8    second.  You and I started off at the beginning of your

9    testimony here today talking about OSHA?

10       A.  Yes.

11       Q.  Okay.  As I understand your testimony, there are

12   some specific provisions within OSHA that would apply to

13   pieces of equipment like this; is that correct?

14       A.  Sure.

15       Q.  Based on the description you have for

16   Mr. Blackshire and his testimony and based on what you

17   see in this report, do either of those things cause you

18   any concern as it relates to those OSHA requirements?

19       A.  Sure.

20       Q.  Explain that to us.

21       A.  It -- basically, it sounds like, you know, there

22   is a malfunction with the jack.  There is testimony of

23   Mr. Blackshire, that he felt that there was something

24   wrong with it.  Apparently, other people had indicated

25   there was something wrong with it.

```
 1              And the OSHA regulations require that for --

 2    you know, it even states, you know, if at any time a

 3    powered industrial truck is found to be in need of

 4    repair, defective, or in any way unsafe, the truck shall

 5    be taken out of service until it has been restored to

 6    safe operating condition.

 7              And that just makes sense.  You don't want

 8    somebody operating a piece of equipment that is

 9    dangerous, malfunctioning, or may even behave

10    differently than what they would expect.

11    Q.  Now, Mr. Madeley, I just -- I want to touch on

12    something you just -- you just talked about.  Under the

13    OSHA requirements applicable to these pieces of

14    equipment, does Tyson have an obligation to take

15    malfunctioning equipment out of service?

16    A.  Yes, they certainly do.

17    Q.  Do they have an obligation to fix malfunctioning

18    pieces of equipment?

19    A.  Either fix or replace or whatever -- at any rate,

20    not put it back into service.

21    Q.  Under any circumstances, is it excused for a

22    company to provide a malfunctioning piece of equipment

23    to its employees to use under your experience?

24    A.  No.  As a safety engineer, you'd never want to do

25    that.
```

1    Q.  I want to ask you about one other thing.  Do you

2    attach any significance to Mr. Blackshire's testimony

3    regarding a prior incident involving this gentleman

4    named Jose with a pallet jack?

5    A.  Certainly.  Any -- any and all accidents,

6    injuries, whether -- or any accident where even maybe

7    nobody is injured but could have been injured should be

8    reported to the Safety Department.  The Safety

9    Department has the responsibility to try to track and

10   see is -- is this a one-time thing, is it a fluke, or is

11   there something going on we need to be aware of.

12           That's what I did at Marathon Oil with crane

13   operations.  I'd look at the maintenance reports, and I

14   detected some things the maintenance supervisor had not

15   picked up on that there was some serious problems with

16   one of the pieces of equipment that we were able to get

17   checked and repaired before anybody got hurt.

18   Q.  And, Mr. Madeley, let me ask you, if the jury

19   ultimately decides -- strike that.

20           If the jury ultimately takes

21   Mr. Blackshire's testimony as true, would it have been

22   proper to allow this jack to remain in service?

23   A.  No.  You would never want this piece of equipment

24   to remain in service.

25   Q.  And -- and, sir, let me ask you, in all the -- in

```
 1   all the information you've been provided in this case,

 2   have -- have you -- have you been provided with

 3   deposition testimony from any other witness who says, "I

 4   saw Mr. Blackshire's accident, and he's wrong.  It

 5   didn't happen that way"?

 6      A.  No.  The -- Mr. Blackshire is the only one, as

 7   far as I've seen, that actually knows what happened at

 8   that time.

 9      Q.  Okay.  I -- I want to back up, and I -- I want to

10   do something a little different here for a second.

11              Let's assume for a moment that

12   Mr. Blackshire is dead wrong.  Let's assume that

13   everything he said is incorrect, inaccurate, false,

14   whatever you want to call it.  If you remove the

15   possibility that this jack was malfunctioning, how else

16   could you explain this accident occurring?

17      A.  I don't know of any way.  I mean, obviously, if

18   he controlled it -- had it under control, but the -- the

19   evidence is from the other testimony to exclude that

20   occurring, the fact is that he is a certified operator,

21   he's comfortable operating the piece of equipment.  His

22   supervisor had observed him and never observed him

23   doing anything incorrectly, so there's not really any

24   other logical explanation for this type of -- of an

25   accident.
```

 1    Q.  So let me walk back.  Let's -- let's assume for a

 2   minute that we want to say Mr. Blackshire did something

 3   wrong, that's why this accident happened.  Is that

 4   supported by the documents you've reviewed in this case?

 5    A.  No.  In fact, he was never written up for it, and

 6   their policy is that if you do anything dangerous or

 7   unsafe with the operation of a pallet jack, that you

 8   will receive disciplinary action.  And there's nothing

 9   in his file indicating that he was ever written up for

10   anything.

11    Q.  And, Mr. Madeley, let me show you.  This is a

12   page from Plaintiff's Exhibit 18 -- and, actually, let

13   me do this.  And this is from one of Tyson's -- this is

14   from one of Tyson's manuals.  Can you identify what's

15   written up here at the top?

16    A.  Yes.  This is the driving rules and operating

17   policy for the Carthage processing plant.

18    Q.  Okay.  I'm going to -- I'm going to zoom in on

19   the section that I've blocked there.  Can you read that,

20   sir?

21    A.  It says, "Disciplinary action will be taken if

22   after investigation is determined that the operator

23   violated any safe operator rules or policy whether an

24   accident, slash, incident occurred or not."

25    Q.  Sir, based on Tyson's own documentation, if

1   someone determined that Anthony Blackshire violated

2   their operating rules with regard to this pallet jack

3   and it caused an accident, would he have been subject to

4   disciplinary action?

5       A.  According to their policy, he would -- he would

6   be, yes.

7       Q.  And, sir, have you seen anything in this case,

8   whether it's testimony or documentation, that

9   Mr. Blackshire received any type of disciplinary action

10  as a result of this accident?

11      A.  No, nothing.

12              MR. PIERCE:  Your Honor, may we approach?

13              THE COURT:  Yes.

14              (Bench conference.)

15              MR. PIERCE:  Your Honor -- Your Honor, I

16  only have one other question I'd like to ask this

17  witness, but I don't want to run afoul of the motion in

18  limine.

19              THE COURT:  That's good.

20              MR. PIERCE:  I would like to ask him if in

21  addition to what he's reviewed, if there's any other

22  type of information he would be interested in seeing in

23  this case.  And I think that what he would likely say is

24  either maintenance or inspection records for the

25  forklift itself.

1          THE COURT:  Well, I think we're going to

2     make it clear.  You're bringing your witness -- y'all's

3     explanation is that these -- when they went from one

4     system to another, I think he's entitled to ask him that

5     question without violating the motion in limine.

6          MR. PIERCE:  That's all that I have, Judge.

7     I'm not going to ask him anything else.

8          THE COURT:  Okay.

9          (Bench conference concluded.)

10     Q.  (By Mr. Pierce)  Mr. Madeley, I believe I only

11     have one final question for you, and I want you to be

12     very clear about what I'm asking you.  You told us about

13     what you reviewed so far in this case.  In addition to

14     what has been provided to you, is there anything else --

15     any other types of documents that would have been useful

16     for you to review in analyzing this accident?

17     A.  Any additional accident reports pertaining to

18     forklift accidents or pallet jack accidents.  I believe

19     the nurse indicated there had been five or six other

20     accidents involving pallet jacks.  And I would like to

21     have reviewed those, as well as the maintenance and

22     repair records for the pallet jacks.

23          MR. PIERCE:  Your Honor, that's all I have.

24     I'll pass the witness.

25          THE COURT:  Okay.  Cross examination?

```
 1            MR. MAYER:  Yes, Your Honor.

 2                     CROSS EXAMINATION

 3  BY MR. MAYER:

 4     Q.  Mr. Madeley, my name is Zach Mayer.  I represent

 5  Tyson.  I'm going to be asking you a few questions.

 6          Sir, when you first formulated your opinions in

 7  this case, you believed that Mr. Blackshire was hit by a

 8  forklift, didn't you?

 9     A.  Yes, that was the original description.  Before I

10  had read any depositions, that was the initial

11  understanding that I had at the time.

12     Q.  And when you formulated your initial opinions, it

13  was that Tyson had too small of a work space for a

14  forklift and Mr. Blackshire to be in the same area,

15  true?

16     A.  Yes.  The way it was described to me, that was

17  the basic scenario.

18     Q.  And -- and you later found out that it was not a

19  forklift involved in the incident but a pallet jack?

20     A.  That is correct.

21     Q.  But the OSHA citations and your opinions with

22  regard to Tyson's violation haven't changed, have they?

23     A.  Some of them did.  At my deposition, I indicated

24  which of the OSHA sections that would have applied to

25  the other scenario no longer applied.
```

1    Q.  When you also formulated your opinions in this

2    case, you had not reviewed any information about the

3    training programs that were in place at Tyson, true?

4    A.  That's correct, I did not have that available at

5    the time.

6    Q.  And when you formulated your opinions in this

7    case, you also did not review any information about what

8    the maintenance program was at Tyson, did you?

9    A.  My initial opinions, that is correct.

10   Q.  And as we sit here today, even up until trial,

11   you still have not inspected the actual pallet jack,

12   have you?

13   A.  That is correct.  As Mr. Howard testified,

14   though, that pallet jack would not be available because

15   they change them out every three years, and so it would

16   not be available.

17   Q.  When you -- have you asked to inspect any other

18   types of similar pallet jacks?

19   A.  No.

20   Q.  Have you on your own gone to try to find a

21   similar Crown pallet jack so that you could inspect it?

22   A.  Not specifically with regard to this case.  I

23   have inspected Crown pallet jacks in the past.

24   Q.  Sir, my question is, in your work in this case,

25   have you gone and inspected any Crown pallet jacks

1    similar to the model that was involved in this incident?

2        A.  No, I have not.

3        Q.  Now, have you reviewed any blueprints or asked to

4    inspect the plant itself to see the configuration of the

5    plant?

6        A.  No.

7        Q.  Since formulating your original opinions in this

8    case, you have reviewed information concerning the

9    maintenance program at Tyson, true?

10       A.  The -- from Mr. Howard's deposition testimony,

11   yes.

12       Q.  And you learned that according to the testimony

13   in this case, there is a weekly, monthly, and quarterly

14   servicing of the pallet jack, correct?

15       A.  Yes.

16       Q.  Do you believe that as an employer, such as

17   Tyson, a weekly, monthly, and quarterly inspection of

18   the pallet jack is prudent?

19       A.  If -- it certainly is.  It should be.  I mean,

20   well, sometimes maintenance programs are evolving.  If

21   it's deemed that it's not sufficient, then you may have

22   to do it more frequent, but generally that -- you know,

23   it's -- it's generally a good -- good policy.

24       Q.  So if Tyson is implementing a weekly, monthly,

25   and quarterly servicing, you believe that would be

1  reasonable as an employer?

2      A.  Yes.  As well as -- as well as if they have a

3  special program that everyone is aware of that if

4  there's any malfunctions, any problems that they're

5  having, that they have a -- a written procedure to make

6  sure that it does get taken care of.

7      Q.  Sir, my question is if Tyson had a weekly, a

8  monthly, and a quarterly servicing program, is that

9  reasonable?

10      A.  It's reasonable.  It may not be adequate, but

11  it's reasonable.

12      Q.  Now, do you also think that an employer, such as

13  Tyson, should ask the actual operator of the pallet jack

14  to inspect the pallet jack before operating it?

15      A.  Certainly.

16      Q.  And, in fact, isn't that an OSHA requirement of

17  anyone who operates a piece of equipment?

18      A.  Yes, although the operation -- inspection

19  checklist that's in the manual would not necessarily

20  cover this particular type of, you know, apparent

21  malfunction.

22      Q.  We -- we can agree that before operating a piece

23  of equipment, the operator should inspect it?

24      A.  Sure.

25      Q.  We can also agree that, according to

1  Mr. Blackshire's own testimony, he was a certified

2  pallet jack operator, correct?

3      A.  Yes.

4      Q.  And that is that he had gone through a written

5  instruction, verbal instruction, and reviewed a -- a

6  video, true?

7      A.  Yes.

8      Q.  And that after he reviewed and went through that

9  classroom program, he took a test and passed the test?

10     A.  Yes.

11     Q.  Do you believe that is appropriate for an

12 employer, such as Tyson, to certify their pallet jack

13 operators?

14     A.  Certainly.

15     Q.  Now, I understand that it's your opinion in this

16 case that there was something wrong with the pallet

17 jack, true?

18     A.  Yes.

19     Q.  Have you tried to do anything mechanical, whether

20 it be testing or inspection of a -- of a different

21 prototype pallet jack to try to determine how it was

22 that this occurred?

23     A.  No.

24     Q.  Now, I understand that when the handle is in the

25 up position, there's a braking position?

1    A.  Yes.

2    Q.  Isn't it also true that when the handle is in a

3    down position, there's also a brake position?

4    A.  There -- it's supposed to work that way, yes.

5    Q.  I'm going to show you a demonstrative.  Can you

6    see that?

7    A.  If I can move, yes.

8    Q.  All right.  Now, what I'm talk --

9         MR. MAYER:  May I have a little leniency

10   from the podium?

11        THE COURT:  Sure.

12   Q.  (By Mr. Mayer)  What I'm referring to is that

13   we've heard when you let go of the handle and the handle

14   goes up, there's a spring that should take it into the

15   up position, correct?

16   A.  Yes.

17   Q.  And when it's in that up position, there's an

18   automatic brake on?

19   A.  Correct.

20   Q.  Now, it's been Mr. Blackshire's testimony that

21   when he turned around, the lever was down?

22   A.  In a lower position.  It wasn't necessarily all

23   the way down, but it was in a -- it was in a down

24   position because he had seen it going up and it was now

25   in a down position of some sort.

1    Q.  Do you know if it was all the way down or not?

2    A.  I don't know.

3    Q.  But if it is in the down position, there's also a

4    brake mechanism just like if it was in the up position,

5    true?

6    A.  There should be, assuming it's functioning

7    correctly.

8    Q.  And you have no reason to doubt that the Crown

9    pallet jack that was involved in this one had the same

10   type of braking mechanism in the down position as it did

11   in the up?

12   A.  As far as I know, it was supposed to.

13   Q.  Now, beyond just the braking when it's up or

14   down, there's also traveling.  And you obviously move

15   the pallet jack around the plant, true?

16   A.  Yes.

17   Q.  In order to move the pallet jack, you have to

18   turn the accelerator, don't you?

19   A.  Generally speaking, yes.

20   Q.  There's mechanical devices that stop the pallet

21   jack from moving without turning the throttle, true?

22   A.  I'm not sure if it is going to be hydraulically

23   stopped or if it is going to merely be in a

24   free-wheeling position.  In other words, you could push

25   it by hand, but the brakes are not on.

1    Q.  But in order to get it to accelerate either

2   forward or backwards, there's a throttle that must be

3   turned to accelerate, true?

4    A.  Or gravity.  If it's on a slight incline, it may

5   roll on its own.

6    Q.  Sir, are you aware of any incline at the plant

7   that caused this to roll?

8    A.  I -- I don't know.  I'm not -- haven't seen the

9   plant, but that's a possibility besides the throttle

10   control.

11    Q.  In order for an operator to move it forward, he's

12   got to turn the control down, true?

13    A.  Generally speaking, yes.

14    Q.  And if he lets go and it springs up or if he lets

15   go and it goes down, the brake's on and it will not

16   move?

17    A.  If it is functioning correctly or unless there is

18   a malfunction within the controls itself that allow it

19   to accelerate on its own.

20    Q.  Mr. Madeley, have you heard of situations where

21   because of the way an operator is operating a pallet

22   jack, he happens to either run over his own foot or

23   someone else's foot?

24    A.  I have seen it before.

25    Q.  You've actually seen it?

1    A.  Well, I've -- I've investigated a case where that

2    had occurred.

3    Q.  And this Mr. Jones or Jose fellow, you don't know

4    as we sit here today whether he just rolled over his own

5    foot when he was operating that pallet jack, do you?

6    A.  I don't have any of the details.

7    Q.  And your opinions -- when it was back -- a

8    forklift hitting Mr. Blackshire, you just revised those

9    and then started talking about a pallet jack, right?

10   A.  I'm not sure I understand the question.

11   Q.  Sure.  Initially, when you were talking about the

12   forklift hitting Mr. Blackshire, when you learned it was

13   a pallet jack, you revised those opinions with the facts

14   in this case?

15   A.  That is correct.

16   Q.  And you came up with your opinions before you

17   knew anything about Tyson's policy for maintenance or

18   training, true?

19   A.  Yes, because the pol -- the opinions that I

20   developed did not directly address that.  It just

21   addressed the fact that if, in fact, this is a

22   malfunctioning and defective piece of equipment, that it

23   should not be in service.  I don't need to know what the

24   policy is.  It just -- all it means is that they're in

25   violation of federal law, as well as good safety

1   practice.

2      Q.  Sir, maybe you didn't understand my question.

3           My question is, did you formulate your

4   opinions before reviewing the policies for training and

5   the policies for maintenance there at Tyson?

6           MR. PIERCE:  Your Honor, I'm going to object

7   as asked and answered.

8           THE COURT:  Overruled.

9      A.  The opinions -- as I investigate -- as I get

10  additional information, my opinions are always evolving

11  and are being adjusted to accommodate the new

12  information --

13          THE COURT:  No.  Let's answer the question

14  he asked you.  Do you know what the question is that he

15  asked you?  He asked you at the time you gave your

16  initial opinions you had not yet reviewed their

17  maintenance policies and their training policy.  Is that

18  the question?

19          MR. MAYER:  That's the question, Your Honor.

20     A.  I'm sorry.  I misunderstood.  I didn't hear the

21  word "initial" in there.

22          Before I -- yes, the initial opinions on the

23  first report that we've discussed at my deposition, that

24  is correct.

25     Q.  (By Mr. Mayer)  And now that you know the

1    training and the maintenance program there at Tyson, you

2    believe that those programs are reasonable and prudent,

3    true?

4        A.  I didn't use the word "prudent."  I said it's

5    reasonable.  I said, they may not be adequate, and they

6    may not be safe because apparently there's not a policy

7    in place in order for people to report, and there's no

8    documentation for maintenance of -- and repairs to

9    defective pieces of equipment.

10       Q.  Sir, would you agree that the training and the

11   maintenance program at Tyson is reasonable?

12       A.  I believe that the training program seems

13   reasonable, based on what I've seen and what we've heard

14   discussed today.  The maintenance program, I have not

15   seen.  I've only heard a couple of phrases that were

16   discussed in a deposition as to what generally was done,

17   so I can't evaluate the entire maintenance program.

18       Q.  And the only evidence that you are judging how

19   this incident occurred or how it may have occurred is

20   the testimony of Mr. Blackshire in this case, true?

21       A.  That is correct.  He's the only one that was

22   there.

23            MR. MAYER:  No further questions.  I'll pass

24   the witness, Your Honor.

25            THE COURT:  Redirect?

```
 1              MR. PIERCE:  Yes, sir, very brief.  Your

 2    Honor, may I take this down?

 3              THE COURT:  Yes.

 4                        REDIRECT EXAMINATION

 5    BY MR. PIERCE:

 6       Q.  Mr. Madeley, you aren't critical about the

 7    training that Tyson provided Mr. Blackshire, are you?

 8       A.  No, I'm not.

 9       Q.  And, sir, would it be fair to say that based on

10    the record, the people at Tyson thought Blackshire was a

11    good operator?

12       A.  That's the testimony, yes.

13       Q.  There were questions asked of you about whether

14    you inspected the Crown pallet jack involved in this

15    accident.  Do you recall those questions?

16       A.  Yes.

17       Q.  First of all, based on Mr. Howard's testimony, do

18    you have any understanding whether Tyson even still has

19    this pallet jack?

20       A.  It would appear they likely do not.  If his

21    testimony is accurate that they change them out every

22    three years on a rotating basis, so they would not have

23    that pallet jack anywhere.

24       Q.  And, sir, you've seen Crown pallet jacks before,

25    correct?
```

1    A.  Yes, I have.

2    Q.  You've read manuals for Crown pallet jacks

3  before, correct?

4    A.  Correct.

5    Q.  In fact, in this case, you even read Tyson's own

6  manual about this pallet jack, correct?

7    A.  Yes.

8    Q.  You were asked a lot of questions about the

9  maintenance program at Tyson.  Do you recall those

10  questions?

11    A.  Yes.

12    Q.  Sir, as you sit here today under oath, can you

13  tell us the last time that this particular pallet jack

14  was inspected before this accident occurred?

15    A.  No.

16    Q.  What would you need to have to be able to do

17  that?

18    A.  Maintenance records.

19    Q.  Sir, as you sit here today under oath, can you

20  tell us the last time that there was routine maintenance

21  performed on this pallet jack before this accident

22  occurred?

23    A.  No, I can't.

24    Q.  Why not?

25    A.  No records.

1    Q.  Sir, is it reasonable and prudent to put a

2  malfunctioning pallet jack back into service?

3    A.  It's not only unreasonable, it's reckless to do

4  so.

5         MR. PIERCE:  Your Honor, I'll pass the

6  witness.

7         THE COURT:  Okay.

8         MR. MAYER:  Nothing further, Your Honor.

9         THE COURT:  All right.  You may step down,

10  Mr. Madeley.

11         THE WITNESS:  Thank you, Judge.

12         THE COURT:  Who will be your next witness?

13         MR. PIERCE:  Your Honor, the plaintiff would

14  call Dr. Kenneth Lee.

15             (Witness sworn.)

16         THE COURT:  Proceed.

17              KENNETH LEE, M.D.,

18  having been first duly sworn, testified as follows:

19              DIRECT EXAMINATION

20  BY MR. PIERCE:

21    Q.  Dr. Lee, can I get you to state your full name

22  for the record?

23    A.  Sure.  My full name is Kenneth Jin Hon Lee.

24    Q.  And, sir, I'm going to -- I'm going to take a

25  minute to walk through your professional background.

1  Let's start out at the college level.  Where did you go

2  to college?

3    A.  I went to college at Duke University.

4    Q.  All right.  And what was your major?

5    A.  Biology.

6    Q.  And what year did you graduate?

7    A.  1994.

8    Q.  What did you do after college?

9    A.  I went to med school.

10   Q.  Where did you go to medical school?

11   A.  At the same institution, Duke University.

12   Q.  What year did you finish medical school?

13   A.  1999.

14   Q.  Doctor, what did you do after finishing medical

15  school?

16   A.  I traveled to the University of Pittsburgh for an

17  orthopedic residency.

18   Q.  And how long did that residency last?

19   A.  Five years.

20   Q.  And so that would take us up through what year?

21   A.  2004.

22   Q.  All right.  What did you do in 2004?

23   A.  I then attained a fellowship award from Harvard

24  for spine surgery and then traveled out to UCLA for a

25  year of spine surgery training.

1    Q.  So that takes us through '06?

2    A.  The fall of '05, 2005.

3    Q.  The fall of '05.  What did you do in the fall of

4  '05?

5    A.  I then traveled to -- I actually moved to Houston

6  where I started my practice.

7    Q.  Doctor, when were you first licensed to practice

8  medicine?

9    A.  In 1999.

10    Q.  Okay.  And your license has been in good standing

11  since that time?

12    A.  Yes.

13    Q.  And -- and, sir, what -- what specific field do

14  you practice in?

15    A.  Orthopedic surgery, but restricted to spine

16  surgery.

17    Q.  Okay.  And that's a -- that's a good point.  Let

18  me back up.  Orthopedic surgeons can treat all kinds of

19  different things, shoulders, elbows, knees, ankles

20  backs?

21    A.  Yes.

22    Q.  And then you -- you say you restrict your

23  practice only to the spine?

24    A.  Correct, both in the neck and -- and low back.

25    Q.  Why is that?

1    A.  Just for advancing technologies, for better

2    expertise, just to focus on one area.

3    Q.  And, Doctor, are you board certified?

4    A.  Yes, sir.

5    Q.  Okay.  If you would, tell the jury what it takes

6    to become board certified.

7    A.  So after completing your training, you have to

8    take a written exam which you have to pass, and then

9    after that, you have to accrue enough surgical cases

10   where you then go for an oral examination.  And after

11   that, you are board certified.

12   Q.  And, Doctor, do you have practice privileges at

13   hospitals in the Houston area?

14   A.  Yes, sir.

15   Q.  Okay.  If you could, tell us where -- where you

16   practice.

17   A.  At Methodist Sugar Land Hospital, St. Luke's

18   Sugar Land Hospital, Foundation Surgical Hospital.

19        MR. PIERCE:  Your Honor, at this time, the

20   plaintiff would tender Dr. Lee as an expert in the field

21   of orthopedic surgery.

22        THE COURT:  The Court will allow him to

23   express his opinions.

24        MR. PIERCE:  Thank you, Judge.

25   Q.  (By Mr. Pierce)  Dr. Lee, before we get into

1    Mr. Blackshire's case specifically, I'd like to get you

2    to talk to the jury just a little bit about the anatomy

3    of the spine.

4              First of all, when we feel down our back and

5    we feel the bones in our back, what's that that we're

6    feeling?

7    A.  Usually the processes that you can feel in the

8    middle of your back are just what's called spinus

9    processes.

10   Q.  And what about the disks in our spine?  Could you

11   first tell us what the disks are?

12   A.  Sure.  So the disks are basically cushions, if

13   you will, in between the bones in your low back.

14   Q.  All right.  And -- and what -- we've heard some

15   references to things called disk bulges.  Tell us what a

16   disk bulge is.

17   A.  So I tend to tell my patients a disk is simply

18   like a jelly donut, for lack of better terms.  There's a

19   soft inside which basically provides the cushioning, and

20   then there's an outer rim of the donut which kind of

21   contains the -- the cushioning material.  And so any

22   time there's pressure or damage to the disk, there can

23   be a bulging, kind of like a donut pushing out.  And

24   sometimes the disk material can actually herniate out

25   into the spinal canal.

1    Q.  And, sir, we talked about the disk.  Let me ask

2    you about the vertebrae in your spine.  Is it possible

3    to injure the vertebrae in your spine?

4    A.  Absolutely.

5    Q.  Okay.  And, sir, both of those types of injuries,

6    a bulging disk, that can be a painful injury; is that

7    correct?

8    A.  Correct.

9    Q.  What about a fractured vertebrae?

10   A.  Correct.

11   Q.  Now, you saw Mr. Blackshire as a patient; is that

12   correct?

13   A.  Yes.

14   Q.  And you understand that Mr. Blackshire actually

15   got your name from my office; is that right?

16   A.  Correct.

17   Q.  Sir, is there anything about your treatment of

18   Mr. Blackshire, your examination of him, that is any

19   different than any of the other patients you see?

20   A.  No.  I treat patients.  I don't treat the

21   referral source, whether it's an academic institution, a

22   friend, a neighbor, or -- or a law firm.

23   Q.  And, sir, just to -- just to give the jury an

24   idea, in an average week, how many patients do you see?

25   A.  An average week, 60 to 90, depending on the week.

1  Q.  And if you're seeing somewhere between 60 to 90

2  patients a week, when that patient walks into your

3  office for an examination, for each patient, do you have

4  a specific idea of how he got there?

5  A.  Not always.

6  Q.  Now, when you first saw Mr. Blackshire, you took

7  a history from him; is that correct?

8  A.  Correct.

9  Q.  And we're going to talk about your treatment more

10  in detail in just a moment, but I -- I want to ask you

11  broadly what was the explanation Mr. Blackshire gave you

12  as to how he was injured?

13  A.  He basically told me that he was operating a

14  chicken plant and was operating a -- a pallet jack that

15  contained tubs of chicken that weighed about 60 to 70

16  pounds.  Somehow he lost control of the pallet jack

17  and it ended up striking him and pinning him against a

18  con -- concrete wall.

19  Q.  And -- and, Dr. Lee, let me ask you just --

20  again, speaking broadly, based on the description that

21  Mr. Blackshire gave to you, is that the type of a

22  traumatic incident that can cause a disk to bulge?

23  A.  It can, yes.

24  Q.  And, sir, again, based on the description

25  Mr. Blackshire gave to you, is that the type of a

1    traumatic incident that can cause a vertebrae to

2    fracture?

3        A.  Sure, yes.

4        Q.  Now, Doctor, as part of your treatment of

5    Mr. Blackshire, did you have an opportunity to review

6    medical records from the facilities and others doctors

7    he had seen before coming to you?

8        A.  Yes, at -- various documents at various times.

9        Q.  Okay.  And -- and, sir, I'm not -- I'm not going

10   to run through all of these in great detail, but I -- I

11   do want to hit a couple of them with you, all right?

12       A.  Sure.

13       Q.  Do you remember seeing the records of a

14   Dr. Nielsen?

15       A.  Yes.

16       Q.  Okay.  Tell the jury who Dr. Nielsen was, if you

17   remember.

18       A.  I think Dr. Nielsen is a board certified family

19   practitioner in Louisiana, I believe.

20       Q.  Okay.  And -- and, sir, to speed things up, I'll

21   represent to you that Mr. Blackshire saw Dr. Nielsen on

22   November the 6th, November the 16th, and November the

23   28th of 2007.  Does that -- does that comport with your

24   memory?

25       A.  Yes.

1    Q.  I want to ask you a couple of things.  Let's

2    see -- for the record, and this is -- this is from

3    Plaintiff's Exhibit No. 14, Pages 5 and 6.  And,

4    Dr. Lee, do you recognize that document?

5    A.  Yes.

6    Q.  Okay.  And let's see, can you -- can you make out

7    the date of the examination?

8    A.  Sure.  It's November 6th, 2007.

9    Q.  Now, Dr. Lee, you and I were -- were talking

10   before.  You said one of the first things you do as a

11   physician is you'll take a history from the patient; is

12   that right?

13   A.  Yes.

14   Q.  Do you also perform a physical examination?

15   A.  Yes.

16   Q.  What's the point of performing a physical

17   examination?

18   A.  Basically, to obtain any sort of objective

19   information that we can to correlate with the history.

20   Q.  And -- and give us an idea, if you have -- if you

21   have somebody like Mr. Blackshire that comes in and he's

22   complaining of back pain, what sort of an exam would you

23   perform?

24   A.  So we'll ask him to walk around the examination

25   room to see if his gait is affected by any sort of back

1    pain.  We'll then palpate or feel his -- his lumbar

2    spine to see if there's any specific areas of

3    tenderness.  We'll also test his range of motion of his

4    low back to see if it's restricted.  And, finally, we'll

5    do some motor and sensory tests of his legs to see if

6    there are any neurologic deficits.

7        Q.  And, Dr. Lee, what I'm going to do, I'm going to

8    turn to the second page of Dr. Nielsen's visit on

9    November the 6th.  There are a couple of findings from

10   his exam I wanted to ask you about.  Okay.  First, we

11   see this reference to thoracic spine.  What's your

12   thoracic spine?

13       A.  So the thoracic spine is the area of the spine

14   between your neck and your low back.

15       Q.  Okay.  Now, there are a couple of things I want

16   to ask you about.  There's -- there's a reference there

17   that says -- actually, I'm not even going to try and

18   pronounce it.  I'm going to let you.

19       A.  It says, thoracolumbar PSMS bilaterally.

20       Q.  Okay.  What does that mean to you, Doctor?

21       A.  He has tenderness bilateral -- tenderness on both

22   sides of his thoracic spine or chest wall.

23       Q.  Okay.  The -- the next section we see under

24   there, it says lumbar sacral spine; is that correct?

25       A.  Correct.

1     Q.   What -- what area of your back is that?

2     A.   So typically people tend to refer to as the low

3     back.

4     Q.   All right.  And there are a couple of things here

5     I want to ask you about.  First, there's a reference to

6     paraspinous muscle spasms.  Did I read that correctly?

7     A.   Yes, sir.

8     Q.   If you would, explain to the jury what that is.

9     A.   So, basically, during the examination at that

10    time point, whenever the physician was palpating or

11    pushing upon his lower back or examining that area, he

12    could actually feel or visualize the muscles kind of

13    moving and contracting by themselves.

14    Q.   And -- and, sir, just -- is this something --

15    when you perform your own examinations, do you look for

16    spasms?

17    A.   Yes.

18    Q.   And are spasms something that a patient can fake?

19    A.   No.  I think as I mentioned earlier, it's usually

20    an -- an uncontrolled motion.

21    Q.   And what -- when you see -- if you're performing

22    an examination on a patient complaining of low back pain

23    and you see spasm, what does that -- what does that

24    indicate to you?

25    A.   It's a sign that there is some sort of trauma

1   that's occurred recently to the point that the patient

2   is still experiencing pain enough to cause these

3   uncontrolled reactions of the muscles.

4       Q.  Doctor, there's a -- there's another section I

5   want to ask you about.  It says, forward flexion

6   decreased, painful 30 degrees.  Do you see that?

7       A.  Yes, sir.

8       Q.  Okay.  What's the significance of that to you,

9   Doctor?

10      A.  So -- usually, depending on how flexible a

11  patient is -- usually, when you try to bend forward --

12  during this particular test, the physician is asking the

13  patient to try to keep a knee straight and -- and bend

14  forward and touch the toes if possible.  And on that

15  particular visit, the patient can only flex about 30

16  degrees and was stopped by pain.

17      Q.  Okay.  And, sir, let me ask you -- let's go ahead

18  and go down to the bottom to the section that says

19  assessment.  What was Dr. Nielsen's assessment on this

20  day?

21      A.  No. 1 was new low back pain.  No. 2 was a new

22  sprain that was thoracic muscles.  And No. 3 was an

23  injury or bruising of the right leg.

24      Q.  And, Doctor, we're going to -- again, we're not

25  going to go through every medical record.  We're going

1  to kind of jump ahead to you after this, but these

2  assessments that were initially made by Dr. Nielsen

3  within less than two weeks after this injury, are those

4  the same assessments that we see carried forward

5  throughout Mr. Blackshire's medical records?

6      A.  Yes.

7      Q.  All right.  Now, Doctor, let me ask you, there

8  are some -- there are some medical imaging tests that I

9  want to talk to you about a little bit.  I think all of

10  us know what an X-ray is.  Doctor, when would you order

11  an X-ray?

12     A.  You would order an X-ray whenever there's been

13  persistent pain, has not improved, generally -- as a

14  general guideline, over six weeks.

15     Q.  Okay.

16     A.  Or if there's been some sort of trauma.

17     Q.  There's also a study called a CT scan.  Can you

18  tell us what that is?

19     A.  A CT scan in general is just simply a more

20  defined imaging study of -- of the bone -- of the bony

21  architecture of the spine.

22     Q.  Now, Doctor, do you remember -- during the time

23  that Mr. Blackshire was seeing Dr. Nielsen, do you

24  remember whether Dr. Nielsen ordered a CT scan?

25     A.  I think he ordered actually X-rays and -- and a

1   CT scan, as well.

2       Q.  And, Doctor, I'm going to show you actually a

3   report from the CT scan, and the copy is not very good,

4   but can -- can you make out the date of the procedure

5   there?

6       A.  Yes, sir.  It looks like December 3rd, 2007.

7       Q.  Okay.  And then I want to talk to you about the

8   findings.  Doctor, take a minute and just take a look at

9   this and tell us if there's anything significant that's

10  shown on this CT.

11      A.  So underneath the impression section, the

12  radiologist described a fracture or injury to the left

13  side of the vertebral column.  Specifically, there was a

14  fracture of a transverse process at the level labeled

15  L-2.

16      Q.  Okay.  And -- and, Doctor, what -- what is the

17  significance of that fracture?

18      A.  It means there was enough trauma to that

19  particular area of the spine to result in -- in a

20  fracture.

21      Q.  And -- and, Doctor, this -- this may seem like a

22  silly question, but is it possible to fake a fractured

23  vertebrae on a CT?

24      A.  No, sir.

25      Q.  And -- and do you remember during the time that

1    Mr. Blackshire was seeing Dr. Nielsen, do you recall

2    whether Dr. Nielsen was giving Mr. Blackshire any

3    medications?

4        A.  I think he -- I think he did describe some

5    anti-inflammatories at least.

6        Q.  And -- and, sir, whenever we talk about

7    conservative treatment, can you tell us what -- what

8    that means?

9        A.  That would basically mean anything nonoperative

10   or nonprocedural.  So consisting of medications, rest,

11   and physical therapy.

12       Q.  And, sir, again, we're not going to go through

13   all the records, but you understand that Mr. Blackshire,

14   after seeing Dr. Nielsen, eventually saw Dr. Kerr, as

15   well?

16       A.  Correct.

17       Q.  Were the diagnoses that Dr. Kerr made, were they

18   essentially the same as Dr. Nielsen's?

19       A.  In general, yes, sir.

20       Q.  All right.  What about the treatment that

21   Dr. Kerr provided?

22       A.  Dr. Kerr also prescribed some further medications

23   and also recommended a -- an MRI of the lumbar spine, as

24   well.

25       Q.  Do you recall whether Dr. Kerr ordered physical

1    therapy?

2        A.  Yes, he did.

3        Q.  And -- and, sir, the next doctor we're going to

4    get to is you.  Before we leave these other doctors

5    alone, I just want to ask you, in either Dr. Nielsen's

6    records or Dr. Kerr's records, did you ever see any

7    indication that Mr. Blackshire was a malingerer?

8        A.  No.

9        Q.  And -- and just tell the jury, what is a

10   malingerer?

11       A.  So a malingerer in general terms is any patient

12   trying to fake symptoms and/or exam findings for

13   secondary gain.

14       Q.  And, Doctor, did you see in any of those medical

15   records any indication that the doctors thought that

16   Mr. Blackshire was magnifying his symptoms?

17       A.  No.

18       Q.  Now, Doctor, do you have a copy of your chart

19   with you?

20       A.  Yes, sir.

21       Q.  Okay.  It may be easier for you just to refer to

22   that.  Do you recall when you first saw Mr. Blackshire

23   as a patient?

24       A.  Yes.  My initial evaluation was on November --

25   I'm sorry, was on -- yes, November 6th of 2009.

1    Q.  And -- and, Doctor, I'll represent to you that

2    we've got a little bit of a gap.  The last time that

3    Mr. Blackshire saw Dr. Kerr was January the 15th of

4    2008, so this would be about a year and ten months after

5    that?

6    A.  Right, right -- correct.

7    Q.  And, Doctor, let me ask you, in your -- in your

8    medical practice, have you seen patients before with

9    back injuries similar to Mr. Blackshire who have gone

10   that long without treatment?

11   A.  Sure.

12   Q.  Okay.  And why?

13   A.  It can be for various reasons.  You know, as we

14   discussed earlier, Mr. Blackshire had already undergone

15   a course -- at least two courses of physical therapy.

16   He may have for financial reasons decided to continue

17   exercises at home.  He may have been self treating with

18   over-the-counter medications, and he may have had

19   difficulty to access medical care at that time.

20   Q.  Sir, at the time Mr. Blackshire saw you in

21   November of 2009, what were his complaints?

22   A.  He mainly complained of back pain was his chief

23   complaint, and his secondary complaint was -- was

24   radiating leg pain.

25   Q.  Okay.  And, Doctor, based on his complaints and

1    based on your examination, what did you decide to do for

2    him going forward?

3         A.  Well, when I first evaluated him, I wanted to

4    continue further physical therapy.  And when that did

5    not work, along with other medications, I recommended

6    that he try an epidural steroid injection.

7         Q.  There's one type of diagnostic test we haven't

8    talked about yet, and that's an MRI.

9         A.  Correct.

10        Q.  Did you order an MRI for Mr. Blackshire?

11        A.  Yes.

12        Q.  And -- and, Doctor, if you would, explain to the

13   ladies and gentlemen of the jury, if he's already had

14   X-rays, if he's already had a CT scan, why do we need an

15   MRI?

16        A.  Well, his CT scan mainly just looks at the bony

17   architecture of his spine.  And since his symptoms had

18   still persisted since the time of injury, I wanted a new

19   updated imaging specifically looking at the disk and/or

20   nerves since he had complained of some radiating leg

21   pain, so I ordered a -- an updated imaging test.

22        Q.  And, Dr. Lee, what did that MRI show?

23        A.  The MRI, if I recall correctly, showed some

24   bulging disks at two levels in his low back.

25        Q.  Okay.  And -- and, sir, give us an idea, you said

1    that you -- you saw him several times over the course of

2    the next few months; is that right?

3        A.  Yes, sir.

4        Q.  And what type of treatment did you provide for

5    him?

6        A.  Again, mainly conservative care, other than the

7    recommendation for the steroid injection.

8        Q.  And if you would -- well, first of all, did

9    Mr. Blackshire undergo that steroid injection?

10       A.  Yes, he did.

11       Q.  Dr. Lee, could you explain to the ladies and

12   gentlemen of the jury what an epidural steroid injection

13   is?

14       A.  Sure.  So this epidural steroid injection is

15   simply a -- an injection of steroids which is used to

16   calm down any sort of inflammation in and around the low

17   back.  So, ideally, I was hoping this injection that's

18   performed by a pain management physician would take care

19   of his back pain, as well as his leg pain.

20       Q.  How did he respond to the epidural steroid

21   injections?

22       A.  He told me he actually did quite well.  He, you

23   know, guesstimated that he obtained about 60 percent

24   pain relief.  However, this pain relief was -- was

25   rather short, only lasting a couple of weeks.

1    Q.  Now -- - now, Dr. Lee, you haven't performed any

2  type of a surgery on Mr. Blackshire; is that right?

3    A.  Correct.

4    Q.  At present, do you feel like he has a surgical

5  injury?

6    A.  Not based upon my last evaluation, no.

7    Q.  And -- and, Doctor, let me ask you, the fact that

8  he hasn't had surgery, does that mean that the injury

9  that he has is not a serious injury?

10    A.  No, not at all.  There's many examples where you

11  could have quite painful conditions, but surgery is not

12  warranted at that time.

13    Q.  And -- and, Doctor, throughout the time that

14  you've seen Mr. Blackshire, has he continued to have the

15  same types of complaints as when he first came in to

16  you?

17    A.  Yes, he's been fairly consistent.

18    Q.  Have you seen anything to indicate that he's

19  malingering?

20    A.  No.

21    Q.  Have you seen anything to indicate that he's

22  magnifying symptoms?

23    A.  No.

24    Q.  Have you seen anything to indicate that he's just

25  faking it?

1      A.  No.

2      Q.  Doctor, I'm going to ask you, within a reasonable

3   degree of medical probability, do you believe that the

4   problems that you were treating Mr. Blackshire for were

5   caused by his accident on October the 26th, 2007?

6      A.  Yes, I believe it's more than probable.

7      Q.  Okay.  Explain that to the jury.

8      A.  So -- you know, based upon my initial history, as

9   well as the other physicians that were involved in his

10   initial care, he did not report any pain prior to this

11   accident in regards to low back pain and/or leg pain.

12   After this reported accident in October of '07, he's

13   continued to have these -- these symptoms.  So based on

14   his history, it's more than probable that the injury

15   from October '07, resulted in his current complaints.

16              MR. PIERCE:  Your Honor, may I approach the

17   witness?

18              THE COURT:  Yes.

19      Q.  (By Mr. Pierce)  Dr. Lee, I'm going to hand you

20   what we've marked as Plaintiff's Exhibit 7, and I want

21   to ask you some questions about that.

22      A.  Okay.

23      Q.  Doctor, I'll represent to you that that is a bill

24   from Memorial MRI.  Does that look correct?

25      A.  Yes, sir.

1    Q.  And, sir, we talked about some of the treatment

2  you ordered for Mr. Blackshire.  That included MRIs?

3    A.  Correct.

4    Q.  It also included epidural steroid injections,

5  correct?

6    A.  Correct.

7    Q.  And was that treatment provided at Memorial MRI?

8    A.  Yes, sir.

9    Q.  And, Doctor, the bill that you have in front of

10  you that's Plaintiff's Exhibit No. 7, are those the

11  charges for the treatment you prescribed?

12    A.  Yes, sir.

13    Q.  Sir, what are the total charges for that

14  treatment?

15    A.  The balance reads $5,985 and no cents.

16    Q.  Okay.  And I want to ask you a couple of

17  questions about that, sir.  The medical treatment you

18  provided, specifically the MRIs and the epidural steroid

19  injections, did you feel that was reasonable and

20  medically necessary to treat Mr. Blackshire's condition?

21    A.  Yes.

22    Q.  And, sir, the charges that are reflected in

23  Exhibit 7 for the MRIs and for the epidural steroid

24  injections, are those the usual and customary charges

25  for such services in the Houston area?

     1      A.  Yes.

     2      Q.  And, sir, do you feel like that care was

     3  necessitated by the injury that Mr. Blackshire suffered

     4  back on October the 26th of 2007?

     5      A.  Yes.

     6          MR. PIERCE:  Your Honor, I don't believe

     7  that exhibit was pre-admitted.  Plaintiffs are now

     8  offering Exhibit No. 7.

     9          THE COURT:  Okay.

    10          MR. MAYER:  No objection, Your Honor.

    11          THE COURT:  Received.

    12      Q.  (By Mr. Pierce)  Dr. Lee, I want to talk to you

    13  just about one last topic.  As of today, is

    14  Mr. Blackshire totally healed?

    15      A.  No.

    16      Q.  All right.  Are you going to continue treating

    17  him as one of your patients?

    18      A.  If he'd be, yes.

    19      Q.  Okay.  And, Doctor, through your examination and

    20  treatment of him, have you reached an opinion as to what

    21  type of medical care he is going to need in the future

    22  specifically related to his low back injury?

    23      A.  A general -- a general guideline, yes.

    24      Q.  Okay.  Let's talk about categories for just a

    25  second before we get into the numbers.  What -- what

1  types of treatment is he going to need?

2    A.  Well, I think he'll probably need continued

3  medication treatment.  He's reported in the past that

4  these anti-inflammatories and muscle relaxers have given

5  him good relief, but it's always been short term.

6    Q.  Okay.  In addition to medication, what else?

7    A.  He'll probably need continued physical therapy.

8  As he stated earlier, it does provide him with some

9  short-term relief again.

10    Q.  All right.  Doctor, anything else?

11    A.  He's only had one epidural steroid injection, so

12  most likely he'll need probably a series or so of

13  epidural steroid injunctions.

14    Q.  Okay.  I just put ESI for that.

15    A.  Uh-huh.

16        MR. MAYER:  Your Honor, may we approach?

17        THE COURT:  Yes.

18        (Bench conference.)

19        MR. MAYER:  The doctor may say that this is

20  all based on reasonable medical probability, but right

21  now he's just saying may need, might need, or possibly

22  will need, and it's --

23        MR. PIERCE:  In fairness, I'll lay -- I'm

24  going to lay the full predicate with him.  I'm not going

25  to write anything up before I ask him --

1          THE COURT:  Based on that representation.

2          How much longer you got, Mr. Pierce?

3          MR. PIERCE:  I would say less than five

4     minutes, Judge.

5          THE COURT:  Okay.  We're going to take a

6     break.

7          (Bench conference concluded.)

8     Q.  (By Mr. Pierce)  Dr. Lee, we're going through

9     again just categories now, not any dollar amounts.  We

10    talked about medication, physical therapy, ESI.  Is

11    there anything else?

12    A.  Finally, yes.  If he persisted with the symptoms,

13    he would eventually require surgery.

14    Q.  Okay.  Now, Doctor, we've talked about this term

15    "reasonable medical probability" today, correct?

16    A.  Correct.

17    Q.  And with the understanding that reasonable

18    medical probability means more probable than not, can

19    you tell the ladies and gentlemen of the jury within a

20    reasonable degree of medical probability whether this is

21    future care that Mr. Blackshire is going to need to

22    treat his lower back injury?

23    A.  Yes, I believe so.

24    Q.  All right.  Now, let's go through this.  Well,

25    first of all, Doctor, for each one of these categories,

1   are these things that you prescribe for your patients?

2       A.  Yes.

3       Q.  Okay.  For medication, if you had to project what

4   he's going to need to continue to treat his back, what

5   figure would you project?

6       A.  Roughly -- low end 5,000; on the high end, 15 to

7   20, depending on the type and -- and length of duration.

8       Q.  Okay.  And -- and to be fair, I'll put the low

9   end of your range there.

10          What about for physical therapy?

11      A.  Roughly around 10,000.

12      Q.  Okay.  What about for epidural steroid

13  injections?

14      A.  I think for a series of three, roughly around

15  10,000, as well.

16      Q.  And that would be consistent with what Memorial

17  MRI has billed for the one series he's had so far; would

18  that be correct?

19      A.  Yes, sir.

20      Q.  Okay.  And then for a future surgery, how much --

21  how much would you project a future surgery would cost

22  for him -- being -- and give us a conservative number.

23      A.  Roughly around 25,000.

24      Q.  Okay.  And, sir, let me -- I'm going to run

25  through these with you, as well.  Sir, the medication

1  you projected, the 5,000, do you feel that that's

2  reasonable and medically necessary to treat

3  Mr. Blackshire's condition?

4      A.  Yes.

5      Q.  And are the charges that you've included there,

6  are those the usual and customary charges for medication

7  to treat those types of conditions?

8      A.  Yes.

9      Q.  And, sir, do you feel like the back injury that

10  is being treated with this medication was caused by the

11  accident on October the 26th of 2007?

12      A.  Yes.

13      Q.  I'm going to ask you the same questions with

14  regard to physical therapy.

15          Sir, do you feel like this physical therapy

16  is reasonable and medically necessary to treat

17  Mr. Blackshire's condition?

18      A.  Yes.

19      Q.  And, sir, the charge you have for the physical

20  therapy, is that the usual and customary charge for

21  physical therapy?

22      A.  Yes.

23      Q.  And, sir, the condition you're treating here, was

24  it caused by Mr. Blackshire's accident on October 26th,

25  2007?

1     A.  Yes.

2     Q.  The next thing we have is ESIs.  Sir, the charge

3  you have here for ESIs of $10,000, is that a -- first of

4  all, is that treatment reasonable and medically

5  necessary to treat his condition?

6     A.  Yes.

7     Q.  And are those charges the usual and customary

8  charges for those services in the Houston area?

9     A.  Yes.

10     Q.  And, sir, are these ESIs going to treat a

11  condition caused by the accident on October the 26th,

12  2007?

13     A.  Yes.

14     Q.  The last thing you have here, Dr. Lee, is

15  surgery.  The surgery that you have there, do you

16  believe that it's reasonable and medically necessary?

17     A.  Yes.

18     Q.  And, sir, the charge that you have there for the

19  surgery, is that the usual and customary charge in the

20  Houston area for that procedure?

21     A.  Yes.

22     Q.  And, sir, is that surgery going to treat a

23  condition that was caused by Mr. Blackshire's accident

24  on October the 26th, 2007?

25     A.  Yes.

1    Q.  All right.  So, sir, if we total up the numbers

2    for past and future care, the number that we would have

3    there is $55,985.00?

4    A.  Yes, sir.

5    Q.  Dr. Lee, have you understood my questions today?

6    A.  Yes.

7    Q.  Thank you for your time, sir.

8         MR. PIERCE:  I'll pass the witness.

9         THE COURT:  Ladies and gentlemen, we're

10   going to take our afternoon break.  Be ready to come

11   back in the courtroom at 3:30.  3:30.

12        Remember my instruction.  Don't discuss this

13   matter during any breaks.  So have a nice break.  I'll

14   see you back at 3:30.  You may leave the courtroom.

15        LAW CLERK:  All rise.

16        THE COURT:  Go ahead, right.  Don't have

17   anybody there to open the door for you.  I hope they

18   didn't lock us out.  There we go.  All right.

19        (Jury out.)

20        THE COURT:  Court's in recess until 3:30.

21        LAW CLERK:  All rise.

22        (Recess.)

23        LAW CLERK:  All rise for the jury.

24        (Jury in.)

25        LAW CLERK:  All rise.

```
 1              THE COURT:  Please be seated.

 2              All right.  Cross examination?

 3              MR. MAYER:  Yes, Your Honor.

 4              THE COURT:  All right.

 5                      CROSS EXAMINATION

 6   BY MR. MAYER:

 7     Q.  Dr. Lee, my name is Zach Mayer.  I represent

 8   Tyson.  I'm going to be asking you a few questions,

 9   okay?

10     A.  Yes, sir.

11     Q.  What I'd like to do is first of all walk through

12   some dates for you just so we're clear.  The first time

13   that you examined Mr. Blackshire was on November 6th,

14   2009?

15     A.  Yes, sir.

16     Q.  Two years plus after the incident, right?

17     A.  Correct.

18     Q.  But you have had the opportunity to review the

19   medical records from his prior providers?

20     A.  Yes, sir.

21     Q.  And in reviewing those medical records, did you

22   determine that a CT scan was taken back in 2007?

23     A.  Correct.

24     Q.  Would a CT scan show a disk bulge?

25     A.  Not necessarily.
```

1      Q.  Could it, though?

2      A.  It could.

3      Q.  All right.  Did you review the CT scan to see if

4  the disk bulge was indicated back in 2007?

5      A.  No, I did not have the actual films.

6      Q.  Okay.  You -- you had the report, though?

7      A.  I only had the report.

8      Q.  Let's take a look at the report if we could,

9  please.

10          Now, this is the CT report that we were

11  provided from December 3rd, 2007, true?

12      A.  Yes, sir.

13      Q.  And in looking at the report, is there an

14  impression?

15      A.  Yes.

16      Q.  And can you read to the jury what the impression

17  is?

18      A.  Yes, sir.  It states under impression:  "A

19  recent" -- I'm sorry, "a recent vertical fracture of the

20  left LT transverse process with approximately two to

21  three millimeter separation at the fracture line."

22      Q.  And can you tell the members of the jury what a

23  transverse process fracture is?

24      A.  Yes, sir.  So these -- there are two elements on

25  both sides of the spine, and basically it is a piece of

1  bone that sticks out from the spine on both the left and

2  right side.  And this particular piece of the vertebral

3  body on the left side sustained crack or a fracture.

4      Q.  And would you agree that back in 2007, this

5  transverse process is what the doctors were treating

6  Mr. Blackshire for?

7      A.  Yes, along with his other complaints.

8      Q.  But the conservative treatment that the doctors

9  prescribed was as a result of the findings in the CT

10  scan, true?

11      A.  True.

12      Q.  And back in 2007, did you see any scan or image

13  that indicated a disk bulge?

14      A.  No.  An MRI was ordered, but was never obtained.

15      Q.  A disk bulge is certainly different than a

16  transverse process, true?

17      A.  Yes, sir.

18      Q.  And the fracture that they were treat -- they

19  were treating, did that eventually heal?

20      A.  I assume so.

21      Q.  Well, when you started treating him in 2009, you

22  were treating him for a disk bulge and not a fracture,

23  true?

24      A.  I was treating him for his complaints of low back

25  pain and leg pain.

1    Q.  And when you took the MRI, did you see any

2    indications or evidence of the fracture back in 2009?

3    A.  No, I did not on the MRI scan.

4    Q.  Is it fair to say that if you were treating him

5    back in 2007 for this transverse process fracture, you

6    would have treated him similarly as the doctors in East

7    Texas did?

8    A.  Yes, sir.

9    Q.  You're not critical of the way that the Tyson

10   doctors treated Mr. Blackshire, are you?

11   A.  No, sir.

12   Q.  Did you see in the medical records that as he was

13   going through physical therapy, there was indication

14   that it was helping?

15   A.  Yes.

16   Q.  Now, in 2009, you ordered an MRI, true?

17   A.  Yes, sir.

18   Q.  And your MRI indicated a disk bulge in L4-L5 and

19   L5-S1, right?

20   A.  Yes, sir.

21   Q.  That's a different position in the back than L2,

22   isn't it?

23   A.  Yes.

24   Q.  Now, I also see -- do you have your medical

25   records with you?

1    A.  Yes.

2    Q.  I understand that from your testimony you had an

3    opportunity to speak with Mr. Blackshire about his

4    incident and injury, right?

5    A.  Yes, sir.

6    Q.  And when you talk with the patient, is it very

7    important for you to try to get an accurate description

8    of both what occurred and then what's going on with the

9    patient?

10    A.  Yes.

11    Q.  And then when you get that information from the

12    patient, do you also want to be very accurate when

13    you're charting in your charts?

14    A.  Yes.

15    Q.  So, basically, you want to relay the information

16    from the patient accurately into your medical records?

17    A.  Yes.

18    Q.  And I think I heard you testify that when

19    Mr. Blackshire presented to you, he told you that he

20    lost control of a pallet jack and he pinned himself?

21    A.  Correct.

22    Q.  And looking at your initial office visit, is part

23    of your initial office visit to put down what he told

24    you of the incident itself?

25    A.  Correct, yes.

1    Q.  And is your record also consistent that he, being

2    Mr. Blackshire, states that he was carrying 60 to 75

3    pounds of -- of tubs of chicken and he lost control?

4    A.  Yes.

5    Q.  And you believe that you accurately charted that

6    information in your medical records?

7    A.  Based on what was told me, yes.

8    Q.  Based on what Mr. Blackshire told you?

9    A.  Correct.

10   Q.  Now, I understand that you had then several

11   different follow-up visits with Mr. Blackshire?

12   A.  Correct.

13   Q.  You indicated that Mr. Blackshire presented with

14   radiating pain down in his legs, true?

15   A.  That is what is reported, yes.

16   Q.  Did you indi -- did you see back in '07 or '08

17   that there was no indication of that radiating pain?

18   A.  I -- I believe there was some indication of -- of

19   right-sided and/or left-sided pain.

20   Q.  And that was associated with that transverse

21   process fracture -- I'll get it right.

22   A.  Yes.  His initial complaints were both back pain

23   and radiating pain back in '07.

24   Q.  Now, you also had the opportunity to treat him on

25   December 22nd, 2009?

1    A.  Yes, sir.

2    Q.  I'm going to show you the medical record from

3    your office on that day.

4        All right.  Now, on December 22nd, 2009, when

5    you're treating him, you referenced the disk bulge that

6    we discussed.  And then you say, "The patient was asked

7    to see their medical care provided to rule out the

8    possibility of nonspinal related causes for his

9    complaints of pain."  These nonspinal related causes for

10   complaints of pain would not have anything to do with

11   the incident at Tyson, would they?

12   A.  Correct, they would not have anything to do with

13   the incident at Tyson, correct.

14   Q.  In other words -- and you're going to have to

15   help me with some of these medical terms, but an

16   abnormal systematic (sic) erythematic metabolic

17   infectious process, that has nothing to do with his

18   incident at Tyson, does it?

19   A.  It does not.

20   Q.  The possibility of malignancy would not have

21   anything to do with Tyson, would it?

22   A.  It should not.

23   Q.  Now, you asked him to go see a medical provider

24   to rule out these other possibilities, right?

25   A.  Sure.

1    Q.  Do you know if he ever did that?

2    A.  I do not know.

3    Q.  I understand that based upon your testimony here

4    today, you're telling the members of the jury that

5    surgery is probable?

6    A.  Yes.

7    Q.  And I know in -- in February of 2010, you saw him

8    and -- you saw Mr. Blackshire, and you said, "At this

9    point, I do not believe he would require surgical

10   intervention," true?

11   A.  Yes.

12   Q.  And then also in March of 2010, looking again at

13   your medical records, you say, "I do not foresee

14   surgical intervention in the near future," true?

15   A.  Yes, in -- in the near future, correct.

16   Q.  And then once again, I guess, as -- as recently

17   as August 13th, 2010, you state in there that "Surgery

18   is not indicated at this time."  You see that?

19   A.  Yes.  At this time, but as that note points out,

20   he may need future imaging studies and potentially

21   eventual medical and/or surgical care.

22   Q.  And -- and I understand that's your testimony.

23   Would you agree with me, Doctor, though, is if the

24   medication or the physical therapy that you prescribe

25   helps his condition, then surgery might not be

1  necessary?

2     A.  It might not, correct.

3     Q.  And if those steroid injections that you're

4  recommending, if those help to subside the pain, surgery

5  also might not be necessary?

6     A.  Correct.

7     Q.  And based upon your medical records, at least at

8  this time, you are not indicating surgery for

9  Mr. Blackshire?

10    A.  Not based upon my last visit, but as I mentioned

11 earlier, his symptoms had persisted and so further

12 workup may be necessary.

13    Q.  And -- and you would agree that in the past,

14 his physical therapy actually helped his condition,

15 right?

16    A.  Yes, sir, it did.

17    Q.  All right.  And -- and you said, although I

18 believe that the -- the steroid injections, he had a

19 negative response to those initially?

20    A.  Yeah, he reported some nausea and vomiting for

21 about four days or so, but that resolved.

22    Q.  But those also helped his condition?

23    A.  The injections did help him, yes, sir.

24    Q.  And if those helped the condition, then, ideally,

25 surgery would not be necessary?

 1    A.  Ideally, but so far, it has not solved his -- his

 2  symptoms yet.

 3    Q.  Do you know -- and I noticed -- noticed in this

 4  last medical record, as well, it says that, again, "The

 5  patient was asked to see their medical care provider to

 6  rule out the possibility of all of those lists of

 7  medical issues again."  This was as re -- recent as

 8  August 13th, this -- this month, true?

 9    A.  Correct.  I do that as a standard recommendation

10  to ensure that nothing is missed.

11    Q.  And would you agree that any of those issues,

12  again referenced in August of this year, would not be

13  related to Tyson?

14    A.  Correct.  They would not be related to Tyson,

15  correct.

16    Q.  Do you know if he has followed up to -- to

17  possibly rule out any of those other medical conditions?

18    A.  I am not aware.

19             MR. MAYER:  Sir, I believe that's all the

20  questions I have.  I appreciate your time here today.

21             THE WITNESS:  Thank you.

22             THE COURT:  Sir, any redirect?

23             MR. PIERCE:  Yes, sir, very briefly.

24                      REDIRECT EXAMINATION

25  BY MR. PIERCE:

1    Q.  Dr. Lee, you were asked some questions about

2    conservative treatment that Mr. Blackshire received

3    early on.  Do you recall those questions?

4    A.  Yes, sir.

5    Q.  Now, the questions were all couched in terms of

6    conservative treatment for his vertebral fracture, and I

7    want to ask you about that.

8              Is the treatment Mr. Blackshire received for

9    his vertebral fracture the same type of conservative

10   treatment you would give him for bulging disks?

11   A.  No.

12   Q.  Okay.  Tell me how it's different.

13   A.  Well, usually for a simple fracture like a

14   transverse fracture which he had, it's -- it's simple

15   treatment.  It usually will heal on its own.  For a

16   bulging disk, instead of a CT scan, which simply looks

17   at the bone, the physician usually will order either a

18   CT myelogram, which is a more detailed study which will

19   enable one to actually visualize the nerves, or an MRI

20   study, which was not done at that time.

21   Q.  And just to be clear, Doctor, even back then when

22   Mr. Blackshire was seeing these doctors from Tyson,

23   there was discussion ordering MRIs; is that right?

24   A.  Yes.  Actually, Dr. Kerr over at the Louisiana

25   Spine Institute actually ordered the MRI of the lumbar

1   spine.

2       Q.  Okay.  And then based on the MRI you reviewed,

3   you actually found a bulging disk; is that right?

4       A.  Yes, sir.

5       Q.  Okay.  I want to ask you a question about the

6   history that you took from Mr. Blackshire.  Now, you

7   recall being asked some questions about you taking a

8   history from him?

9       A.  Yes, sir.

10      Q.  Now, this is the section opposing counsel read to

11  you, and I want to go through it verbatim because I -- I

12  may be missing something.  It says, "He states that a

13  jack carrying 65 to 75 -- or 70 pound tubs of chickens

14  lost control"; is that right?

15      A.  Yes, sir.

16      Q.  Does it say anything in there about

17  Mr. Blackshire lost control?

18      A.  No, he simply reported that pallet -- this was

19  supposed to be pallet jack, but the dictation -- it just

20  simply lost control of the pallet jack.

21      Q.  Okay.  Now, sir, there were some questions asked

22  of you -- oh, let me back up.

23          You have seen medical records from a number of

24  different providers, including from the emergency room

25  where Mr. Blackshire received treatment for conditions

1  not related to his back; is that right?

2      A.  Yes.

3      Q.  Okay.  Have you ever seen anything in a single

4  medical record that you've been presented with that

5  indicates that there's a nonspinal cause for his pain?

6      A.  No.

7      Q.  Let me ask you -- opposing counsel pointed out

8  that note from your records.  Why do you put that in

9  there?

10     A.  Well, I want to be a -- a thorough and complete

11 physician.  I'm only a spine surgeon.  I can't rule out

12 for sure that -- you know, the last thing I would want

13 to do is miss a tumor or miss any other

14 nonspinal-related cause for his pain, so I refer him to

15 a generalist to make sure I'm not missing those other

16 factors that I'm not an expert in.

17     Q.  And, sir -- and based on what you have, there's

18 nothing -- there's no nonspinal cause that would explain

19 the pain that he's having, correct?

20     A.  Correct.

21     Q.  Let's -- let's talk about this.  You were asked

22 some questions about this where you talk about future

23 care.

24     A.  Yes.

25     Q.  Medication.  Mr. Blackshire has been on

1   medication off and on for three years, correct?

2       A.  Yes, sir.

3       Q.  Are his symptoms gone?

4       A.  They're still present.

5       Q.  Is he totally healed?

6       A.  Not yet.

7       Q.  ESIs.  Mr. Blackshire's had one round of ESIs,

8   correct?

9       A.  Correct.

10      Q.  Are his symptoms totally gone?

11      A.  Not yet.

12      Q.  Is he totally healed?

13      A.  Not yet.

14      Q.  Physical therapy.  He's had at least two courses

15  of physical therapy.

16      A.  Correct.

17      Q.  Are his symptoms gone?

18      A.  Not yet.

19      Q.  Is he totally healed?

20      A.  Not yet.

21      Q.  You talk about surgery right there.  And, Doctor,

22  I want to ask you, just to be clear, is it your opinion,

23  more probable than not, that Mr. Blackshire's condition

24  is going to require this surgery in the future?

25      A.  I would say more probable than not, given the

1   fact that it has not healed over the past three years

2   and he's gone through some of the conservative treatment

3   measures already.

4           MR. PIERCE:  That's all I have, Your Honor.

5   I'll pass the witness.

6           MR. MAYER:  Nothing further, Your Honor.

7           THE COURT:  Okay.  You may step down,

8   doctor.

9           THE WITNESS:  Thank you.

10          THE COURT:  Who'll be the plaintiff's next

11  witness?

12          MR. PIERCE:  Your Honor, at this time, the

13  plaintiff rests.

14          THE COURT:  Okay.  Counsel approach.

15          (Bench conference.)

16          THE COURT:  You got your witnesses here?

17          MR. MAYER:  Yes, Your Honor.

18          THE COURT:  Okay.  Can we have an agreement

19  on the record that we'll go -- that he can -- he can

20  make his motion that he wishes to make, a Rule 50 motion

21  not now, but later in the day and it be deemed as timely

22  made?

23          MR. PIERCE:  Yes, sir, that's agreeable to

24  plaintiff.

25          THE COURT:  I'll just say we'll go ahead and

1    work the jury until about -- close to around 5:00, and

2    then we'll take up that motion then at 5:00.  Just

3    remind me.

4                    MR. MAYER:  Yes, Your Honor, don't you

5    worry.

6                    THE COURT:  Well, I've heard that before,

7    and then I get embarrassed.

8                    MR. MAYER:  Okay.

9                    (Bench conference ended.)

10                   THE COURT:  All right.  Who'll be the

11   defendant's first witness?

12                   MR. MAYER:  Your Honor, at this time, the

13   defendants call Patricia Williams to the stand, and she

14   is out in the hall.

15                   THE COURT:  Okay.

16                   MR. PIERCE:  Your Honor, may Dr. Lee be

17   excused from the courtroom?

18                   THE COURT:  Any objection, Mr. Worthington?

19                   MR. WORTHINGTON:  No objection, Your Honor.

20                   THE COURT:  You're excused, Dr. Lee.  Thank

21   you for coming.  Travel safely.

22                   THE WITNESS:  Thank you.

23                   (Witness sworn.)

24                   THE COURT:  Proceed.

25                   MR. MAYER:  Thank you, Your Honor.

```
 1                    PATRICIA WILLIAMS,

 2    having first been duly sworn, testified as follows:

 3                    DIRECT EXAMINATION

 4    BY MR. MAYER:

 5       Q.  Ma'am, would you please state your name for the

 6    record?

 7       A.  Patricia Williams.

 8       Q.  Ms. Williams, will you introduce yourself to the

 9    jury?  Just tell them a little bit about where you were

10    born and where you were raised.

11       A.  My name is Patricia Williams.  I was born in

12    Marshall, Texas, and I was raised in Waskom, Texas.  I

13    have three girls, and I have a husband.  And I've been

14    working for Tyson for 20-plus years.

15       Q.  And can you tell the members of the jury, over

16    the 20 years, what have been your different job

17    responsibilities?  Kind of give us an overview, if you

18    would.

19       A.  Okay.  I have mostly managed people in my

20    department, make sure that our lines run correctly or

21    make sure that absenteeism...

22                I facilitate with different products to get

23    to the stores when we run chicken and some press line

24    supervisor.

25       Q.  I don't think that we have actually described
```

1    what type of plant the Carthage plant is.  What -- what

2    do you do there?

3        A.  It's a processing plant.  And where we -- what we

4    do is that when they kill the chicken, we -- my

5    department distributes the birds to each other

6    department, which when we get through distributing the

7    birds to each department, it's different sides it's

8    because birds are different sizes.  And we also do

9    cut-up for KFC, Popeye's, and Church's.

10       Q.  Now, can you tell the members of the jury what

11   your specific job responsibilities are currently?  What

12   are you doing now?

13       A.  I work in a department called packing and

14   overhead, and we pack the chickens, and we distribute

15   to each of our departments to make sure that our

16   customers have the right size bird and a good quality.

17       Q.  I want to go back to October of 2007.  What was

18   your job responsibilities at that time?

19       A.  Managing the packing and overhead.

20       Q.  Okay.  Pretty much the same responsibilities you

21   have now?

22       A.  Yes, sir.

23       Q.  And back in October of '07, did you have the

24   occasion to work with Mr. Blackshire?

25       A.  Yes, sir.

1    Q.  And tell me, first of all, in what capacity did

2    you work for him -- work with him, excuse me?

3    A.  Oh, he came to me from the night shift.  He

4    transferred from the night shift to me to work on my

5    stack-off line, slash, jack operator.  Any time we get

6    an employee that can do two jobs which they're

7    trained for, then we'll use them occasionally to do a

8    job.

9    Q.  That brings up a good point.  You said that

10   Mr. Blackshire was a pallet jack operator.  Are you

11   familiar with what type of certification process Tyson

12   requires before they'll allow a team member to work a

13   pallet jack?

14   A.  Yes, sir.  Each supervisor can visually watch the

15   team member control the pallet jack, and then they're

16   given a test, a video that goes over the safety

17   department.  And after the test, they determine whether

18   they get the jack license or not.

19   Q.  Now, are you familiar with the test well enough

20   to say it is written or verbal?

21   A.  No.

22   Q.  Okay.  Don't know one way or the other?

23   A.  No.

24   Q.  Okay.  Fair enough.  But you know that before a

25   pallet jack operator ever gets released to your line, do

1  they have to be certified?

2      A.  Yes, they do.

3      Q.  And then once they're certified, do you have any

4  job responsibilities over that pallet jack operator?

5      A.  Just make -- mostly just make -- make sure they

6  maintain the safety, doing all the safety things that

7  are necessary with that jack.

8      Q.  Was Mr. Blackshire certified to operate a pallet

9  jack back in October of 2007?

10     A.  Yes, he was.

11     Q.  On October 26th, 2007, that's the day that the

12  alleged incident occurred, on that day, did you ask

13  Mr. Blackshire to operate the pallet jack?

14     A.  Yes, sir, I did.

15     Q.  Can you tell me the circumstances around that?

16     A.  Whenever I have any employee that's absent and

17  another employee knows how to do a job, then I will ask

18  them to perform that job.

19     Q.  Now, go ahead, did you ask Mr. Blackshire to

20  perform that job?

21     A.  Yes, I did.

22     Q.  When you asked him to -- to operate the pallet

23  jack, did he raise any objections or concerns?

24     A.  No, sir, he did not.

25     Q.  All right.  Are you familiar with what type of

 1    inspection an operator must do before they can operate

 2    the pallet jack?

 3       A.  They're supposed to visually -- they're supposed

 4    to clean the jacks first.  Then if anything is wrong

 5    with that jack, they're supposed to report it to me then

 6    so I can make -- make sure maintenance know and get it

 7    taken care of, and then I'll get them another jack to

 8    use.

 9       Q.  In October -- on October 26th, 2007, when you

10    asked Mr. Blackshire to operate that pallet jack, had

11    anyone reported to you any problems with the pallet jack

12    that Mr. Blackshire was operating?

13       A.  No, they did not.

14       Q.  After Mr. Blackshire started to operate the

15    pallet jack, right at first, did he express any concerns

16    or objections on how it was functioning?

17       A.  No, he did not.

18       Q.  And on October 26th, 2007, were you made aware of

19    any malfunction in the pallet jacks?

20       A.  No, sir, I did not.

21       Q.  All right.  What was the next thing that you

22    heard from Mr. Blackshire?

23       A.  The next thing in the midpart of the day, he had

24    mentioned to me that he had pinned himself up against

25    the pole with the jack and that he had hurt his back.

1    Q.  All right.  So I want you to be as detailed as

2  possible on what he told you about what occurred.

3    A.  He said he was backing up with the jack and he

4  pinned himself up against the pole.  And I told him

5  that, you know, that he needed to go to the nurse.  I

6  always tell them, "If you get to hurting, go to the

7  nurse as soon as possible," because we practice safe

8  practice out there.

9    Q.  Did -- did Mr. Blackshire tell you that he had

10  stepped away from the pallet jack?

11    A.  No, he never said he stepped away from it.

12    Q.  Did he tell you that he had let go of the handle

13  and it accelerated into him?

14    A.  No, he did not.

15    Q.  All right.  What you just told us, was that

16  everything that you can recall about what Mr. Blackshire

17  told you?

18    A.  Yes, sir.

19    Q.  And so after he reported the incident, you said

20  you sent him to the nurse?

21    A.  Uh-huh.

22    Q.  Did you have any additional follow-up with

23  Mr. Blackshire on that day?

24    A.  That day I did ask him later on up in the day was

25  he okay.  He said, "Well, I'm -- I'm going to make it."

1    And that's what he did through the rest of the day.  And

2    so after that, I never seen him any more about that.

3       Q.  Throughout the remainder of the shift, did he

4    ever raise any concern to you about how the pallet jack

5    was operating?

6       A.  No, he did not.

7       Q.  Did he tell you that the pallet jack was

8    malfunctioning in any way?

9       A.  No.  I would have never let him operate a pallet

10    jack that was malfunctioning.

11       Q.  What do you mean by that?

12       A.  I would have never allowed him to use the jack if

13    it would hurt him in any way.

14       Q.  If -- if you would have been made aware of any

15    type of incident where the pallet jack accelerated into

16    employees -- first of all, had you ever been aware of

17    that type of incident?

18       A.  Never.

19       Q.  What would you have done if you would have been

20    informed of that type of occurrence?

21       A.  I would have immediately told him to leave that

22    jack where -- wherever he had -- was working with it at,

23    and I would have called maintenance and told maintenance

24    to come get the jack and tell him to get -- get another

25    jack.

1    Q.  Did you have the availability of other jacks to

2    work on at the same time?

3    A.  Yes, we could use another jack from the

4    department.

5    Q.  Now, I understand -- were you his supervisor that

6    day?

7    A.  Yes, I was.

8    Q.  All right.  So because of that, did you also have

9    the occasion to review the employee's initial report of

10   injury?

11   A.  Yes, I can review them.

12   Q.  Okay.  And is this -- you see up top here where

13   it says, "supervisor," and it's "Patricia Williams"?  Do

14   you see that?

15   A.  Yes, sir, I see it.

16   Q.  All right.  That -- that's you?

17   A.  Uh-huh.

18   Q.  And then where it says, "Describe what you were

19   doing when the accident occurred," it says, "Driving the

20   jack"?

21   A.  Uh-huh.

22   Q.  Now, is that consistent what Mr. Blackshire told

23   you?

24   A.  Yes, he was driving the jack.

25   Q.  And then it -- it goes on and it says,

1    "Describe how the accident occurs," and it says,

2    "Driving the jack, backing it up against pole, and jack

3    ran and pinned him against the pole."

4       A.  Uh-huh.

5       Q.  Do you see that?

6       A.  Yes, sir, I see it.

7       Q.  And is that similar to the description that

8    Mr. Blackshire gave you on --

9       A.  It's similar, yes, sir.

10      Q.  All right.  Now, after October 26th when

11   Mr. Blackshire finished his shift, did you have an

12   occasion to work with him ever again?

13      A.  No, I did not.

14      Q.  Did you have an occasion to see Mr. Blackshire

15   ever again?

16      A.  Yes, sir, I did.

17      Q.  Where did you see him?

18      A.  I would see him in the locker area of the plant

19   or in the break room.

20      Q.  Did you ever see -- have an occasion to see him

21   outside of your work with Tyson?

22      A.  Yes, sir, I did.

23      Q.  Where did you see him?

24      A.  I seen him at a party, a birthday party.

25      Q.  All right.  And did you observe Mr. Blackshire at

1   that time?

2       A.  Well, yeah -- but, no, I was looking at him,

3   and -- and he was turned around like this talking to

4   some other guys at the party.

5       Q.  All right.  Did he appear to be injured at that

6   time?

7               MR. PIERCE:  Your Honor, I'm going to

8   object.  It calls for speculation.

9               THE COURT:  Restate your question.  I don't

10  think she can -- I sustain it as asked.

11              MR. MAYER:  Okay.

12      Q.  (By Mr. Mayer)  Ms. Black -- Ms. Williams, you

13  saw Mr. Blackshire turn completely around in his chair?

14      A.  Yes, he turned around in the chair.

15      Q.  Did you see him do anything else that day?

16      A.  During the night, I saw -- I appeared to see him

17  dancing, but other than that, that was it because I left

18  after that.

19      Q.  And was that the last time that you saw

20  Mr. Blackshire?

21      A.  Yes, sir.

22      Q.  All right.  Ms. Williams, I appreciate your time

23  here today.

24              MR. MAYER:  We'll go ahead and pass the

25  witness.

```
 1          THE COURT:  All right.  Cross examination?

 2          MR. PIERCE:  Thank you, Your Honor.

 3                   CROSS EXAMINATION

 4    BY MR. PIERCE:

 5      Q.  Ms. Williams, you and I have never met before.

 6    My name is Michael Pierce.  I represent Mr. Blackshire.

 7    It's nice to see you this afternoon.

 8      A.  Nice to see you, too, sir.

 9      Q.  I'm going to -- I'm going to do my best to be

10    brief with you, okay?

11      A.  Okay.

12      Q.  You did not actually see Mr. Blackshire's

13    accident happen, correct?

14      A.  No, I did not.

15      Q.  Based on own your personal knowledge, based on

16    your own personal observations, you can't tell us what

17    happened, correct?

18      A.  I can tell you what he said happened.

19      Q.  And -- and let me be clear with my question.  I'm

20    talking about what you observed with your own eyes.  You

21    can't tell us what happened because you didn't see it,

22    right?

23      A.  That's right.

24      Q.  Let me ask you -- I'm going to backtrack and ask

25    you about something that Tyson's lawyer asked you about.
```

 1  That accident report that was filled out, the one you

 2  were just looking at?

 3      A.  Yes.

 4      Q.  Were you with Mr. Blackshire when he filled that

 5  out?

 6      A.  No.

 7      Q.  Okay.

 8      A.  Just the nurse.

 9      Q.  All right.  Do you remember when's the first time

10  you ever saw that document?

11      A.  Just then.

12      Q.  You've never seen it before today?

13      A.  No, I haven't seen it.

14      Q.  Okay.  Let's talk about pallet jacks in general

15  for just a minute, okay?

16      A.  Okay.

17      Q.  You've never actually operated a pallet jack

18  yourself; is that right?

19      A.  No, sir.

20      Q.  You don't know anything about the maintenance or

21  the inspection of pallet jacks back at the time this

22  accident took place, correct?

23      A.  No, sir, just visual.

24      Q.  Okay.  You don't know how often pallet jacks have

25  to be serviced, correct?

1    A.  No, sir, I do not.

2    Q.  You don't know what types of service they

3  receive; is that correct?

4    A.  No, sir, I do not.

5    Q.  You don't know if there are any records kept of

6  maintenance or inspection of pallet jacks, correct?

7    A.  No, sir, I do not.

8    Q.  You can't tell us as you sit here today under

9  oath when the last time it was that this particular

10  pallet jack had either been inspected or had

11  maintenance, correct?

12    A.  No, I could not tell you.

13    Q.  And, Ms. Williams, you -- obviously, you did not

14  operate this particular pallet jack on the date of the

15  accident, correct?

16    A.  No, I do not operate pallet jacks.

17    Q.  Okay.  And, obviously, you did not inspect this

18  particular pallet jack on the date of the accident,

19  correct?

20    A.  No.  Each individual inspects their own pallet

21  jacks before they use them.

22    Q.  Let me back up, and I want to be clear.  I'm just

23  asking about you right now.  On the date of this

24  accident, did you personally inspect the pallet jack

25  involved in Mr. Blackshire's accident?

1    A.  No, sir.

2    Q.  Okay.  Let's talk about Mr. Blackshire generally

3    just for a minute, okay?

4    A.  Yes.

5    Q.  Okay.  He was certified to operate a pallet jack,

6    correct?

7    A.  Yes, sir.

8    Q.  Let's talk about what all that means.  He had had

9    to watch y'all's video, right?

10   A.  Yes, he would.

11   Q.  He would have to take some kind of test whether

12   it was written or verbal, correct?

13   A.  Yes, sir, he should.

14   Q.  As far as Tyson was concerned, this man was safe

15   operating a pallet jack, correct?

16   A.  Yes, sir.

17   Q.  You actually observed him personally operating a

18   pallet jack before this accident, correct?

19   A.  Yes, sir.

20   Q.  Okay.  You thought he was safe?

21   A.  He's a good -- he was a good driver.

22   Q.  You had no concern about the way this gentlemen

23   operated a pallet jack, correct?

24   A.  No, sir.

25   Q.  All right.  Now, Tyson has some policies about

1  how you should operate pallet jacks.  They have some

2  rules about it, don't they?

3     A.  Yes, sir.

4     Q.  Okay.  Now, let me ask you something.  If -- if

5  Mr. -- if what you said on direct examination is

6  correct, if Mr. Blackshire comes up to you as his

7  supervisor and says, "Hey, Ms. Williams, I was running

8  this pallet jack and, darn it, I pinned myself up

9  against the wall" --

10    A.  Uh-huh.

11    Q.  -- that indicates to you he's probably not doing

12 it, right, huh?

13    A.  No, he's not.

14    Q.  Okay.  And if he's not doing it right, it's your

15 responsibility as his supervisor to make sure he's doing

16 it safely, correct?

17    A.  Yes, sir.

18    Q.  Okay.  I want to show you a document that Tyson's

19 lawyers gave to us.  I'm going to -- I'm going to back

20 up.  Can you see this okay?

21    A.  Okay.

22    Q.  And can you read what it says up here at the top?

23    A.  "Carthage, Texas, Processing Plant, Forklift and

24 Pallet Jack, Driving Rules and Operation Policies."

25    Q.  Okay.  Had you ever seen this before?

1    A.  No, sir.

2    Q.  Never seen it before?

3    A.  No, sir.

4    Q.  Okay.  Let's talk about it.  There's a section I

5    just drew a little blue box around.  Can you see that

6    section?

7    A.  Yes, sir, I see it.

8    Q.  Can you read that out loud for me?

9    A.  It says, "Disciplinary action will be taken if

10   after investigation it is determined that the operator

11   violates any safety operation rules or policy, whether

12   an accident, slash, incident occur or not."

13   Q.  Okay.  Let's -- let's talk to the jury about this

14   for just a second.

15   A.  Okay.

16   Q.  If what Mr. Blackshire -- if what you've

17   testified to on direct examination is correct and

18   Mr. Blackshire told you that he had pinned himself up

19   against a pole running one of these pallet jacks, you've

20   already agreed with me that's not safe, right?

21   A.  No, it isn't.

22   Q.  Okay.  According to this policy, if he is

23   violating operator rules for this pallet jack and doing

24   something unsafe, he's subject to disciplinary action,

25   correct?  We just read that.

1    A.  Yes.

2    Q.  Okay.  Now, ma'am, I'm going to tell you, I've

3  looked at all the documents that Tyson's given me.  I've

4  never seen that any type of disciplinary action was

5  taken against this man as a result of this accident.  Do

6  you know if that's right or wrong?

7    A.  No -- no disciplinary action was ever taken.

8    Q.  I want to go back to the day of the accident for

9  just a minute.

10   A.  Okay.

11   Q.  Now, Ms. Williams, that was -- that was almost

12  three years ago.

13   A.  Yes, sir, I know.

14   Q.  It's a long time?

15   A.  It's a long time.

16   Q.  All right.  There's some things you don't

17  remember about what happened three years ago, right?

18   A.  Yeah.

19   Q.  Just like all of us?

20   A.  Uh-huh.

21   Q.  Let's talk about some things that you don't

22  remember.  Do you remember giving a deposition in this

23  case?

24   A.  Yes, I remember that.

25   Q.  Do you remember that at the time of your

1  deposition, you couldn't even tell us whether on the

2  date of this accident Mr. Blackshire was primarily a

3  line worker or whether he was primarily a pallet jack

4  operator?

5          MR. MAYER:  Objection, Your Honor, that's

6  improper cross examination.

7          MR. PIERCE:  Your Honor, I'm just asking at

8  the time if she remembered it.

9     A.  No, sir, I couldn't remember --

10         THE COURT:  Wait, wait just a minute,

11  don't --

12         MR. PIERCE:  I'm not.

13         THE COURT:  I overrule the objection.

14    Q.  (By Mr. Pierce)  Ms. Williams, do you need me to

15  repeat my question?

16    A.  No, sir.  At the time, I couldn't remember.

17    Q.  Okay.  And let's just -- let's give the jury an

18  idea of kind of the dates that you and I are talking

19  about here.  Let's see if I can get this right.

20         Ms. -- Ms. Williams, I'll represent to you

21  that your deposition happened on June the 2nd of 2010.

22  Do you remember if that's right or wrong?

23    A.  I think that's correct.

24    Q.  Okay.  I'm going to zoom this out a little bit.

25  My handwriting is pretty bad.  I've got the date of the

1   accident -- actually, I put the wrong date -- 10/26/07.

2   The date of your deposition was June 2nd, 2010; is that

3   right?

4       A.  Yes, sir.

5       Q.  Now, let's -- let's go back to what you

6   remembered on the date of your deposition.  You already

7   told me you couldn't remember if Mr. Blackshire was

8   primarily a line worker or a pallet jack operator,

9   correct?

10      A.  Correct.

11      Q.  At the time of your deposition, you couldn't even

12  remember the names of the pallet jack operators who

13  worked under you.  Do you remember that?

14      A.  I remember that, yes, sir.

15      Q.  Okay.  At the time of your deposition, you were

16  asked and you could not remember if you had even spoken

17  with Mr. Blackshire on the morning of his accident.  Do

18  you remember that?

19      A.  It was not a morning.  It was at midshift.  It

20  was not in the morning time.  The accident didn't happen

21  in the morning.

22      Q.  Okay.  Let me be clear about what I'm asking you.

23  I'm not asking you about the accident itself.

24      A.  Okay.

25      Q.  What I'm asking you is on the morning of his

1   accident --

2       A.  Uh-huh.

3       Q.  -- the morning of that day on October the 26th at

4   the time of your deposition, you couldn't remember one

5   way or the other if you had even talked to him; is that

6   right?

7       A.  Yeah, I had to talk to him to tell him that -- to

8   operate the jack.

9       Q.  Okay.  Just to be clear, let me ask you, do you

10  remember talking to him at all when he showed up for

11  work that morning?

12      A.  Yes.

13              MR. PIERCE:  Your Honor, may I approach the

14  witness?

15              THE COURT:  Yes.

16              MR. PIERCE:  Counsel, Page 21, Lines 5 to 7.

17      Q.  (By Mr. Pierce)  Ms. Williams, I only got one

18  copy, so I'll have to invade your --

19      A.  Okay.

20      Q.  -- space a little bit here.  I've got a lot of

21  markings on it.  But I want to show you where I'm

22  reading.

23      A.  Okay.

24      Q.  It's Page 21 --

25      A.  All right.

1    Q.  -- Line 5.  The question was:  "Do you remember

2    talking to him at all when he showed up for work that

3    morning?"

4         Answer --

5    A.  "No."

6    Q.  Okay.  And, Ms. Williams, just to be clear for

7    the jury, at the time you gave your deposition, you were

8    under oath just like you're under oath today; is that

9    right?

10   A.  Yes, sir.

11   Q.  And you told the truth, correct?

12   A.  Yes, sir.

13   Q.  And your best memory on that date was you didn't

14   know if you talked to him or not?

15   A.  No.

16   Q.  Now, on -- on direct examination, the lawyer for

17   Tyson talked to you about having this conversation with

18   Mr. Blackshire where you were asking him to fill in as

19   the pallet jack operator on the morning of his accident,

20   correct?

21   A.  Yes, sir.

22   Q.  And the truth is back when we took your

23   deposition, you didn't remember that conversation at

24   all, correct?

25   A.  I didn't remember it, no.

1    Q.  Okay.  Now, Ms. -- Ms. Williams, you told me

2  before you were not with Mr. Blackshire when he

3  completed his accident report; is that right?

4    A.  No, sir, I was with him.

5    Q.  Okay.  And, in fact, you told us that you hadn't

6  even seen that document before today; is that right?

7    A.  No, sir, I hadn't seen it.

8    Q.  Okay.  If -- if Mr. Blackshire's testimony in

9  this case is correct, if this jack really did run at

10  him --

11    A.  Uh-huh.

12    Q.  -- would it be proper for him to tell somebody

13  about that?

14    A.  Yes, he would have to tell somebody if a jack run

15  at you.

16    Q.  Okay.  And if the jack ran at him and he told

17  somebody, let's say that he told Ms. Gatlin when he was

18  filling out his report --

19    A.  Uh-huh.

20    Q.  -- would it be proper for her to write it down?

21    A.  Yes, she would write it down.

22    Q.  Okay.  Now, Ms. Williams, you don't know one way

23  or the other whether this accident ever got reported to

24  the maintenance department, correct?

25    A.  No, sir, I don't know.

1    Q.  And, Ms. Williams, you don't know one way or the

2  other whether this accident ever got reported to the

3  safety department, correct?

4    A.  No, sir, I don't know.

5    Q.  And, Ms. Williams, you told us at the time of

6  your deposition that you think it should have been

7  reported?

8    A.  Yes, sir, it should have.

9    Q.  But you don't know if it was?

10   A.  No, sir, I don't know.

11   Q.  And you would agree with me that if this jack ran

12 at Mr. Blackshire, first, he should have told somebody

13 about it, correct?

14   A.  Yes, sir.

15   Q.  And then when he told somebody that the jack ran

16 at him, they should have written it down?

17   A.  Yes, sir.

18        MR. PIERCE:  That's all I have.  I'll pass

19 the witness.

20        MR. MAYER:  Very brief, Your Honor.

21        THE COURT:  Redirect?

22              REDIRECT EXAMINATION

23 BY MR. MAYER:

24   Q.  Ms. Williams, have you ever heard of a jack

25 running at -- running someone down?

         1     A.  No, sir, I never heard of a jack running someone

         2  down.

         3     Q.  Has that ever been reported to you by

         4  Mr. Blackshire?

         5     A.  No, sir.

         6     Q.  Has that ever been reported to you by any other

         7  employee there at Tyson?

         8     A.  No, sir.  A jack can't run you down.  You have to

         9  control the jack.

        10     Q.  After -- after this incident, was that jack still

        11  operated?

        12     A.  Yes, sir.

        13     Q.  And did anyone else after the incident tell you

        14  that it was malfunctioning?

        15     A.  No, sir.

        16            MR. MAYER:  That's all I have.  Thank you,

        17  Your Honor.  No further questions.

        18            MR. PIERCE:  Your Honor, may I ask just a

        19  very, very brief --

        20            THE COURT:  Okay.  We're not going to get

        21  into a ping-pong match.

        22            MR. PIERCE:  This is all I've got, Your

        23  Honor.

        24                    RECROSS EXAMINATION

        25  BY MR. PIERCE:

1    Q.  Ms. Williams, I just want to ask you, you were

2   asked some questions about what happened with this jack

3   after the accident.  Do you know how long Tyson kept

4   this jack?

5    A.  No, sir, I'm not aware of how long they kept the

6   jack.

7    Q.  After this accident, do you know when the next

8   time came that Tyson would have inspected or performed

9   maintenance on this jack?

10    A.  No, sir, I'm not aware of maintenance.

11            MR. PIERCE:  That's all I have, Your Honor.

12            MR. MAYER:  Nothing further, Your Honor.

13            THE COURT:  All right.  You may step down.

14            When I use the word "ping-pong," sometimes

15   lawyers will just go back and forth one more question,

16   one more question.  That's what I meant by that.  The

17   lawyers understood.  Maybe I should have explained that

18   to the jury.

19            Who'll be your next witness?

20            MR. MAYER:  At this time, we'll call Larry

21   Howard to the stand.

22            THE COURT:  All right.

23            MR. MAYER:  He's also out in the hallway.

24            THE COURT:  Okay.

25                (Witness sworn.)

```
 1                    LARRY HOWARD,
 2   having first been duly sworn, testified as follows:
 3                    DIRECT EXAMINATION
 4   BY MR. MAYER:
 5      Q.  Sir, will you please introduce yourself to the
 6   jury?
 7      A.  I'm Lawrence Howard.
 8      Q.  Mr. Howard, can you tell the members of the jury
 9   a little bit about your upbringing, where were you born
10   and where were you raised?
11      A.  Okay.  Born in Amarillo, Texas.  Grew up in
12   California on a farm, and spent 20 years in the Air
13   Force after that and retired from the Air Force.  And
14   I've been working plant maintenance, industrial
15   maintenance for about 20 years.
16      Q.  Now, when you were in the Air Force, did you have
17   an occasion to do maintenance work, as well?
18      A.  Yes.  I was an aircraft mechanic and aircraft
19   maintenance supervisor.
20      Q.  Can you tell us a little bit about your training
21   and your job responsibilities in the Air Force?
22      A.  I went through about 20 weeks of technical
23   school, electrical training, pneumatics, hydraulics,
24   fluid power, elec -- electronic and electrical, both
25   on -- all on aircraft and ground equipment.
```

1    Q.  Now, once you left the Air Force, you said you

2    went into machine maintenance?

3    A.  Industrial-type plant maintenance.

4    Q.  Can you walk us through your job history up

5    until the time that you were hired by Tyson, an

6    overview?

7    A.  Okay.  I worked for Louis Rich Poultry Products

8    or Louis Rich Turkey in California for 10 years as a

9    maintenance supervisor, maintenance manager, and a -- I

10   can't think of the other name they had for it.  Anyway,

11   I was over all the maintenance management there.

12            After Louis Rich, I went to a creamery in

13   Tulare, California.  I was maintenance manager there,

14   and at the time, it was the biggest creamery operation

15   in the world.  Worked there a couple of years, and

16   wanted to move, so I moved to Stephenville, Texas.

17            Worked in Stephenville, Texas, at a cheese

18   plant for approximately two years and the plant closed.

19   This makes me think that I'm a bad omen or something.

20            Left that plant, moved to Memphis,

21   Tennessee, for Sonoco Products, a packaging company.  I

22   worked with the -- Sonoco Products as maintenance

23   manager in a metal end plant -- make the metal ends for

24   biscuit cans.

25   Q.  They didn't go under, did they?

        1       A.  Pardon?

        2       Q.  They didn't go under, did they?

        3       A.  No.

        4       Q.  Okay.  Good.

        5       A.  I request -- I requested that they transfer me,

        6    after I'd been there about five years, to another Sonoco

        7    plant because I wanted to get back to Texas.  So they

        8    moved me to Denison, Texas, Sonoco Pillsbury Plant, and

        9    after about 10 months, Pillsbury closed their plant

       10    down.  You don't need to make cans if there's no

       11    biscuits to put in them.

       12            So Sonoco then moved me to Charlotte, North

       13    Carolina, and I was maintenance manager there in a

       14    printing plant or folded carton plant.  Makes small

       15    cartons like the hard cigarette pack cartons and Fuji

       16    film carton, things of that nature.

       17       Q.  When were you hired by Tyson?

       18       A.  Right after Sonoco in Charlotte, North Carolina.

       19       Q.  All right.  And what year was that?

       20       A.  2006.

       21       Q.  And you moved down to the Carthage area?

       22       A.  Yes, I moved to Carthage for the job.

       23       Q.  What was your job responsibilities when you were

       24    hire -- hired there at Tyson plant?

       25       A.  Maintenance manager.

      1    Q.  What does that mean?  Can you explain what you're

      2  over and -- and what you do?

      3    A.  Maintenance -- maintenance manager at this plant

      4  is responsible for maintenance of all plant equipment,

      5  forklifts, refrigeration, the building itself, the

      6  grounds, the garbage man, the offal by-products from the

      7  chickens, making sure that those are graded and shipped

      8  out, basically, the -- the whole facility and everything

      9  on the grounds.

     10    Q.  What I want to do is narrow our questions to

     11  pallet jacks.  First of all -- first of all, do you have

     12  any experience operating pallet jacks?

     13    A.  Yes, I do.  I have operated pallet jacks before.

     14    Q.  And -- and have you been certified as an operator

     15  of a pallet jack?

     16    A.  Yes, I have.

     17    Q.  Gone through that course?

     18    A.  Yes.

     19    Q.  And are you generally familiar with what type of

     20  course Tyson requires before someone can operate a

     21  pallet jack?

     22    A.  Yes.

     23    Q.  Let's talk also about the maintenance of the

     24  pallet jacks.  Do you know how it is that Tyson

     25  purchases their pallet jacks?

1    A.  All of our pallet jacks are purchased on a lease

2  agreement right now with Crown Forklift Company is who

3  we lease the jacks through.  We lease jacks for 36

4  months.

5    Q.  That was going to be my question.  So every 36

6  months you replace the jacks with a new one?

7    A.  We replace one-third of the jacks.

8    Q.  Do you have a rotating process?

9    A.  Yes.

10    Q.  All right.  Does the jack stay in your plant for

11  more than three years?

12    A.  No.

13    Q.  So -- so the longest that an operator will ever

14  use a jack is going to be for three years?

15    A.  Yes.

16    Q.  And why is it that you rotate them out after

17  three years?

18    A.  The jacks are getting to the point where they

19  start to break more, they're worn.  We run them in a

20  pretty rough environment.  They're always wet.  And you

21  start having failures, so we only lease for three years.

22    Q.  All right.  Let's talk about what you do between

23  the time that the jack arrives at the plant and when it

24  finally leaves three years later.  Can you walk me

25  through in detail the maintenance that's required for

1    each of these pallet jacks?

2      A.  Okay.  Pallet jacks, we -- we main -- maintain

3    them.  I say, "we."  I said part of my responsibility

4    was refrigeration, actually refrigeration people are the

5    ones that do the pallet jack maintenance.

6      Q.  So is there a separate group that's responsible

7    for pallet jacks?

8      A.  Yes.

9      Q.  And -- and how many employees or team members are

10   in that group, approximately?

11     A.  Seven.

12     Q.  And are they specifically designated to make sure

13   that the pallet jacks are maintained?

14     A.  Yes.

15     Q.  All right.  So what types of maintenance do you

16   do on the pallet jacks?

17     A.  We do routine maintenance or breakdown

18   maintenance.  If there's a problem with the jack,

19   someone will -- either supervisor or the operator will

20   notify myself, one of the supervisors, or one of the

21   refrigeration people, let them know that they've got a

22   jack that has got a problem.  We do routine maintenance.

23   We do weekly preventative maintenance, check the jack

24   over, make sure everything is operating correctly.

25     Q.  Let me stop you there for one second.  If -- if

1  someone reports that there's a problem with a pallet

2  jack, what is your group's responsibility?

3      A.  Fix it.

4      Q.  And do you pull it out of service if there's a

5  problem?

6      A.  Sure.  Normally, they bring the jack to the

7  shop, jack shop, and it will be fixed right then.

8      Q.  You mentioned that there's weekly maintenance.

9  What is all entailed in weekly maintenance?

10     A.  Weekly maintenance is basically an inspection,

11 replacement of any worn or defective parts.

12     Q.  And then is there a checklist that you go through

13 on a weekly basis?

14     A.  Yeah, there's a PM listing.  Tells you what --

15 what items you check on a weekly basis, a monthly, and a

16 quarterly basis.

17     Q.  Now, does every pallet jack go through that

18 weekly inspection?

19     A.  Yes.

20     Q.  Prior to the operator ever actually operating the

21 pallet jack, do they have an obligation to inspect?

22     A.  Yes.  There's OSHA regulations stating that you

23 do a pre-operational inspection, safety inspection of

24 the pallet jack before you operate it.

25     Q.  All right.  Let's talk about the monthly.  How

1    does that differ from the weekly inspection?

2       A.  Monthly is just more detailed.  The weekly is

3    basically a visual and operate everything.  On a monthly

4    inspection, you would pull -- open the panels up, check

5    down further inside, give everything a grease job and

6    cleaning.

7       Q.  Now, would that be in addition to any reported

8    problems or incidents with the pallet jacks?

9       A.  Yes, sir.  If a jack broke down on Monday, you'd

10   fix it.  And it came in Tuesday for an inspection, you'd

11   do the inspection anyway.

12      Q.  Are there enough pallet jacks at the plant that

13   if one goes down, there's other options to use?

14      A.  Now, that's kind of hard.  There's jacks assigned

15   to different areas in the plant.  And whether or not

16   there's backups or duplicate jacks, I -- I couldn't say

17   that for sure.  I -- I don't know --

18      Q.  You mentioned --

19      A.  -- how tight they are.

20      Q.  You mentioned the monthly inspections.  What

21   about quarterly?  What do you do on that?

22      A.  Quarterly would be things like checking the

23   linkage under the jack and replacing it, replacing

24   bearings, and the drive wheels, things of that nature.

25      Q.  Now, are there documentation that also go when

1    you complete the weekly, monthly, and quarterly?

2        A.  There is documentation -- electronic

3    documentation for the inspections now.  Previously -- I

4    guess prior to about April 2008 is when we started doing

5    the electronic version.  Prior to that, it was paper

6    version.

7        Q.  Let's talk about that.  There's been some

8    discussion about maintenance records.  In October of

9    2007, will you explain to the jury, first, what type of

10   maintenance records there were at that time?

11       A.  Okay.  At that time, it was just a printed

12   document, usually single sheet of paper that said,

13   "Check the bearings, check the drive wheel for wear,

14   check the drag link" -- you know, it's just a checklist,

15   you check it off, and initial at the bottom.  And

16   that -- that was the inspection.

17       Q.  And was it your responsibility as the maintenance

18   manager to make sure those documents were being

19   completed?

20       A.  Yes.

21       Q.  And were they back in October of 2007?

22       A.  Yes, they were.

23       Q.  Now, I understand that at some point, April of

24   '08, you changed your system.  How did you change the

25   system?

     1    A.  We went to a computerized maintenance management

     2    system, and everything is electronic now.  It's all on

     3    computer.  But all the inspection data or completion

     4    dates on the preventative maintenance is now just on a

     5    computer.

     6    Q.  So when you switched over from having all the

     7    paper to the computers, did you keep all those papers?

     8    A.  No.  We got rid of the papers.  There's no

     9    requirement to keep that, and the lifts that were here

    10    at that time are no longer here.  So why have the

    11    documentation?

    12    Q.  Did you have an occasion to review these weekly,

    13    monthly, and quarterly service reports, the actual

    14    documents themselves?

    15    A.  Yes, I've reviewed many of them.

    16    Q.  And is it your testimony to this jury that that

    17    type of maintenance was being performed in October of

    18    2007?

    19    A.  Yes.

    20    Q.  I want to talk with you a little bit about the

    21    incident involving Mr. Blackshire.  It's -- it's his

    22    testimony in this case that he let go or I guess stepped

    23    away from the pallet jack.  And when he did, first of

    24    all, a spring was engaged that took the handle up, all

    25    right?  Assume with me those facts.  Knowing the pallet

1   jack, is there a spring on the pallet jack that lifts

2   the handle?

3       A.  Yes.

4       Q.  And why does that happen?

5       A.  Well, when -- when you turn loose of the handle,

6   the jack come -- or the jack handle comes up --

7   spring-loaded up, and that applies the brake.  So if

8   you're running the jack at I'll say five mile an hour

9   and you release the handle, it will spring up and the

10  jack will stop.

11      Q.  Now, alternatively, if you let go of the

12  handle and for some reason it goes all the way down, is

13  that also a braking mechanism when it's all the way

14  down?

15      A.  It -- the jack will not drive.  It's not a

16  braking mechanism, but it will not drive if it's all the

17  way down.

18      Q.  All right.  What does it take to actually have

19  a -- a pallet jack operate -- to move?

20      A.  You -- you have to pull the handle down to a --

21  I'd -- I'd say normal walking hand height.  If you're

22  standing up, if you push the handle down too far, the

23  jack will not operate it -- or operate.  If you let it

24  up too high, it will not operate.

25              There's just a certain range where it would

1  be comfortable for most people to walk and operate the

2  lift.  You have the forward and reverse control.  You

3  have your up and down controls right there on the handle

4  and horn control.

5     Q.  Sir, back in October of 2007, did anyone ever

6  report to you that a pallet jack accelerated on its own

7  and injured an employee?

8     A.  No.

9     Q.  Since you've been working at the plant since

10  2006, have you ever heard of that type of complaint?

11     A.  No.

12     Q.  Assume with me that someone let go of the handle,

13  what type of mechanisms are on the pallet jack to stop

14  it from moving?

15     A.  Well, one, if you let go of the handle, the

16  handle goes up.  It -- through linkage enter -- or

17  activates the brake.  It's a mechanical link, and it

18  applies the brake on the lift.  5.

19           Also, in the hand grip -- you've got your

20  forward and reverse hand grip, like on a motorcycle, rev

21  it up to make it go.  Well, this you turn forward or

22  reverse and that closes the micro switch which energizes

23  the motor and tells the pallet jack to move.

24           For the pallet jack to move or for it to not

25  move, you'd have to have the handle down to make it

1   move.  You have to turn the -- you have to have it down

2   and at the right height.  You have to turn the grip to

3   be able to get it to go forward or backward.

4      Q.  Now, has ever -- any team member ever reported to

5   you that when the handle was down, a pallet jack

6   accelerated on its own?

7      A.  No.

8      Q.  Would your group, the maintenance department or

9   refrigerator -- refrigeration, be responsible for

10   repairing any pallet jack that was involved in an

11   incident?

12      A.  Yes.

13      Q.  Have you repaired pallet jacks?

14      A.  Yes.

15      Q.  Have you ever repaired a pallet jack when it was

16   alleged that it ran out of control?

17      A.  No.

18         MR. MAYER:  That's all the further questions

19   I have.  I'll pass the witness, Your Honor.

20         THE COURT:  Cross examination?

21               CROSS EXAMINATION

22   BY MR. SKRABANEK:

23      Q.  Good afternoon, Mr. Howard.  My name is Paul

24   Skrabanek, and I represent Mr. Blackshire here.

25        When was the last time you performed an

1    inspection on a pallet jack, personally?

2        A.  Last time I personally performed one?

3        Q.  Correct.

4        A.  It's probably -- well, you say an inspection.  A

5    full inspection, like a monthly?

6        Q.  Weekly inspection, let's say.

7        A.  Weekly?  It's probably been four years.

8        Q.  And how many folks did you have in your -- under

9    your Maintenance Department in 2007 when this incident

10   occurred?

11       A.  Approximately 30.

12       Q.  And there -- how many pallet jacks in the

13   department?

14       A.  Probably 16.

15       Q.  So 16 pallet jacks, we're talking about three

16   years, okay, so what are we talking about, hundreds and

17   hundreds of inspections between that time and today?

18       A.  Yes.

19       Q.  Safe to say that you can't remember every little

20   inspection that goes on?

21       A.  Yes, that's safe to say.

22       Q.  Safe to say you can't even tell me which one of

23   your maintenance workers has inspected which pallet

24   jack?

25       A.  Since we do not have the paper documentation, no,

1    I cannot.

2        Q.  You -- you weren't there when Mr. Blackshire's

3    incident occurred, right?

4        A.  I -- I guess it -- I was if it occurred in 2007.

5        Q.  I'm sorry.  That was a bad question.  You didn't

6    personally witness Mr. Blackshire's incident, did you?

7        A.  I -- I never heard anything about the incident.

8        Q.  You didn't inspect the pallet jack that he was

9    operating on the date of his injury, did you?

10       A.  What pallet jack was it, sir?

11       Q.  The pallet jack that we're here talking about

12   today?

13       A.  Pardon?

14       Q.  Did you personally inspect the pallet jack that

15   Mr. Blackshire was operating on the date of his injury?

16       A.  What pallet jack was it?

17       Q.  I mean, you can tell me.

18       A.  The pallet jacks all have numbers.  If you tell

19   me what number it was, I could tell you if it was

20   inspected by me.

21       Q.  Do you remember if you inspected any pallet jack

22   on the date of Mr. Blackshire's injury seeing that you

23   hadn't inspected --

24       A.  No.

25       Q.  So you didn't inspect --

1      A.  No.

2      Q.  -- the pallet jack that Mr. Blackshire was

3   operating?

4      A.  No.

5      Q.  So you can't tell me one way or another whether

6   it was properly inspected that morning?

7      A.  That morning?

8      Q.  Correct.

9      A.  The daily inspection is the operator's

10  inspection.

11     Q.  Well, where would I find that information?

12     A.  On the operator's daily checklist.

13     Q.  And where would I find proof that that was

14  actually done that day?

15     A.  Mr. Blackshire would have signed that saying that

16  he did the daily inspection.

17     Q.  Have you ever seen that document?

18     A.  No, I don't -- I don't get that document.

19     Q.  You don't know whether your Maintenance

20  Department even inspected the pallet jack that day?

21     A.  If it -- the Maintenance Department would have

22  only inspected it if there was a weekly, monthly, or

23  quarterly inspection due that day.

24     Q.  Can you tell me when the last time a weekly

25  inspection had been performed on this pallet jack before

1  Mr. Blackshire's injury?

2      A.  All I can say is within seven days.

3      Q.  Can you tell me the last time a monthly

4  inspection had been performed on this pallet jack before

5  Mr. Blackshire's injury?

6      A.  Again, I could only say within 30 days.

7      Q.  Would y'all have written that down in records?

8      A.  There would be a checklist that was signed off

9  with that.

10     Q.  Have you looked at any of those records?

11     A.  We do not have those records anymore.

12     Q.  You don't know -- so since you didn't see the

13  pallet jack that day, right -- and I'm right on that?

14     A.  I don't know if I seen the pallet jack that

15  day --

16     Q.  You didn't personally inspect it --

17     A.  -- because I don't know what pallet jack it is.

18     Q.  You couldn't tell me how the brakes -- the spring

19  brake was functioning that day, right?

20     A.  No, I could not.

21     Q.  You couldn't tell me how the throttle control was

22  working that day?

23     A.  No, I could not.

24     Q.  You could not tell me how the brake system was

25  working that day?

1    A.  No, I could not.

2    Q.  So you can offer no testimony whether they were

3    working properly or improperly?

4    A.  If they were not working properly, the operator

5    should have notified maintenance.  That's all I can

6    tell.

7    Q.  That's what Mr. Blackshire did after it ran over

8    him, right?

9         MR. MAYER:  Objection, argumentative, Your

10   Honor.

11   A.  I don't know.

12        THE COURT:  Sustained.  Let's move on.

13        MR. SKRABANEK:  Pass the witness, Your

14   Honor.

15        THE COURT:  Anything further?

16        MR. MAYER:  Very briefly, Your Honor.

17              REDIRECT EXAMINATION

18   BY MR. MAYER:

19   Q.  Although you don't have knowledge of this

20   specific inspection, based upon the program that you

21   have in place at the Maintenance Department, does every

22   one of those 16 pallet jacks get inspected weekly,

23   monthly, and quarterly?

24   A.  Yes.

25        MR. MAYER:  Nothing further, Your Honor.

```
 1              THE COURT:  Okay.

 2              MR. SKRABANEK:  Nothing further.

 3              THE COURT:  You may step down.

 4              Who's your next witness?

 5              MR. MAYER:  Jessica Gatlin to the stand.

 6              THE COURT:  Okay.

 7              (Witness sworn.)

 8                   JESSICA GATLIN,

 9      having first been duly sworn, testified as follows:

10                   DIRECT EXAMINATION

11      BY MR. MAYER:

12        Q.  Ma'am, will you please state your name for the

13      record?

14        A.  My name is Jessica Gatlin.

15        Q.  Ms. Gatlin, can you tell the members of the jury

16      a little bit about where you were born and where you

17      were raised?

18        A.  I was born in Shreveport.  I was raised in

19      Joaquin, Texas.  I'm married and have two kids.

20        Q.  How long have you been working at the Tyson

21      plant?

22        A.  In two weeks, I'll be there 15 years.

23        Q.  And what is your current job position?

24        A.  I'm the nurse manager.

25        Q.  Tell us a little bit about your educational
```

1   background and what got you into nursing.

2       A.  Yes, sir.  I just like to help people.  I've

3   been -- I went to Panola College, and I've been a nurse

4   since '96.  And I've been straight at Tyson, so I just

5   love to help people, so...

6       Q.  And what is your job responsibility currently at

7   Tyson?

8       A.  I oversee Workers' Comp.  I oversee some nurses.

9   I have two nurses that work for me.

10      Q.  And if someone is injured on the job, would they

11  come to see you?

12      A.  Yes, sir, or my nurses.  Yes, sir.

13      Q.  All right.  We have -- we have talked about the

14  WISP program that's in place.  And I -- I understand --

15  would -- would the WISP program come under your job

16  responsibilities?

17      A.  Yes, sir.

18      Q.  And let's talk, first of all, when a -- a new

19  hire comes to Tyson for the first time, a team member,

20  I'm sure they get orientation.

21      A.  Yes, sir.

22      Q.  And what type of orientation or description are

23  they given about the WISP program itself?

24      A.  We have a packet of information.  It's in the

25  booklet orientation, and it states right there that we

 1    don't have Workers' Comp.  We're not a nonsubscriber.

 2    And it has right there.  They sign it.

 3        Q.  And at orientation, is it also verbally described

 4    what type of program Tyson has in place?

 5        A.  We have a program called WISP, which is Workplace

 6    Injury Settlement Program.  It's over -- we don't have

 7    Workers' Comp.  They come in, and they do stuff with the

 8    nurses, and we fill out everything in there with us

 9    first.

10        Q.  Tell the members of the jury a little bit about

11    that program.  I know you're familiar with Workers'

12    Comp.  How does the Tyson program differ in the amount

13    of weekly lost wages you receive compared to the Texas

14    State?

15        A.  We -- we pay a little more than, you know,

16    regular Workers' Comp.  We pay 85 percent of lost wages,

17    so if somebody gets taken off work, they get a little

18    more money than they do with just regular Workers' Comp.

19        Q.  All right.  And then what about if they are off

20    work, when do their benefits kick in in comparison to

21    the Texas program?

22        A.  I think whenever -- on the Texas Workers' -- the

23    program, there's so many days you have to wait.  But we

24    have -- when they -- the doctor takes you off that day,

25    we want you to get paid for that day one, so --

       1       Q.  So do the benefits that Tyson provides its

       2   employees, are they actually better than the State

       3   program?

       4       A.  Yes, sir.

       5       Q.  Now, you mentioned that you get the booklet of

       6   information that described the program?

       7       A.  Yes, sir.

       8       Q.  Now, what I'd like for you to do is explain, if

       9   someone is injured on the job --

      10       A.  Okay.

      11       Q.  -- what happens then?

      12       A.  If somebody is injured on the job, they come to

      13   the nurse's station.  Of course, we -- the nurse takes

      14   what happened down on a piece of paper.  Then we have

      15   like a packet -- it's a red -- and it's got everything

      16   for them we need to fill out in a little red form.  What

      17   the team member does, they come in and sit down with a

      18   nurse or myself and they go over every piece of paper

      19   with them and go over every piece of paper that's in --

      20   make sure they understand every little piece of paper.

      21       Q.  Now, is that actually on the date that the

      22   incident occurs?

      23       A.  On the date of the injury?  Yes, sir, the date of

      24   injury it is, if they seek outside medical treatment.

      25       Q.  On the date of injury, if they come to you and

1    report it, tell me what you describe to them about the

2    WISP program.

3        A.  If they come in there, I describe to them

4    everything, the benefits.  We go through every piece of

5    paper and -- the good stuff about it, and, of course,

6    you know, it's voluntarily.  We tell them -- even

7    there's a waiver in there, annual status report in

8    there.  Pick a doctor form in there.  They get to pick

9    their own doctor.  And then -- then we ask them if they

10   have any questions.

11       Q.  At that point in time, do you actually have them

12   sign any of the waiver?

13       A.  No, sir.  They don't even have to sign the waiver

14   that day.  They get 20 day -- 10 days before they even

15   have to sign.

16       Q.  When is it that they come back and see you again?

17       A.  It depends.  If they -- if they hurt, they'll see

18   us the same day.  You know, we send them to the doctor

19   if they want to go.  But if not, we have 10 days from

20   the date of injury, and we bring them back in here and

21   say, you know, "Here's the paper again," go over it

22   again.

23       Q.  And when you say you go over it again, after that

24   10 days, what are you going over?

25       A.  The -- the waiver itself.

1    Q.  And what about the waiver do you describe to the

2  employees?

3    A.  It's voluntary.  They can sign if they want to.

4  If they don't want to sign it, they don't have to.  And

5  it has in big letters on there what it says that -- you

6  know, so they can see.  And if they have any questions,

7  they can feel free to ask me.

8    Q.  What I'd like to do is talk a little bit about

9  Mr. Blackshire's incident.  Do you recall on October

10 26th, 2007, Mr. Blackshire coming to see you?

11   A.  Yes, sir.

12   Q.  What I'd like for you to do is tell the members

13 of the jury what he reported to you on October 26th.

14   A.  He come in the nurse's station.  He said he was

15 driving the jack and he pinned himself against the

16 pole.

17   Q.  Did he give you any other description at that

18 point?

19   A.  Just he pinned himself against the pole.

20   Q.  Did he --

21   A.  And he was -- I'm sorry.

22   Q.  Sure.  Did he tell you at that point that the

23 pallet jack itself had malfunctioned?

24   A.  No, sir.

25   Q.  Did he make reference to it accelerating into

1   him?

2      A.  No, sir.

3      Q.  All right.  He -- he told you that he pinned

4   himself against the pole?

5      A.  Yes, sir.

6      Q.  What did you do for him?

7      A.  Asked him if he was okay.  And he said he was

8   fine and went back to work.

9      Q.  When was the next time that you saw

10  Mr. Blackshire?

11     A.  He come back in Monday.

12     Q.  And -- and on Monday, what did you do?

13     A.  He brought -- he went to the doctor on his own

14  over the weekend or whatever day, so I brought him back

15  in there, and we filled out the paperwork in that little

16  red folder I was talking about.

17     Q.  Now, when you fill out the paperwork, was part of

18  that the injury report?

19     A.  Yes, sir.

20     Q.  Now, in this case, we've looked at the injury

21  report, and I'll --

22            MR. MAYER:  May I have some leeway, Your

23  Honor?

24            THE COURT:  Yes.

25     Q.  (By Mr. Mayer)  I'll grab it in a second.  We've

1    all seen it.  The injury report was filled out by you,

2    right?

3        A.  He fills it out, and then like the places --

4    like he may have trouble spelling, or I'll look over it,

5    and if there's something missing, then, you know, I do

6    help.

7        Q.  Okay.  So if there's any sections of the injury

8    report that he can't complete, do you then help him

9     out?

10       A.  Yes.

11       Q.  Well, in this situation, if he had trouble

12   filling out -- thank you.

13           All right.  This is the injury report.  The

14   testimony in the case has been that he didn't fill out

15   No. 1, 2, or 3 on this report.  Do you see that?

16       A.  Yes, sir.

17       Q.  Does that appear to be your handwriting?

18       A.  Yes, sir.

19       Q.  And when you complete that section -- first of

20   all, why would you do that?

21       A.  That way in case he -- sometimes, you know, team

22   members have trouble.  Sometimes they don't know how to

23   say it.  Sometimes they can't spell.  So whoever -- you

24   know, I don't mind helping.

25       Q.  But when a team member reports to you an injury,

1  what do you put, for example, on No. 3?

2     A.  What exactly they say, what they tell me.

3     Q.  And so when Mr. Blackshire presented and said

4  that he was driving the jack back up against the pole,

5  is that what you put?

6     A.  I put exactly what they say.

7     Q.  After you complete this injury report, do you

8  then give it to the team member?

9     A.  We go over it together line for line.  Like if

10 they miss -- you know, if they miss a word or whatever,

11 I go back over it one more time, just, you know, make

12 sure they don't miss nothing.

13    Q.  When you say you go over it, do you actually read

14 it to them?

15    A.  Yes, sir.  Well, in his case, you know, you

16 can -- you read it to him or you can go over what they

17 got answered and, you know, make sure that's right, you

18 know, just ask them.

19    Q.  And then on the bottom, do you then ask the team

20 member to actually sign the document?

21    A.  Yes, sir.

22    Q.  And did Mr. Blackshire sign this document in your

23 presence?

24    A.  Yes, sir.

25    Q.  By that point in time, had he gone to see a

1   doctor?

2       A.  On his own, yes, sir.

3       Q.  And -- and who did he go to see?

4       A.  I'm -- I'm not for sure whether the papers are in

5   front of me.  He went on his own, I think, to the ER.

6       Q.  All right.  And then once he comes to you and he

7   fills out this injury report, does Tyson then provide

8   him a doctor to go to?

9       A.  Yes, sir.  In that packet, he picks a doctor

10  right then.  He gets to go -- we got a panel, he gets to

11  pick his doctor, and we send him to the doctor.

12      Q.  And after he goes to the doctor, then does he

13  come back to you and fill out more paperwork?

14      A.  Yes, he bring his paperwork back from the doctor

15  or whatever.  If he gets prescription medicine or

16  whatever he gets, we pay for it and everything, and he

17  brings it to me.

18      Q.  Now, we have heard about the -- the WISP waiver

19  that was signed, and let's talk a little bit about it.

20          First of all, by signing the waiver, do you

21  get certain benefits from Tyson?

22      A.  Yes, sir.  If you sign the waiver, I mean,

23  everything keeps going.  You get your medicine paid, you

24  get doctors' visits paid.  If you need X-ray -- I mean,

25  anything.

1    Q.  The date on this is November 14th.  Would

2    Mr. Blackshire have come back to see you on -- on

3    November 14th?

4    A.  Yes, sir.

5    Q.  And what I'd like for you to do is explain how

6    you go about talking about the waiver with the team

7    member and presenting it to them.

8    A.  Okay.  When they come in -- actually they come

9    in -- they come in the office, and I say, "It's time for

10   your waiver."  I give them the waiver.  I let them read

11   over it, and if they have any questions, they feel free

12   to ask me.

13   Q.  Now, do you recall giving Mr. Blackshire the

14   waiver?

15   A.  Yes, sir.

16   Q.  You said that you -- you asked them if they have

17   any questions?

18   A.  Yes, sir.

19   Q.  Is that a standard practice that you do?

20   A.  Yes, sir.  Every time I have a team member, yes,

21   sir.

22   Q.  Do you ask them if they understood the document

23   that they're reading?

24   A.  Yes, sir.

25   Q.  Do they actually read the document in front of

1  you?

2    A.  Yes, sir.

3    Q.  And then before they ever go to that second page

4  and they sign the document, do y'all discuss it?

5    A.  Yes.

6    Q.  What I want you to do is tell the members of the

7  jury what in particular you discuss about the waiver and

8  the benefits.

9    A.  Okay.  The main -- the basic thing is I tell them

10  is that "This is your voluntarily right.  I'm not making

11  you do this.  Tyson not making you do it.  You can do it

12  if you want to."

13          It says big letters right there in -- it's

14  highlighted in yellow that they waive the right to sue

15  the company, and I tell them that.  And then, you know,

16  of course, the good stuff about it, all your medicine

17  keeps going, you know, go to the doctor all the time,

18  need X-rays, whatever, ain't no problem.  And, of

19  course, ask if they've got any questions.

20    Q.  And after Mr. Blackshire signed what is Exhibit

21  No. 15, did his benefits continue?

22    A.  Yes.

23          MR. MAYER:  Your Honor, may we approach?

24          THE COURT:  Yes.

25          (Bench conference.)

         1              MR. MAYER:  Your Honor, there's been a --

         2              THE COURT:  Wait.  Just let everybody get up

         3    here --

         4              MR. MAYER:  Sure.

         5              THE COURT:  -- who wants to visit with us.

         6              MR. MAYER:  There's been a -- some

         7    statements -- some testimony about that the reason why

         8    he didn't go for any further treatment was because of

         9    his financial hardship and also that if he wouldn't have

        10    signed the document, he wouldn't have gotten benefits.

        11              Tyson actually has health insurance in place

        12    that if they don't go into the WISP program, they go

        13    into the health insurance program.  And I'd like to

        14    discuss that given the fact that they said that if the

        15    WISP waiver is not signed, he wouldn't get benefits.

        16              THE COURT:  Well, I haven't heard any

        17    testimony about -- that I -- you agree that's what the

        18    testimony has been, that he testified he didn't go

        19    because of financial hardship or not?

        20              MR. PIERCE:  No, I -- I don't think that

        21    that's what he testified to.  I think the question that

        22    was asked of Dr. Lee, and I just asked him, "Have you

        23    had patients before that had gaps in treatment and why,"

        24    and he rattled off several reasons.

        25              The other thing, Judge, if I can say this,

1    the problem we get into is this gap kind of coincides

2    with the period of time where he's terminated.  If he

3    was terminated, none of this would apply anyway.  So

4    that -- that -- that becomes irrelevant at that point.

5              MR. MAYER:  His health insurance benefits

6    were in an -- in an alternative program.  He can either

7    go into the WISP program, or he can go into the health

8    insurance program.

9              THE COURT:  Well, I think we'll stay with

10   rebutting the testimony that -- she's going to say, I'm

11   sure, that she didn't tell him that he had to sign it to

12   get medical benefits.

13             MR. MAYER:  Right.

14             THE COURT:  Then if that's what her

15   testimony is, then -- then this other, I don't see the

16   relevancy of it.

17             MR. MAYER:  All right.

18             THE COURT:  That's my problem with it.  I

19   understand that's what's going to be her testimony.  If

20   she changes on you, I'll re --

21             MR. MAYER:  All right.

22             THE COURT:  -- re-visit.

23             MR. MAYER:  All right.

24             (Bench conference concluded.)

25        Q.  (By Mr. Mayer)  Ms. Gatlin, this is a yes or no

1  question.  By -- by not going through the WISP waiver,

2  were there alternative means for an employee to get

3  their benefits paid?

4     A.  Yes.

5     Q.  Okay.  Now, when Mr. Blackshire signed off on the

6  WISP acceptance and waiver, did he then get to go see

7  Dr. Nielsen?

8     A.  Yes, sir.  Well, he -- can I -- he already saw --

9  before he gets to sign the waiver, they get to go see

10  the doctor first.

11    Q.  And so by the time he saw you, he had already

12  been to the doctor once?

13    A.  Yes, sir.

14    Q.  And then that's when you discussed the program

15  that's in place.  You -- you mentioned the benefits as

16  far as how it offers more to the employee than, say, the

17  State of Texas does.  Do you walk through those

18  differences with an employee?

19    A.  Yes, sir.  And they're even given a booklet when

20  they fill out the paperwork, and it's got everything

21  about the program, a big thick booklet, and they give --

22  every time we have injury, they get it.

23    Q.  When you provided -- well, actually, any team

24  member, when you provide the acceptance and waiver to

25  any team member, if they have any question at all about

1   the waiver and acceptance, do you go through those

2   questions?

3       A.  Yes, sir.  And if I can't answer them or they

4   have one that they don't want me to answer, I will call

5   corporate.  I don't mind getting somebody else to help

6   me.

7       Q.  Is there someone else there at the plant that

8   also has familiarity with the acceptance and waiver in

9   HR?

10      A.  Yes, sir, HR does.

11      Q.  And -- and is that another place that the team

12  member might go to if they, say, have questions about

13  the program?

14      A.  Yes, sir.

15      Q.  Do you recall that Mr. Blackshire spoke with HR,

16  as well?

17      A.  Yes, sir.

18      Q.  And what would HR do differently than what you do

19  in -- in presenting the waiver?

20      A.  Probably another perspective.  You know, if he

21  has any questions he don't want to ask me or he just

22  wants to ask them, they go straight to them.

23      Q.  When -- when you presented the waiver, do you

24  recall Mr. Blackshire ever saying to you that he didn't

25  understand the document?

1    A.  No, sir.

2    Q.  Do you ever recall him asking any specific

3    questions that you couldn't answer?

4    A.  No, sir.

5    Q.  Did he ever tell you that he couldn't read the

6    document?

7    A.  No, sir.

8    Q.  Have you had situations like that where a team

9    member couldn't read?

10   A.  Yes, sir.

11   Q.  What do you do then?

12   A.  I read it to them and ask if they have any

13   questions or, you know, clarify.

14   Q.  Is it your understanding that after and even

15   before that he fell underneath what is called the WISP

16   program with Tyson?

17   A.  Sir?

18   Q.  That Mr. Blackshire, after the injury, fell

19   underneath the WISP program with Tyson?

20   A.  When he signed the paper, yes.

21   Q.  All right.  Did Mr. Blackshire, when he was in

22   your office, ever raise any objection to signing the

23   WISP waiver?

24   A.  Yes.  He didn't want to sign it, yes, sir.

25   Q.  And then when he did that, what did you do?

1       A.  Call HR.

2       Q.  Why would you do that?

3       A.  That way -- because that's our policy.  If they

4   don't want to sign the waiver, we call HR right then,

5   and he goes to HR to be placed on leave.

6       Q.  So he even got a second person to describe the

7   document more?

8       A.  Yes, sir.

9       Q.  When he came back down, did he sign the document

10  in front of you?

11      A.  Yes, sir.

12      Q.  Did you all discuss it again?

13      A.  Yes, sir.

14      Q.  At that point in time, did he have any additional

15  questions?

16      A.  No, sir.  He signed it.

17      Q.  Once Mr. Blackshire is treated outside by an

18  outside doctor, does he still come to you for any type

19  of treatment?

20      A.  Are you talking about when they get placed on

21  leave or when?

22      Q.  Well, any time after an injury like this, would

23  they still check in with you?

24      A.  Oh, yes, sir.

25      Q.  All right.  After Mr. Blackshire and Tyson parted

1   ways, have you had any follow-up with Mr. Blackshire?

2     A.  No, sir.

3         MR. MAYER:  I believe that's all the

4   questions I have.  I appreciate your time.  I'll pass

5   the witness.

6         THE COURT:  Counsel, cross examination.

7                 CROSS EXAMINATION

8   BY MR. SKRABANEK:

9     Q.  Good afternoon, Ms. Gatlin.  My name is Paul

10  Skrabanek.  I'm Anthony Blackshire's attorney.

11        When Mr. Blackshire came in to see you the

12  week after his incident, you helped him fill out that

13  accident report, right?

14    A.  Oh, yes, sir, on that -- when he come back that

15  Monday.

16    Q.  And the reason you did that is because you did --

17  you testified that he didn't understand or know what he

18  was filling out at the time?

19    A.  No, he understood.

20    Q.  Why is it that you filled out Nos. 1, 2, and 3,

21  and he filled out the rest?

22    A.  Because he understood some of it.  Like the

23  overhead cooler and stuff, you know, I put the overhead

24  cooler there, and, you know, just helped him out.

25        MR. SKRABANEK:  Your Honor, may I approach

1    the witness?

2              THE COURT:  Yes.

3              MR. SKRABANEK:  Counsel, I'm on Page 15.

4        Q.  (By Mr. Skrabanek)  Ms. Gatlin, if you'll just

5    look at Page 15, Line 2.  "Why is it that you filled out

6    Nos. 1, 2, and 3?"  Can you tell us what your answer was

7    in your deposition?

8        A.  Yes, sir.  Because he had trouble writing and,

9    you know, understanding, so I wrote for him.  He didn't

10   know how to spell the words, so I help him go through

11   it, and I signed it and made sure he read over it --

12   make sure it was wrong -- made sure there wasn't nothing

13   wrong, make sure he understood.

14       Q.  So, in fact, is your testimony now that he didn't

15   understand this accident report when you were helping

16   him fill it out?

17       A.  Yes, he did understand the accident report.

18       Q.  Did not?

19       A.  He did.  I just said I -- he understood what was

20   going on, yes.

21       Q.  Okay.  But that contradicts your earlier

22   testimony, though, right?

23       A.  No.  He did understand what was going on.

24       Q.  Okay.  If a -- but you -- your testimony is he

25   did need some extra help in filling this out, correct?

1    A.  Yes, sir, I did help him.

2    Q.  And part of your job is to make extra careful and

3    make sure what you write down is accurately -- accurate

4    from what he says, correct?

5    A.  Yes.

6    Q.  And you got to be careful with that, right?

7    A.  Yes.

8    Q.  Because you want to get down what actually

9    happened or his version of events, right?

10    A.  Yes, sir.

11    Q.  Because you were not there when the pallet --

12    when he had this pallet jack incident, correct?

13    A.  That's why I write down what he said.

14    Q.  And you can only take his word for it?

15    A.  Yes, sir.

16    Q.  And your testimony to Tyson's lawyer was, I

17    believe, "He was driving a jack and pinned himself up

18    against a pole"?

19    A.  Yes, sir, that's what he stated.

20    Q.  And that's what you wrote down on the incident

21    report?

22    A.  Exactly what he said.

23    Q.  Okay.  Let's look at this incident report.

24    A.  Yes, sir.

25    Q.  I see where you say, "driving jack."

1    A.  Yes, sir.

2    Q.  I boxed that in.  And where does it say,

3  "himself"?

4    A.  "Driving jack backing up against the pole, and

5  the jack ran and pinned him up against the pole."

6    Q.  Doesn't say, "pinned himself up against the

7  pole," does it?

8    A.  "Pinned him up against the pole."

9    Q.  But it doesn't say, "pinned himself," does it?

10    A.  It does not say, "self," but it says, "him up."

11    Q.  And your testimony is that he told you that he

12  pinned himself, but you did not write that?

13    A.  Exactly what it says.  He's driving jack backing

14  up against a pole, jack ran, pinned him up against the

15  pole.  I wrote down what he said.

16    Q.  Your testimony to Tyson's lawyer was that --

17  well, there was no testimony about the jack ran.  You

18  just said, "driving jack, pinned himself up against the

19  pole."  Why did you put jack ran in there?

20         MR. MAYER:  Objection, Your Honor, asked and

21  answered.

22         THE COURT:  Overruled.

23    Q.  (By Mr. Skrabanek)  Why did you put "jack ran" in

24  the incident report?  He didn't say that to you.

25    A.  Because that -- that's what the team member

```
1    stated, "driving jack, backing up against the pole, and
2    jack ran -- you know, pinned him up against the pole."
3    I just write down what he's saying.
4        Q.  Did you ask him what jack ran meant when he told
5    you that?
6        A.  No, sir.
7        Q.  Were you curious about it?
8        A.  I believe what he said.
9        Q.  So do you believe that the jack ran?  Do you take
10   Mr. Blackshire at his word?
11       A.  It's an electric jack.
12       Q.  You have no reason to dispute his testimony that
13   the jack ran?
14       A.  He didn't question -- he said he was fine.
15       Q.  Now, you've treated other team members at Tyson
16   for injuries related to pallet jacks, right?
17       A.  Yes, sir.
18       Q.  About how many while you worked there?
19       A.  About the pallet jack or just injuries total?
20       Q.  Pallet jack injuries?
21       A.  I can't get an estimate number, but I've treated
22   some, yes, sir.
23       Q.  Was it about five to ten over your career?
24       A.  I don't remember.  I've treated some, though.
25       Q.  Do you remember testifying in your deposition
```

1  that it was probably five to ten?

2     A.  I don't remember, but I know I've treated some.

3     Q.  Do you want me to bring your deposition up to you

4  to help you?

5     A.  You can.

6     Q.  Okay.

7     A.  I can read it.

8           MR. SKRABANEK:  May I approach the witness?

9           THE COURT:  Yes.  Let her refresh her

10  memory.

11          MR. SKRABANEK:  Page 19.

12    Q.  (By Mr. Skrabanek)  If you'll just look at Page

13  19 here, Ms. Gatlin.

14    A.  "Maybe five to ten maybe, but I don't know

15  exactly because I don't -- I have to look at my notes.

16  I can't remember.  I got so many.  Everybody comes in."

17    Q.  Best recollection five to ten, then?

18    A.  Yes, sir, that's what it says.

19    Q.  Okay.  You stand by that?  Do you stand by that?

20    A.  Oh, yes, sir.  I mean, I treat -- I treat some.

21    Q.  Do you know anything about the training that goes

22  into pallet operators at Tyson?

23    A.  That -- I don't have nothing to do with that.

24    Q.  Let's talk about this workplace injury settlement

25  program.

1    A.  Yes, sir.

2    Q.  I want to talk specifically about the documents

3    that you gave or provided to Mr. Blackshire the week

4    after -- the first visit you had the week after his

5    incident, okay?

6    A.  The Monday?

7    Q.  The Monday after.  Okay.  What all would you have

8    handed him?

9    A.  We have a red folder, like I stated earlier.  It

10   had the -- the WISP paper, the waiver to show you what

11   it is.  That way you don't have to sign it right then.

12   The injury and the status report, The pick a doctor

13   form, and they get to pick a doctor, and then the

14   release of medical information so we can get the medical

15   records.

16   Q.  Are these -- are these documents prepackaged for

17   you?

18   A.  Yes.  My nurse does them, yes, sir.

19   Q.  Do they come down from HR?

20   A.  No, sir.  The nurses do them ourselves.

21   Q.  Do you know who drafts them?

22   A.  Who drafts them, like where the -- the originals

23   come from?

24   Q.  Correct.

25   A.  They come from corporate.

1    Q.  Do you know where corporate gets them?

2    A.  No, sir.  The print shop, I assume.

3    Q.  Do you know -- have you fully read everything

4    that's in this WISP program?

5    A.  Yes, sir.  We have a book we keep in our office

6    that team members can refer to if they have a question

7    about it.  They're always welcome to come in and look at

8    it.  I have no problem.

9         MR. SKRABANEK:  Can I approach and just hand

10   her this and ask her if this is one -- one of the

11   things --

12        THE COURT:  Yes.

13        MR. SKRABANEK:  -- she's given?

14   Q.  (By Mr Skrabanek)  Is this one of the documents

15   that you would have handed Mr. Blackshire --

16   A.  Yes, sir.

17   Q.  -- initially?

18   A.  Yes, sir.  This one, it also comes in a little --

19   like a little booklet -- a little booklet, too.  Comes

20   two different ways.

21   Q.  How many pages in that, ma'am?

22   A.  It is -- it doesn't have page numbers on it.

23   Q.  There's a bunch of papers there, though?

24   A.  Yes, sir.

25   Q.  Okay.  And this is -- fully describes Tyson's

1  workplace injury safety program -- settlement program?

2      A.  The WISP program, yes, sir, and that's the

3  pamphlet that comes from Tyson.

4      Q.  Do you read this line-by-line with anyone that

5  comes in your office that may be injured when you have

6  to have these filled out?

7      A.  No, sir.  We give them a booklet.

8      Q.  Did Mr. Blackshire take the booklet with him?

9      A.  Yes, sir.  Now, what he did with it, I don't

10  know, but they're all given the booklet.

11      Q.  Is he also presented with a waiver at that same

12  time?

13      A.  No, sir.  He's just given the waiver to look

14  at -- the -- when he first get hurt, so I know -- I can

15  tell him, you know, in so many days, you'll be calling

16  here and you'll be given this paper again.  But he don't

17  have to sign it right then.

18      Q.  Did you -- do you remember whether you personally

19  sat there with Mr. Blackshire this first visit, the

20  Monday after?

21      A.  The visit where he got hurt when he come back in

22  there?  Yes, sir.  And my nurse was in there, too,

23  because some of the paperwork is filled out by her, so,

24  yes, we're both there.

25      Q.  What's your nurse's name?

1    A.  Audra Lloyd.

2    Q.  How many people have you treated for workplace

3    injuries since this incident?

4    A.  Oh, I do not know.

5    Q.  Can you remember every conversation you've had

6    with every injured worker at Tyson between this incident

7    and today?

8    A.  Not every one, no, sir.

9    Q.  Is it safe to say that you don't have a clear

10   memory of exactly what was said between you and

11   Mr. Blackshire and your nurse on the date of this first

12   meeting the Monday after?

13   A.  The exact words, no.  Nobody does.  No.

14   Q.  Okay.  So you don't know what warnings you would

15   have given him?

16   A.  No, I have a -- a place in protocol that we go by

17   everything in that booklet, so I know, and, in fact,

18   even if I do not remember, every piece of paper in that

19   booklet, we went over every time.

20   Q.  Do you advise him he might want to seek some

21   lawyer's advice on this WISP program?

22   A.  No, sir.

23   Q.  Why not?

24   A.  Because if he had asked questions, he can ask me.

25   That's -- that's his personal preference.

    1      Q.  Have you ever been trained as a lawyer?

    2      A.  Oh, no, sir.

    3      Q.  Do you have any idea what the legal effects are

    4   of these documents that you're handing to these injured

    5   patient -- injured workers?

    6      A.  No, sir.

    7      Q.  Do you feel like you're qualified to explain the

    8   legal effect these documents have on these injured

    9   workers' lives?

   10      A.  No, I'm not a lawyer.  I'm just a medical

   11   professional.

   12      Q.  And what Tyson does is they leave it up to you to

   13   explain this WISP program to these injured workers?

   14      A.  They give me the paperwork, and they get copies

   15   of them, and they're welcome to seek counsel if they

   16   want.  That's up to them.

   17      Q.  But you don't make -- you don't say, "Hey, you

   18   might want to go check with a lawyer first"?

   19      A.  No, sir.

   20      Q.  What happens if -- let's fast forward to the

   21   second meeting.  What happens if an employee -- an

   22   injured employee comes in and doesn't sign one of these

   23   waivers?

   24      A.  The same thing.  They -- I call HR, and they get

   25   sent to HR.

1    Q.  Okay.  And then if they still refuse to sign it?

2    A.  Then they'll be placed on a personal leave of

3    absence in HR.

4    Q.  And that's an unpaid leave of absence, right?

5    A.  Ask HR.  I think so, yes, sir.

6    Q.  And so what you're -- in fact, what you're saying

7    is that if you don't sign the waiver, Tyson sends you

8    home?

9    A.  No.  If you do not sign the waiver, Tyson sends

10   you to HR.  And then it goes from there.

11   Q.  Okay.  So if you don't sign the waiver, Tyson --

12   you send them to HR.  If they don't sign the waiver with

13   HR, HR sends them home?

14   A.  Yes.

15   Q.  And they cannot see a doctor under the program?

16   A.  Oh, no.  Yeah, they can see a doctor.

17   Q.  Under the program.

18   A.  No.  Under the program, no.  But they can see

19   their own personal doctor.

20   Q.  With money out of their own pocket?

21   A.  Yes.

22   Q.  It wouldn't be money coming from Tyson at that

23   point?

24   A.  They get placed on their own personal insurance.

25   Q.  Isn't it true that you have to have a set amount

1   of days between your initial meeting and sending them to

2   see a Tyson doctor and the time that they could sign a

3   waiver?

4       A.  Yes, sir.

5       Q.  Why is that?

6       A.  That way it gives them time to read the waiver,

7   and there -- and there's 14 days.  We don't rush them

8   right then.  They have time to fully understand.  If

9   they got any other questions, they can ask me.

10      Q.  Anybody ever tell you that's a requirement under

11  Texas law?

12      A.  Under 14 days?

13      Q.  Correct.

14      A.  They get a copy of it.  They can look at it right

15  then.

16      Q.  No, but has anybody ever told you that, that

17  that's a requirement under Texas law --

18      A.  No, sir.

19      Q.  -- this waiting period?  You've never heard that

20  before?

21      A.  No, sir.

22      Q.  What's -- let's talk -- let's go back to when

23  Mr. Blackshire initially came in to see you on the day

24  of his injury.

25      A.  Yes, sir.

     1     Q.  Was his medical condition clear to you at that

     2   point?

     3     A.  He was fine.  He told me he wanted to go back to

     4   work.  He reported his injury and went back to work.

     5     Q.  But you're not a doctor, right?

     6     A.  No, I'm not a doctor.  No.

     7     Q.  Did you feel that he might should follow up with

     8   a doctor?

     9     A.  If he asked -- had any kind of pain, I would, but

    10   he didn't say nothing but "I'm going back to work and I

    11   just reported my injury."

    12     Q.  Did he tell you that he did follow up with a

    13   doctor the next week?

    14     A.  He went to the doctor on his own over the

    15   weekend.  He brought his paperwork in Monday and told me

    16   then.

    17     Q.  And you didn't have any criticism of that?

    18     A.  No, sir.  That's his personal preference if he,

    19   you know --

    20     Q.  Did he report to you when he came back he was in

    21   pain?

    22     A.  When he come back, he filled out the paperwork,

    23   yes, sir, then.  Then we send him to the doctor.

    24     Q.  Now, jumping back to this waiver.  I'm going to

    25   show you a section.  It's Section 3.01 from the WISP

1   packet.  I've highlighted a section.  Have you seen that

2   or read that section before?

3       A.  Yes, sir.

4       Q.  Why don't you read that out loud?

5       A.  "Employee who has not become a participant of the

6   program by the time they completed (sic) --

7               THE REPORTER:  I'm sorry?

8               THE WITNESS:  Am I going too fast?  I'm

9   sorry.  I read very fast.  I'm sorry.

10      A.  ...acceptable to the employer shall cease upon

11  ten business days after the date of the initial report

12  of injury, the date that the employee receives a medical

13  evaluation by a nonemergency care designated provider

14  (sic).

15      Q.  (By Mr. Skrabanek)  Okay.  What's that mean?

16      A.  That means that they get to see a doctor before

17  they can sign the waiver.

18      Q.  Well, doesn't it mean that if you don't sign the

19  waiver, then you're cut off under the plan, and you

20  can't see a doctor under the plan anymore?

21      A.  No, it states right there -- it says that they

22  have to wait ten business days, so -- before they sign

23  the waiver.  So when they get hurt, like he did, then we

24  would send him to a doctor, and then after them ten days

25  are up, they bring -- and he did, he come back and

1  signed the waiver.

2     Q.  And he came back after those ten days?

3     A.  And I don't know exactly the day.  I have to look

4  at the paperwork.

5     Q.  And assuming -- let's just assume in general for

6  a second.  If an employee comes back after those ten

7  days and refuses to sign it, what this does -- this

8  section does, it says you can't see a doctor under our

9  plan anymore?

10    A.  Are you asking a question?

11    Q.  Yes.

12    A.  Okay.  I'm sorry, I thought you were just stating

13  that.

14         They get to see a doctor.  Now, like the

15  thing says up there, ten days, they have to wait.  They

16  get to see a doctor.  They get to pick who they get to

17  go see, and that's what it states.

18    Q.  They get to see a doctor only if they sign the

19  waiver, right, after those ten days?

20    A.  No.  They get to see a doctor first before they

21  sign the waiver.

22    Q.  And if they refuse to sign the waiver after that,

23  they don't get to see another doctor under the plan?

24    A.  That's right.

25    Q.  Now, let's talk about the second meeting you had

1   with Mr. Blackshire.  This would have been the day that

2   he signed this waiver form.  Do you remember whether or

3   not you actually sat down and talked to him about the

4   waiver?

5       A.  Yes, sir, he was in the office.

6       Q.  I'm going to ask you a real specific question.

7   Was it you or was it one of your -- the nurses you

8   supervise who went through the Black -- Mr. Blackshire's

9   packet with him?

10      A.  The nurse did some of it, and I did some of it.

11      Q.  Do you remember testifying differently in your

12  deposition?

13      A.  The nurse did do some of it.  Look in his

14  paperwork.

15          MR. SKRABANEK:  Approach the witness, Your

16  Honor?

17          THE COURT:  Yes.

18      Q.  (By Mr. Skrabanek)  I'm going to go to 29,

19  Ms. Gatlin.  It's this first part up here on 29.  That's

20  the question.  Can you read that out loud?  Read your

21  answer.

22      A.  Yes, sir.

23          "Was it you or one of the nurses you

24  supervised who went through the -- Mr. Blackshire paper

25  with him."

1          "I don't remember, but that's how we all do

2     the same thing."

3          Q.  So you said you didn't remember in your

4     deposition.

5          A.  Yes, sir, because I had to look at the paperwork.

6          Q.  So how is it that you remember that you actually

7     participated in explaining this waiver to him in the

8     second meeting the ten days later?

9          A.  Because I did the deposition, and I looked at the

10    paperwork.

11         Q.  Did you read every sentence of the waiver to

12    him the second --

13         A.  Yes, he reads it himself.

14         Q.  What's that?

15         A.  He can read it himself.  I give him the waiver.

16         Q.  Did you specifically ask Mr. Blackshire -- and

17    listen to my question real carefully.  Did you

18    specifically ask him this?  Do you understand what that

19    waiver says after he -- he got done reading it?

20         A.  I said, "Do you have any questions?"

21         Q.  That's all you said?

22         A.  Yes, sir.

23         Q.  So you don't know one way or another whether he

24    understood that waiver after he read it?

25         A.  If I asked him if he had any questions and he

1  told me, no, that would --

2    Q.  Well, all you would know, to be fair, is that he

3  didn't have any questions?

4    A.  Yes, sir, I asked him.

5    Q.  You wouldn't know one way or another whether he

6  understood?

7    A.  He didn't say he understood.  He didn't say he

8  didn't understand.  He just said, "I don't have any

9  questions," because I asked him.

10   Q.  Do you have any idea what happened in that

11  meeting with HR that you testified --

12   A.  No, sir.

13   Q.  Do you know one way or another whether HR

14  explained anything to him about the WISP program?

15   A.  I was in my office, no, sir.  I don't know what

16  they talked about.

17   Q.  Do you know one way or another whether they were

18  able to adequately explain the WISP program and waiver

19  form to Mr. Blackshire?

20   A.  I don't know.  I wasn't there.

21           MR. SKRABANEK:  Pass the witness.

22           MR. MAYER:  Can we approach, Your Honor?

23           THE COURT:  Okay.  Redirect.

24           MR. MAYER:  May we approach?

25           THE COURT:  Oh, approach.  You can approach.

1          (Bench conference.)

2          MR. MAYER:  I think -- I think we made it

3     pretty clear that we weren't going to go into the other

4     program, that being the health insurance.  But I believe

5     the door has been opened in the sense that he said if

6     they don't get the WISP, they don't get any benefits.

7          She made a statement that was unclear that

8     they go to their personal, but it's actually Tyson's

9     health insurance, and I think that leads a question by

10    his -- by his questions.

11         THE COURT:  I don't agree with you.  I'm not

12    letting you -- I'm not going to open that up.  I mean,

13    she volunteered that answer, I believe.  I don't believe

14    he's the one that said that.

15         MR. MAYER:  No.  His -- his --

16         THE COURT:  She can't open the door for you,

17    Counselor.  She's your witness.  I'm overruling it.

18         MR. MAYER:  Fair enough.

19         (Bench conference concluded.)

20         MR. MAYER:  Redirect, Your Honor?

21         THE COURT:  Yes.

22                   REDIRECT EXAMINATION

23    BY MR. MAYER:

24    Q.  Ms. Gatlin, you mentioned that you had treated

25    some team members or saw some team members with a pallet

1    jack incident or injury.  Did any of those other team

2    members ever report to you a runaway pallet jack?

3         A.  No, sir.

4         Q.  Did they ever report to you a pallet jack that

5    accelerated on its own?

6         A.  No, sir.

7              MR. MAYER:  No further questions.  Pass the

8    witness, Your Honor.

9              MR. SKRABANEK:  Nothing further, Your Honor.

10             THE COURT:  Okay.  You may step down.  Thank

11   you.

12             THE WITNESS:  Yes, sir.

13             THE COURT:  Ladies and gentlemen, we're

14   going to go ahead and recess for today.  And in

15   accordance -- I believe I told you that we'll start in

16   the morning at 8:30.  You be here just a few minutes

17   before 8:30.

18             Now, it's real important that you not

19   discuss this case with your friends or your respective

20   spouses tonight.  And, undoubtedly, if you see some --

21   get home tonight, somebody's going to say, "Well, what

22   are you doing?  What happened down there?"  And

23   certainly you tell them you're on the jury, but it's

24   been my experience in the last 40 something years that

25   what happens next is they say, "What kind of case is

1    it?"  Don't ever answer that question, please, because

2    once you answer that question, undoubtedly the person

3    you're talking to is going to say, "You know, I know

4    something about a case like that," and then you start

5    hearing things about matters not under -- you know, not

6    sworn to.  We want to decide this case solely on the

7    evidence.

8            So if you'd remember that, just tell them

9    that Judge Ward has instructed us not to discuss the

10   case and what kind of case it is.  And I am instructing

11   you that way.  So if you'll keep those instructions in

12   mind.  And have a nice evening, and I will see you in

13   the morning, and we'll get started, and I believe we'll

14   get through with this case hopefully tomorrow.

15           So you may leave the courtroom at this time.

16   Thank you very much.

17           LAW CLERK:  All rise.

18           (Jury out.)

19           THE COURT:  Please be seated.  All right.

20   We'll take motions now from the defendant.

21           MR. MAYER:  It's my understanding that the

22   plaintiffs are going to be dropping their gross

23   negligence claim.

24           THE COURT:  Well, that saves me -- is that

25   correct?

1          MR. PIERCE:  That's correct, Judge.

2          THE COURT:  Well, that saves me from saying

3    it's granted on that, so --

4          MR. MAYER:  Other than that, Your Honor, the

5    defendants have no other motions.

6          THE COURT:  Okay.  Then how much more time

7    do you think you'll have?

8          MR. MAYER:  That was our last witness, Your

9    Honor.

10         THE COURT:  Oh, okay.  Well, I'm just trying

11   to think timing-wise.

12         Can you get them a draft of the charge here

13   in 15 minutes or so?

14         LAW CLERK:  Yes.

15         THE COURT:  I was just saying, I will give

16   you a draft of the charge here in just a few minutes and

17   we could gather in the morning at 8:00 and see if you

18   had any real heart burn-type issues.  You know, we just

19   have an informal charge conference, and if you have some

20   real heart burn issues, well, we'll take -- I'll listen

21   to you then, and then I will make whatever changes I'm

22   going to make, and we'll take formal objections.

23         I should have asked you -- I thought you had

24   another witness for some reason.  And I would have told

25   them to come in at 9:00, but we might have to wait 10

1  minutes or so, but I'm thinking we can get it together

2  pretty quick.

3        MR. MAYER:  I think like Your Honor

4  referenced this morning, we're pretty streamlined in

5  the -- the charge.

6        THE COURT:  Well, I think we've -- I don't

7  know, we may not have everything in there that y'all

8  have, but it made it a lot simpler.

9        Let me ask Mr. Pierce, you anticipate using

10  any type of unit of time argument in your closing on

11  placing a value because that has something -- I have an

12  instruction I either put in or put out, you know, in

13  the --

14        MR. PIERCE:  Uh...

15        THE COURT:  You don't know -- you don't

16  know.  Well, I'll just -- I'll tell you that won't --

17  that one won't be in the charge, but I'll have a copy of

18  it up here so that if you elect to make that argument,

19  then I'll add something to the charge.

20        MR. PIERCE:  Okay.

21        THE COURT:  But if y'all -- we'll take a

22  break.  And if you can check in chambers -- I tell you

23  what, I'll -- Mr. Mann's getting this charge together.

24  I'd like to visit with counsel in chambers maybe just

25  for just a few minutes while we're working on that.  So

```
 1   if you'll come on in in about seven or eight minutes,

 2   that will be good.

 3                LAW CLERK:  All rise.

 4                (Recess.)

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                          CERTIFICATION

2

3              I HEREBY CERTIFY that the foregoing is a

4    true and correct transcript from the stenographic notes

5    of the proceedings in the above-entitled matter to the

6    best of my ability.

7

8

9
     SHELLY HOLMES                        Date
10   Deputy Official Reporter
     State of Texas No.: 7804
11   Expiration Date:     12/31/10

12

13

14

15

16

17

18

19

20

21

22

23

24

25