```
 1            IN THE UNITED STATES DISTRICT COURT

 2            FOR THE EASTERN DISTRICT OF TEXAS

 3                    MARSHALL DIVISION

 4   ANTHONY BLACKSHIRE        )(

 5                            )(   CIVIL DOCKET NO.

 6                            )(   2:09-CV-329-TJW

 7   VS.                      )(   MARSHALL, TEXAS

 8                            )(

 9   TYSON FOODS, INC.        )(   AUGUST 24, 2010

10                            )(   8:30 A.M.

11                           TRIAL

12          BEFORE THE HONORABLE JUDGE T. JOHN WARD

13                UNITED STATES DISTRICT JUDGE

14                     VOLUME 2 OF 2

15   APPEARANCES:

16

17   FOR THE PLAINTIFFS:  MR. MICHAEL E. PIERCE
                          MR. MATTHEW PAUL SKRABANEK
18                        Arnold & Itkin, LLP
                          1400 McKinney, Suite 2550
19                        Houston, TX 77010

20   APPEARANCES CONTINUED ON NEXT PAGE

21   COURT REPORTER:     MS. SHELLY HOLMES, CSR
                         Deputy Official Court Reporter
22                       2593 Myrtle Road
                         Diana, Texas  75640
23                       (903) 663-5082

24
     (Proceedings recorded by mechanical stenography,
25   transcript produced on a CAT system.)
```

```
 1                        MR. CHAD NEWMAN
                          Erskine & McMahon
 2                        521 N. Second St.
                          P.O. Box 3485
 3                        Longview, TX 75606

 4   FOR THE DEFENDANTS:  MR. ZACHARY THOMAS MAYER
                          Kane Russell Coleman & Logan
 5                        1601 Elm St., Suite 3700
                          Dallas, TX 75201
 6
                          MR. STAYTON L. WORTHINGTON
 7                        Coghlan Crowson, et al
                          1127 Judson Road, Suite 211
 8                        P.O. Box 2665
                          Longview, TX 75606-2665
 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                       I N D E X

2
   August 24, 2010
3
                                         Page
4
      Appearances                        1
5
      Plaintiff's Closing Argument       6
6
      Defendant's Closing Argument       18
7
      Plaintiff's Rebuttal Closing Argument   34
8
      Court's Charge                     38
9
      Court Reporter's Certificate       56
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              THE LAW CLERK:  All rise.

 2              THE COURT:  Please be seated.

 3              All right.  We'll take objections at this

 4    time to the Court's charge from the plaintiff.

 5              MR. SKRABANEK:  Your Honor, we would ask

 6    that the Court add an instruction on Page 4 of the

 7    charge to instruct the jury that they may not presume

 8    that simply because the waiver is signed, that

 9    Mr. Blackshire understood it.

10              THE COURT:  Okay.

11              MR. SKRABANEK:  In light of your holding in

12    the summary judgment.

13              THE COURT:  The Court's going to deny that

14    request.

15              Anything further from the plaintiff?

16              MR. SKRABANEK:  Nothing, Your Honor.

17              THE COURT:  All right.  Anything from the

18    defendant?

19              MR. WORTHINGTON:  Yes, Your Honor.

20              Defendants would object to Question No. 3 as

21    written and would request that it include a

22    qualification based on the response to Question No. 2,

23    as it does for Question No. 1.

24              THE COURT:  Okay.  That request is denied.

25              MR. WORTHINGTON:  Thank you, Your Honor.
```

1          THE COURT:  Anything further?

2          MR. WORTHINGTON:  No, Your Honor.

3          THE COURT:  All right.  Well, I guess we'll

4    have a formal opening of Court at 8:30.  We don't want

5    them to think they're not as important as they were

6    yesterday.  So I'll be back, and we'll formally open.

7          THE LAW CLERK:  All rise.

8          (Recess.)

9          THE LAW CLERK:  All rise.

10          (Jury in.)

11          THE COURT:  Please be seated.

12          Good morning ladies and gentlemen.  Thank

13    you for being here timely.  I've already spoken with

14    counsel.

15          At this time, does the defendant have any

16    further witnesses?

17          MR. MAYER:  No, Your Honor, the defendant

18    rests at this time.

19          THE COURT:  All right.  Plaintiff?

20          MR. PIERCE:  Your Honor, the plaintiff

21    rests, as well.

22          THE COURT:  Okay.  All right.  Ladies and

23    gentlemen, that means we've heard all the evidence in

24    the case, and we've, of course, worked with counsel.  We

25    were here early this morning and got the Court's charge

1  ready.  So the first thing we need to do is have closing

2  arguments.  We'll hear from the plaintiffs first.

3          MR. PIERCE:  Thank you, Your Honor.  May it

4  please the Court.

5          THE COURT:  Mr. Pierce.

6          MR. PIERCE:  Ladies and gentlemen, I want

7  to take just a moment to thank you again.  I want to

8  thank you for the time and for the attention you've

9  given to this case.  This isn't the biggest case that's

10  ever been tried in this courthouse.  But to

11  Mr. Blackshire it is the biggest case that's ever been

12  tried in this courthouse because when today's over, I'm

13  going to go back to my law firm.  I'm going to back to

14  other cases.  These lawyers for Tyson are going to do

15  the same thing.  Tyson is going to keep on doing what

16  they do, and you folks are going to go back to your

17  lives.  But tomorrow and next week and next month, next

18  year, there's one person in this courtroom who has to

19  live with the consequences of what happens, and that's

20  Mr. Blackshire.

21          And so today is very well the most important

22  day of his life.  And without folks like you who are

23  willing to come down and serve on juries like this, he's

24  denied that day.  And so we all thank you for your

25  service in this case.

1          In my time with you this morning, I want to

2     do a couple of things.  I want to talk to you about the

3     evidence that you've heard, and I want to go back to

4     something that the defense counsel brought up in the

5     beginning of this trial.  There are two points they made

6     that I think are absolutely critical.

7          The first is don't check your common sense

8     at the door.  The reason we want you -- the reason that

9     we have a jury system is so that we can have citizens

10     like you come in, look at evidence, and say, "You know

11     what, that just doesn't make sense."  And there's some

12     points like that in this case, and I want to talk to you

13     about that.

14          The second thing that the defendants brought

15     up that to me is absolutely critical in the case was

16     this whole point about there being two sides to every

17     story.  There normally are, but I'm going to tell you

18     this, as we go through what the defendant's witnesses

19     actually said, they have no side.  They don't have

20     anything to refute the evidence you've heard.  I'm going

21     to talk to you about that.

22          First, let's talk about the accident.  On

23     October 26th, 2007, Mr. Blackshire was injured.

24     Nobody's really fighting that.  You heard from the

25     doctor.  X-rays don't lie.  CT scans don't lie.  MRIs

1    don't lie.  There's evidence he was injured.

2            So then the next question is why?  What

3    happened to injure him?  Ladies and gentlemen, there's

4    only one person that you've heard from in this entire

5    trial who was there, who saw what happened, and who told

6    you what happened, and that's Mr. Blackshire himself.

7    Mr. Blackshire told you that for whatever reason, this

8    jack malfunctioned and it pinned him against the wall.

9            You heard from Mr. Madeley, a certified

10   safety professional and licensed engineer, somebody who

11   is familiar with OSHA, the federal law governing

12   workplace safety.  He told you that Tyson had an

13   absolute responsibility to make sure that they provided

14   safe equipment for their workers.  He told you that

15   Tyson had an absolute responsibility to take

16   malfunctioning equipment out of service.  And in this

17   case, based on the evidence that we have, they didn't do

18   that.  They failed in their responsibility.  That was

19   unreasonable.

20           Two sides to every story.  What did

21   defendants tell you?  First, they don't have a single

22   witness who can come in and say what Mr. Blackshire says

23   is wrong.  I saw it, and it didn't happen the way he

24   says.

25           Next, they have Ms. Williams and Ms. Gatlin.

1    Talk about credibility.  Ms. Williams walked into this

2    courtroom, sat on that witness stand, and went into

3    great detail with you about every conversation she had

4    with Mr. Blackshire.  Oh, no, he never reported to me

5    that there was a problem that morning.  I talked to him.

6    I had to ask him to run the pallet jack because my other

7    jack operator couldn't do it.  Went into great detail.

8    When I was sitting at that table listening to it, I

9    didn't know what to make of it because I had a sworn

10   deposition in my hand that did not match at all what

11   this lady was saying.

12            The most important questions you heard in

13   this trial, ladies and gentlemen, is when I got up and I

14   said, "Ms. Williams, you remember when I took your sworn

15   deposition two months ago?  On that day, you didn't

16   remember any conversation.  You couldn't tell us one

17   way or the other whether you'd even talked to

18   Mr. Blackshire."

19            And do y'all remember I walked up, I showed

20   her her deposition, and I said, "What does it say?  Did

21   you remember the conversation?"

22            "No."

23            Common sense, ladies and gentlemen.  How

24   does someone under oath two months ago not remember a

25   conversation and then walk into a courthouse after

meeting with Tyson's attorneys and all of a sudden that

conversation is crystal clear?  She has no doubt about

it.  Ms. Williams is an honest lady, and she ended up

admitting -- she goes, "I don't remember one way or the

other."

Ms. Gatlin.  Ms. Gatlin came into this

courtroom and when opposing counsel was questioning her,

she was really clear -- again, crystal clear, picture

perfect.  He told me the jack -- he pinned himself

against the wall, and I wrote down exactly what he said.

Well, ladies and gentlemen, that's kind of

funny because we have the document that's not in

Mr. Blackshire's handwriting.  It's in her handwriting.

She doesn't say that he pinned himself against the wall.

What does she say?  She says, "Driving jack, backing up

against pole, jack ran and pinned him up against pole."

Ladies and gentlemen, these jacks aren't supposed to run

at you.  Every witness admitted that.  Why is this

crucial?

Let's go back to Ms. Williams for a minute.

Do y'all remember when I was questioning her, and I

said, "Ms. Williams, is this jack supposed to run at

you?"

"No."

"If the jack ran at Mr. Blackshire, what

1 should he have done?"

2        "He should have reported it."

3        "And if he reported the jack ran at him,

4 what should happen?"

5        "It should be recorded."

6        It's right here.  It's in plain English.

7 The jack ran.

8        So if we take away Ms. Williams not

9 remembering these conversations, if we take away this

10 excuse that Mr. Blackshire told them he pinned himself

11 which doesn't show up anywhere here, what do we have

12 left?

13        Well, now, they put up Mr. Howard, the

14 maintenance supervisor.  And what does Mr. Howard tell

15 you?  Mr. Howard says, "I never heard anything about

16 this.  I don't know anything about it.  I didn't inspect

17 the jack that day, but I would have heard if this had

18 hurt somebody."

19        Well, ladies and gentlemen, I'll submit this

20 to you, in order for Mr. Howard to know this thing

21 malfunctioned, somebody's got to tell him.  I'm not

22 claiming he's psychic.

23        Mr. Blackshire went in and he reported that

24 this jack ran, and then we go back to Ms. Williams.  Do

25 y'all remember me questioning her?  I said,

1    "Ms. Williams, did this get reported to safety?"

2         "I don't know."

3         "Ms. Williams, did this get reported to

4    maintenance?"

5         "I don't know."

6         Last question and maybe one of the most

7    important questions in this trial:  "Should it have been

8    reported?"

9         "Yes."

10        Their own witnesses admits that based on

11   this information, it should have been reported to

12   maintenance, and it wasn't.  Do I blame Mr. Howard for

13   not knowing about this?  No, I don't blame him because

14   nobody told him.  That was Ms. Williams' job.  That was

15   Ms. Gatlin's job, and they failed in their jobs.

16        What's the last thing about the accident

17   that I want to touch on -- one last thing.  Tyson -- and

18   this is something that even their lawyers cannot explain

19   away.  They have rules.  One of the rules they have, and

20   we looked at this before, remember when Ms. -- when

21   Ms. Williams was on the stand, I asked her, "If

22   Mr. Blackshire really did what you claim, if he pinned

23   himself up against a wall, is this safe?"

24        Answer:  "No, it's not safe."

25        "Do you have a policy?"

1           "Yes, we have a policy."

2           What does the policy require?

3           Ladies and gentlemen, y'all can read this

4   just as well as I can.  If he is not operating this

5   safely, if he does something unsafe, whether or not

6   there's even an accident, he is subject to disciplinary

7   action.  I asked Ms. Williams, he -- "You're claiming he

8   came and reported to you that he's operating this in

9   such a way that it would be unsafe.  Where's the

10  disciplinary action?"  It's not there.

11          Two sides to every story.  They have these

12  excuses, but when you look at them and you look at the

13  evidence, they don't make sense.  This was reported.

14  It's in their own documents.  Maintenance didn't know

15  about this because it didn't get reported up the chain

16  by Ms. Williams, like she admits it should have.

17          And then, finally, if this happens the way

18  they claim, where's the disciplinary action?  If he's

19  operating in an unsafe manner, where's the paperwork?

20  Let's see it.

21          The last point that they make on their side

22  of the story about the accident is to say, "We check

23  these jacks out all the time.  We check them every week.

24  We check them every month.  We check them every

25  quarter."  Ladies and gentlemen, these jacks, just like

1　ever other piece of mechanical equipment, can fail.  You

2　heard it in voir dire.  Whenever we were picking the

3　jury, how many people did I ask, "Have you seen a pallet

4　jack fail?"

5　　　　　"Yes."

6　　　　　Now, what would be nice to have?  The

7　records.  I would love to be able to look at you and

8　tell you, "Folks, here's the report.  This thing hadn't

9　been inspected for a month."  I can't tell you that,

10　though.  You know why?  Because I've never seen the

11　records.  I don't have those records.  They don't even

12　have those records.  That's a problem.  How can you sit

13　here and tell us this thing is in good working order

14　when you can't prove it?  And they can't prove it.

15　　　　　Ladies and gentlemen, when you look at all

16　the evidence -- when you look at both sides of this,

17　they don't have a story.  They don't have any evidence,

18　and their witnesses don't hold up.  The only account you

19　have in front of you is what Mr. Blackshire says, and

20　nobody can prove it's wrong.  When you go back in the

21　jury room and you talk about this, think about

22　something.  If their story is true, if he messed up that

23　day, why wasn't he written up?  If he really went to his

24　supervisor and said, "I did this in an unsafe way," why

25　did she violate their policy and not write him up?  It

1   doesn't make sense.  Don't check your common sense at

2   the door.

3          Let's talk about this waiver.  That's going

4   to be the next thing you're asked about.  Did

5   Mr. Blackshire waive his rights?  You heard Ms. Gatlin

6   on the witness stand, and they did this big dog and pony

7   show with her about how great this program is that Tyson

8   has.  Make no mistake about it, ladies and gentlemen,

9   this program is designed to do one thing.  They want you

10  to commit up front and give up every right you have on

11  the chance that they'll continue to be good to you, that

12  they'll continue to pay you.  That's what the program

13  is.

14         On the day that this occurred, they brought

15  Mr. Blackshire in.  They talked to him.  Same thing for

16  Ms. Gatlin as we had with Ms. Williams.  On direct

17  examination with Tyson's lawyers, crystal clear memory,

18  picture perfect, remembered every detail.  But my law

19  partner, Mr. Skrabanek got up.  Y'all remember this?

20  And walked up to her and said, "Now, when we took your

21  deposition, you told us you didn't remember if it was

22  you having the conversation or if it was one of your

23  nurses."

24         It's kind of funny how a couple of months

25  ago under oath she didn't know, but then in the

1   courthouse after meeting with Tyson's lawyers, she was

2   sure of it.  She was sure she had that conversation.

3   She was sure he understood.  She doesn't know.  She

4   doesn't remember.  She told the truth in her deposition.

5           The next point they make about this waiver,

6   and I think the biggest point in the case regarding this

7   waiver, whether he understood it.

8           THE COURT:  You've used 13 minutes.

9           MR. PIERCE:  Thank you, Judge.

10          They will tell you on the one hand --

11  remember this accident report that we keep going back

12  to?  Ms. Gatlin will tell you on the one hand,

13  Mr. Blackshire didn't understand this well enough to be

14  able to write it himself.  That's why she had to write

15  it.  But then on the other hand, she will tell you that

16  we have this nice document full of legal language

17  drafted by Tyson's lawyers, and Mr. Blackshire, boy, he

18  absolutely got that.

19          Did she tell him what he was giving up?  No.

20  Did she tell him you may want to talk to a lawyer?  No.

21  Did she do anything to make sure he understood?  No.

22  Was it voluntary?  No.  You heard from her, if

23  Mr. Blackshire stood up and said "I don't want to sign

24  this document," guess what happens?  Leave of absence.

25  They send you home.  And guess what?  That great benefit

1   plan they have with all those doctors, that's out the

2   window, too.  It's not voluntary, and he didn't

3   understand it.

4           And they can't prove to you he did.  That's

5   their burden.  We've been talking about burden of proof

6   the whole trial.  They have the burden on that issue.

7   They've got to tilt the scales to prove to you that he

8   knew about it, that he understood it, and that it was

9   voluntary.  They can't do it.

10          The last thing I want to talk to you about

11  this morning are the consequences.  Because of what

12  Tyson did, we went through this with the doctor.

13  Mr. Blackshire has almost $6,000.00 in past meds that

14  haven't been paid.  You heard the doctor say he's going

15  to need another 50 in future medications.  This is money

16  not to make Mr. Blackshire rich, this is money to pay

17  the doctors to treat the injuries he has that they

18  caused.  That's fair.

19          Ladies and gentlemen, they may get up and

20  nitpick with these numbers and fight about it, but the

21  truth of the matter is, did they bring you a doctor to

22  say it's wrong?  They didn't.  The only competent

23  medical evidence you have heard in this case is that

24  these injuries were caused at Tyson, that they're

25  ongoing, and that he's going to need medical treatment.

1    So we ask you to award that.

2         The last thing I'll say is this.  Ladies and

3    gentlemen, we're not here asking for millions of

4    dollars.  We're not.  We're asking for this man's

5    medical to be paid, and here's why.  If somehow you

6    decide, you know what, we're going to give him half

7    that, in three years if he runs out of money and can't

8    afford this, he doesn't get to come back.  He doesn't

9    get to talk to another jury and tell them, "You know

10   what, Tyson's lawyers were too good.  They tricked the

11   first jury, and they didn't give me enough money to pay

12   for my meds."  He doesn't get to do that.

13        The last thing I'm going to ask you for is

14   this.  He's been through pain and suffering.  And we'd

15   ask you to award whatever you think is fair for that,

16   because this is something, again, that he's got to live

17   with.  Not you, not me, definitely not Tyson.  Anthony's

18   got to live with it.  And after today, the only thing

19   he's going to have is whatever you think is fair and

20   whatever you give to him, and that's what we ask you to

21   do.

22        Thank you, Judge.

23        THE COURT:  Thank you.

24        Mr. Mayer?

25        MR. MAYER:  Yes, Your Honor.  May it please

1    the Court.

2              THE COURT:  Mr. Mayor.

3              MR. MAYER:  Counsel.

4              Ladies and gentlemen of the jury, you'll

5    remember back yesterday morning at the beginning of this

6    case, we explained that this trial will be about a -- a

7    few simple principles.  First, taking responsibility for

8    your own actions.  Next, it's living up to a promise.

9    But what we learned in this trial is that there's

10   another issue that was developed, and that is someone

11   changing their story when they have something to gain.

12             Throughout this entire trial, you heard the

13   plaintiff's attorney say that it was only Mr. Blackshire

14   who knows what happened that day because he was the only

15   one there.  Well, that's true.  There was no one else

16   working right next to him at the time this incident

17   occurred.  So he, in fact, was the only one there.

18             But what you have to look at is how

19   drastically his version of this incident changed from

20   October 26th until today when he's presenting his case

21   and asking for money damages from you.  Then you ask --

22   have to ask yourself why did it change?  Because he's

23   got something to gain.  But don't just take my argument

24   for it.  What I want you to do is I want you to judge

25   the credibility of the testimony.  The credibility of

the evidence and the documents that prove that the

plaintiff's attorney is right, there are definitely two

sides to Mr. Blackshire -- Blackshire's story.

The first side of the story is what he told

Tyson back on October 26th.

The second side of that story is what he is

coming in this courtroom today and telling you.  His

version of the story during this trial has been this,

that he was operating a pallet jack that he -- he

inspected that morning and had no problem operating it

from Point A to Point B.  He was then waiting for

another gentleman to come out of a cooler.  So what did

he do?  He said he stepped away four to five feet from

that pallet jack.  And when he did, that handle was in

the upright position.  It was in a braking position.

And he said that when he turned around again to look

back to his right, all of a sudden, suddenly he saw the

handle in a down position and the pallet jack was

accelerating towards him, a runaway pallet jack.  That

is the one side of the story that he's telling you

today.

But let's look at the evidence that proves

what the other side of the story is.  See, we heard from

witnesses during this trial.  We also reviewed

documents.  And what I'd like to do in my moments with

1    you is go through what that evidence showed and what

2    those documents prove.

3            The first person that you heard from from

4    Tyson was Patricia Williams.  Ms. Williams is a front

5    line supervisor.  That's what she does for a living.

6    She certainly does not come in courtrooms and testify in

7    front of juries and get paid for it.  Her job is back at

8    the plant, and the plaintiff's lawyer is right, she's

9    back living her life at the plant.  She's doing her job

10    day in and day out.

11            So when they fuss with her about how she

12    testified, I hope you'll realize that Ms. Williams is a

13    plant supervisor.  She's not a paid expert like

14    Mr. Madeley or even Dr. Lee who has done this time and

15    time before.  Each one of the Tyson folks, their primary

16    job is being a nurse, being a maintenance man, or being

17    a front line supervisor, not being a professional

18    witness.

19            But what did Ms. Williams tell you?  Her

20    version of that morning was very clear.  She asked

21    Mr. Blackshire to run the jack, and a few hours later

22    Mr. Blackshire came to her and said, "I was operating

23    the jack, and I pinned myself against the wall."

24    There's nothing else to remember.  It's not rocket

25    science.  It's one sentence, and she remembered that one

1  sentence clearly.

2          Ladies and gentlemen, if -- if there would

3  have been any reference at all to Ms. Williams about a

4  malfunctioning jack, she would have done exactly what

5  she should have, and that is walk down to her

6  Maintenance Department which was a few hundred yards

7  away and said, "Men, I would really like you to take a

8  look at this jack."

9          If Mr. Blackshire actually reported this

10  runaway jack, she would have called up Mr. Howard and

11  said, "We've got a problem here."  And certainly if

12  anyone would have reported a malfunctioning jack before

13  that day, Ms. Williams would have taken care of it.  She

14  testified to you that if that would have ever been

15  reported, it was her job, her responsibility, and more

16  than anything, just what she would have done because it

17  was right.  She would have taken care of it.  But no

18  one, not Mr. Blackshire, not any other employee reported

19  an accelerating runaway jack before this trial.

20          So the next person that you heard from was

21  Ms. Jessica Gatlin.  Ms. Jessica Gatlin talked very

22  fast.  We can all tell that she's not a professional

23  witness, but her story and her testimony was credible.

24  She was consistent in that she said Mr. Blackshire came

25  on October 26th, the day of the incident, and said, "I

1    want to report what just happened.  I'm reporting that I

2    was operating a pallet jack, and I pinned myself against

3    the wall."

4                As the nurse wanting to help, she said, "Are

5    you okay?"

6                He said, "Yeah, I'm fine.  I'm going to go

7    back, I'm going to finish my shift."

8                That was on the day of the incident.  No

9    reference to standing four or five feet away from the

10   pallet jack and it accelerating into him.  That type of

11   information, that would have required an investigation.

12   That would have required some kind of disciplinary

13   looking into.  But a simple statement, a one-sentence

14   statement that "I was operating the jack, and I pinned

15   myself against the wall," that doesn't require an

16   investigation.

17               But I don't want you only to take Tyson's

18   testimony for it.  What I want you to do next is I want

19   you to look at the evidence.  I want you to look at the

20   documents in this case.  The first document that we have

21   happened on November 1st.  Incident is on October 26th.

22   Mr. Blackshire comes in on November 1st, and he meets

23   with Ms. Gatlin.  He comes back and he says, "Over the

24   weekend, I went to the emergency room and my back's

25   hurting me."

1          And she said, "Well, I want you to indicate

2   on this form exactly where -- where you're hurting."

3          And he did.  He put the dots in there.  He

4   also signed the document.

5          And then she said, "I want you to describe

6   for me, and we're going to fill out this report

7   together."

8          The plaintiff's attorney is -- is critical

9   of Ms. Gatlin for helping Mr. Blackshire fill out the

10   report.  But, again, let's use our common sense here.

11   The report states very clearly that what was he doing,

12   number one, driving the jack, not standing four or five

13   feet away from it.  And then secondly, it says, "Driving

14   the jack, backing up against pole, jack ran and pinned

15   him up against the pole."

16          I want you to recall back to the cross

17   examination.  Plaintiff's lawyer actually crossed

18   Ms. Gatlin on the fact that she did not put "self."  She

19   didn't put "himself," she just put "him."

20          Now, I also want you to use your common

21   sense when you're evaluating this language.

22   Mr. Blackshire was in her office.  Her office is small.

23   They're sitting next to each other.  They're filling out

24   this -- this document.  If the discrepancy between the

25   incident was so great that Ms. Gatlin put driving the

1  pallet jack backing up, whereas Mr. Blackshire said,

2  "No, I was four or five feet away, and it accelerated

3  into me after the handle dropped," Mr. Blackshire never

4  would have signed that document.

5          He would have said -- just like when he was

6  indicating where he was hurt, "We need to change that

7  document.  We need to clearly indicate what happened

8  that day."  But he didn't do it.  The reason why is

9  because the incident, as described by Mr. Blackshire,

10  was consistent.  It was consistent with Patricia

11  Williams.  It was consistent with Jessica Gatlin.  And

12  it was consistent on the document that he signed on

13  November 1st.

14          So don't stop there.  Those are three -- two

15  Tyson employees and a Tyson document.  I want you to

16  look further at the evidence.  And I want you to

17  consider the first doctor that Mr. Blackshire saw was

18  Dr. Nielsen.  He chose Dr. Nielsen, and he went to him.

19  And you'll remember that Mr. Blackshire testified that

20  Dr. Nielsen, he referred me to another doctor and they

21  helped me out.  What's important -- it's in the record

22  that you'll have the opportunity to review -- from

23  Dr. Nielsen.  This is a medical record that comes from

24  his office.  There's a questionnaire that's filled out

25  that first -- that first day that he treats with him

1    which is November 6th, 2007.  It's a patient information
2    sheet.  And I know it's somewhat difficult to read in
3    the middle, but I want you to follow along with me if
4    you can.  Where it says patient's information, the
5    patient name is Anthony Blackshire.  And it says, "Give
6    statement of cause of injury."  On October -- November
7    6th, it states, "Drove jack into himself and pinned
8    himself between jack and wall."  Exactly the same
9    version that Mr. Blackshire told Tyson.  This isn't
10   coming from Tyson.  This is coming from Dr. Nielsen.
11   And who signed this document?  No one other than Anthony
12   Blackshire.
13           So we've got two people who testified.
14   We've got an injury report.  Now, we have a medical
15   record from Dr. Nielsen that is, again, signed by
16   Mr. Blackshire that proves he pinned himself against the
17   wall.
18           The last person I want you to consider, and
19   that is Dr. Lee.  Dr. Lee came before you, and he
20   described the medical treatment that he is currently
21   giving Mr. Blackshire.  But what he also described was
22   very important.  He said that I relied upon what the
23   patients tell me so I can evaluate the patients and
24   treat them properly.  And what he said specifically is
25   that Mr. Blackshire told him he was operating the pallet

1    jack when it lost control.  Nothing -- nothing about

2    standing four or five feet away from it, not operating

3    it and a runaway pallet jack.

4             Dr. Lee is Mr. Blackshire's own document --

5    doctor.  And what I want you to consider is how that

6    story from the beginning up until the time that he

7    testified in front of you -- in front of you has

8    remained consistent.  That's the one side of the story

9    that is proven by the testimony and the documents and

10   the evidence.

11            The other side of the story is what he told

12   you when he testified.  And I want you to really judge

13   the credibility of that version because no one, not

14   Tyson, not the doctors, not the documents reflect that

15   version of the story.

16            So what the -- the Judge is going to do here

17   momentarily is he's going to read what is called jury

18   instructions, a jury charge.  That's your road map when

19   you go back to deliberate, and I want to cover just a

20   few things about that jury charge.

21            It's a long document, and it's got a lot of

22   instructions that come directly from the Court.  But one

23   of those instructions that I believe is really important

24   coming from the Judge states:  "You must determine

25   whether the plaintiff has established by a preponderance

1     of the evidence -- that goes back to that -- that burden

2     of proof that we talked about in the beginning. The

3     Judge is going to remind you about that burden of proof,

4     that the plaintiff has the burden by a preponderance of

5     the evidence to prove their case. And what must they

6     prove?

7            First of all, they must show that the

8     negligence of Tyson proximately caused Mr. Blackshire's

9     injuries. And the Court's going to instruct you that a

10    corporation such as Tyson can only through its officers,

11    employees, or agents act. Tyson is only made up of

12    people like Patricia Williams, Jessica Gatlin, and Larry

13    Howard. So what you need to decide, as the Court

14    instructs, the burden is on the plaintiff to establish

15    by a preponderance of the evidence in this case that the

16    negligence of one or more officers, employees, or agents

17    of Tyson was a proximate cause of the injuries.

18          Basically, what the Court is instructing you

19    is that you must find that one of the employees at Tyson

20    was negligent. You might ask yourself, what is

21    negligence? Well, there's an instruction for that, too.

22    And negligent means the failure to use ordinary care,

23    ordinary care. Not extraordinary care. Not perfect

24    care. Ordinary reasonable care. Using this standard,

25    you have to judge the testimony.

1          And I want you to think about Larry Howard,

2     the maintenance manager.  He had a long history of

3     maintenance, and we went through that on test -- on the

4     witness stand.  But what was important is he never

5     wavered from his testimony in that his maintenance

6     program is solid.  And what it is, is it's a weekly, a

7     monthly, and a quarterly maintenance program for these

8     pallet jacks.  He's got seven people from the

9     Refrigerated Department, that's all they do.  They work

10    on pallet jacks.  And he described to you in his

11    testimony that they make sure that those pallet jacks

12    are operating safely, that they're not malfunctioning,

13    and that if anything is reported to him, he takes care

14    of it immediately.  That maintenance program was

15    reasonable, but you don't have to just take Mr. Howard's

16    version of how the maintenance program was actually in

17    place.

18          Let's think about Mr. Madeley.  This is the

19    hired expert that the plaintiff's brought before you.  I

20    asked Mr. Madeley, I said, "Assume with me that the

21    maintenance program consisted of a weekly, a monthly,

22    and a quarterly servicing, as well as a requirement that

23    any operator inspect the pallet jack before they used

24    it.  Would that be reasonable?"

25          And he said, "Yes, that would be reasonable.

1   That's what I would expect from Tyson."

2            And that is exactly what Tyson did.

3            Now, the plaintiffs have made a big fuss

4   about these -- these documents, and -- and I'll be

5   honest, no one -- no one in this courtroom wants those

6   documents more than I do because I know what they're

7   going to prove.  They're going to prove exactly what

8   Mr. Howard testified to, that that pallet jack was

9   inspected seven days before at least, that that pallet

10  jack was inspected at least 30 days before, and it was

11  inspected quarterly.

12           But because this lawsuit was brought some

13  almost two years after the incident, Tyson had changed

14  its policy.  It went from paper to paperless.  And in

15  this great movement of going to paperless, they

16  discarded the documents.  But that does not discount

17  Mr. Howard's testimony that he has a program in place

18  that was the same in '06 as it is today, weekly,

19  monthly, and quarterly inspections.

20           THE COURT:  Five minutes.

21           MR. MAYER:  Thank you.

22           Now, what Mr. Madeley also confirmed is that

23  Tyson's training program was reasonable.  We talked

24  about the certification, and it was remarkable that in

25  voir dire one person was certified but several people

1  had operated pallet jacks in the past.  It's clear from

2  Mr. Madeley's own testimony that Tyson was reasonable in

3  the way they trained Mr. Blackshire.  So given that,

4  given the testimony, the consistency in the version of

5  the incident from Mr. Blackshire on the day of the

6  incident, from Tyson's employees, from the documents,

7  you then have to answer a few questions.

8          The first question that you have to answer,

9  which I believe is the most important question in this

10  case, is did the negligence, if any, of Tyson

11  proximately cause the occurrence in question?  This goes

12  back to the instruction.

13          The negligence question is did Tyson use

14  ordinary care.  And Tyson means its employees, Patricia

15  Williams, Ms. Gatlin, Mr. Howard.  Did they use ordinary

16  care?  The clear answer to that, what the evidence

17  directs you to is yes -- I'm sorry, is no, they -- they

18  were not negligent, and, yes, they used ordinary care.

19  So was Tyson negligent?  No.

20          Next question -- and there's a separate

21  element here, and that's proximate cause, and you're

22  going to get a definition of that.  And there was only

23  one sole cause of this incident.  The sole cause of this

24  incident was Mr. Blackshire.  He pinned himself against

25  the wall.  We're not faulting him for that.  That's just

 1  what caused the incident.

 2          Now, when you answer this first question, I

 3  want you to consider the credible evidence.  I want you

 4  to use your common sense, and I want you to think about

 5  the testimony.  And when you do, the answer, did the

 6  negligence, if any, of Tyson proximately cause the

 7  occurrence in question, it's no.

 8          The next question:  Did Anthony Blackshire

 9  voluntarily enter -- you can't see that question.

10          Did Anthony Blackshire voluntarily enter

11  into the acceptance and waiver form with knowledge of

12  the waiver form's effect?  The only person that you need

13  to think back to is Ms. Gatlin and her testimony.  She

14  clearly went through with you how she explained that

15  waiver.  She doesn't just hand it to him and walk away.

16  She explains it and makes sure that he understood, and

17  if he didn't understand it, he had the opportunity to

18  ask questions.  And he did.  He went up to HR, asked

19  questions, and came back down to Ms. Gatlin.

20          When he came back down the second time, he

21  voluntarily signed the waiver.  It is clear that the

22  answer, according to the evidence, according to

23  Ms. Gatlin's testimony, is that Mr. Blackshire did

24  voluntarily enter into the acceptance waiver, and he had

25  knowledge of the waiver's effects.

1          The last issue is damages.  And what the

2     Court will instruct you is that if you answer no to

3     No. 1, you don't answer No. 3, which is the damages

4     question.

5          I want you to remember a couple of things,

6     and that is about the future medical expenses.  I want

7     you to put the -- the evidence before you to the test of

8     probability.  The doctor said if the PT works, nothing

9     else will need to be done.  If the steroid injections

10    work, nothing will need to be done.  So just test the

11    credibility of that witness and that -- that testimony.

12         Pain and suffering.  The only thing that I

13    know about the pain and suffering is -- is what

14    Ms. Williams saw.  She said -- not having anything to

15    gain on that testimony on that witness stand, that she

16    saw Mr. Blackshire dancing.

17         Now, I understand he wasn't dancing in this

18    courtroom, but that's what she saw.  I want you to

19    consider that when you're judging the credibility of --

20    of the witnesses and the testimony.

21         Ladies and gentlemen, on behalf of Tyson, on

22    behalf of Vicki Amy, on behalf of the Carthage plant, I

23    want to thank you for your time, your service as a juror

24    on this case.  It is an important case, and don't let

25    the plaintiffs tell you that it's not an important case

1    to Tyson because it is.  They take great pride in that

2    plant and their program, and that's why they are here in

3    this courtroom defending themselves.

4                  In all, you have been very attentive and we

5    thank you for that.  And Tyson looks forward to your

6    verdict in this case.

7                  THE COURT:  Thank you, Mr. Mayer.

8                  Mr. Pierce?

9                  MR. PIERCE:  Your Honor, how much time do I

10   have left?

11                 THE COURT:  Five minutes.  You wanted a

12   two-minute warning, right?

13                 MR. PIERCE:  Yes, sir.

14                 THE COURT:  Okay.

15                 MR. PIERCE:  I'm going to take a deep breath

16   so I can talk fast.

17                 Mr. Mayer made a lot of points.  I want to

18   talk to you about them.  As you can imagine, we don't

19   agree on a single one of them.

20                 Ms. Williams and Ms. Gatlin, he says,

21   "They're not professional witnesses, don't hold that

22   against them."  I don't.  I think they're nice ladies.

23   I have no problem with them.  You know what I hold

24   against them?  Their stories changed.  Two months ago

25   under oath, they don't remember what happened.  They

1    don't remember conversations.  They don't remember who

2    explained something to Mr. Blackshire.  And then

3    miraculously when we're in this courtroom, they

4    remember.  Their memories get better with time.  I don't

5    know anybody that that happens to, but it happens to

6    these ladies.  That's why their testimony is not

7    credible.

8            Mr. Blackshire's story changed.  That's what

9    they tell you.  I'm sure you folks are as tired of

10   looking at this document as I am.  But if you look at

11   it, from day one, he tells you the jack ran.  If what

12   Ms. Williams told you is true and what Ms. Gatlin told

13   you is true, these words don't belong in there.  It's as

14   simple as saying, "He ran it into himself."  It's that

15   simple.  But those words are there, and no matter how

16   hard Tyson's lawyers try to distract you from these

17   words, they're still there.  You still see them.  Don't

18   take my word for it.  Look at the document.

19           Tyson's lawyer says Mr. Blackshire is the

20   sole cause of the accident.  That's funny, because if he

21   messed up and he was unsafe, Tyson's own policies, the

22   policies they're so proud of, the policies that they're

23   here in Court to defend, those policies required

24   disciplinary action to be taken.  There was none.

25           The most amazing thing to me about opposing

1    counsel's closing argument is he says if this came in

2    and Ms. Williams heard this, end of story.  It's -- it's

3    real simple.  It's a one-sentence thing.  Well, if

4    that's the case, why when I had her on the witness stand

5    did I ask her, "Ms. Williams, was this reported to

6    safety or maintenance?"

7            "No."

8            Key question:  "Should it have been?"

9            "Yes."

10           If it's as simple as these lawyers want to

11   make it out to be, why does their own witness say, "This

12   should have been reported"?  Why?  It doesn't quite make

13   sense.

14           Opposing counsel goes through the medical

15   records.  They know that the accident report doesn't

16   support their version of the case because it says the

17   jack ran.  So they literally will look for anything that

18   they can wave in front of you and say, "Oh, yeah, he

19   pinned himself."

20           They tried to do it with Dr. Lee on the

21   witness stand.  Do y'all remember that?  And then I came

22   back and I said, "Dr. Lee, what did you write down?"

23           He said, "I -- I wrote down it lost control.

24   I didn't write anything about it pinning himself."

25           They go to Dr. Nielsen, a doctor who is a

1   medical doctor, not a pallet jack operator, who is

2   trying to listen to Mr. Blackshire, and he writes down

3   as best he can understand what happened.

4           THE COURT:  Two minutes.

5           MR. PIERCE:  Is Dr. Nielsen the one who's

6   charged with investigating this accident?  No.

7           The story that you have heard is consistent.

8   Mr. Blackshire told you the jack ran.  Tyson's own

9   document tells you the jack ran.  And no matter how hard

10  opposing counsel tries, they shouldn't be able to

11  distract you from that.  Look at their own documents.

12          Mr. Mayer went through this verdict form

13  with you.  I'm going to do the same thing.  Was Tyson

14  negligent in this case?  Absolutely they were.  The

15  answer to that question is yes.  Why?  He says, "You

16  don't need to use super ordinary care or extraordinary

17  care, just ordinary care."

18          Ladies and gentlemen, we've all had jobs

19  before.  If my employer put me in a position with a

20  malfunctioning piece of equipment, I sure wouldn't think

21  their care was ordinary.  That's what happened in this

22  case.  That's the only evidence you have.

23          On the issue of waiver, did Mr. Blackshire

24  voluntarily enter into the waiver?  Ladies and

25  gentlemen, again, what's the evidence?  They can't tell

1   you what he was thinking.  He told you he didn't

2   understand it.  He told you that as clear as day.  And

3   Ms. Gatlin, boy, she did her best.  She came in here and

4   totally changed her story, went from not remembering who

5   talked to him a couple of months ago under oath to now

6   saying, "Oh, yeah, it was me, he understood, I know

7   exactly what was going on."  Credibility.  Common sense.

8   That doesn't make sense.  The answer to this question

9   is, no.

10       The last question is about damages.  On

11   these medical expenses, we asked Dr. Lee point blank, is

12   this a possibility or a probability?  He said, "It is a

13   probability."  If Mr. Mayer's right and Dr. Lee is so

14   wrong, where's their doctor?  Where's their witness to

15   come in and say, "You know what, Dr. Lee, boy, he's just

16   crazy.  This is out of this world.  There's no way

17   that's real. "

18       THE COURT:  Mr. Pierce, you've got to wind

19   it up, sir.

20       MR. PIERCE:  Okay.

21       Ladies and gentlemen, once again, I want to

22   thank you for your time.  I appreciate your attention in

23   this case, and we look forward to your verdict, as well.

24       THE COURT:  Thank you, sir.

25       Ladies and gentlemen, you've now heard all

1    of the evidence that's been presented in the case.

2    You've heard the argument of the respective attorneys in

3    support of their positions.  It is my duty to give you

4    the charge in this case.  It will be an oral charge as

5    given to you in an effort to assist you in your

6    deliberations in deciding the issues which you must

7    decide in order to reach a fair and impartial verdict in

8    this case.  Perhaps this function of the Court is the

9    most important one that the Court performs in the trial

10   of any case, so I ask that you pay close attention to my

11   remarks.

12            Yesterday morning, you remember that at the

13   beginning, I gave you some general instructions and

14   definitions.  Rather than repeat them, I will ask you to

15   recall them now in deciding the facts and issues which

16   you are to decide.

17            You are to perform your duty without bias or

18   prejudice to any party.  The law does not permit jurors

19   to be governed by sympathy or prejudice.  The Court and

20   the parties expect that you will carefully and

21   impartially consider all of the evidence, follow the law

22   as I will give it to you, and reach a just verdict.

23            You're instructed that all persons,

24   including the plaintiff and the defendant in this case,

25   stand equal before the law and are to be dealt with as

1   equals in this Court.  The law is no respecter of

2   persons.

3           First thing I'll do is briefly review the

4   contentions of the parties and then give you some

5   additional instructions and definitions that will guide

6   you in deciding the issues or facts that you must decide

7   and resolve in this case.

8           Now, the plaintiff, Anthony Blackshire,

9   seeks damages for personal injuries he sustained while

10  he was an employee of the defendant, Tyson Foods,

11  Incorporated, because of a pallet jack that

12  malfunctioned and injured the plaintiff.  The plaintiff

13  contends that the defendant was negligent because the

14  defendant was on notice of previous malfunctions of the

15  particular pallet jack, but failed to take the necessary

16  steps to fix it.

17          Now, you must determine whether the

18  plaintiff has established by a preponderance of the

19  evidence that the negligence of Tyson Foods,

20  Incorporated, proximately caused his injuries.

21          Now, a corporation can only act through its

22  officers, employee, or other agents.  The burden is on

23  the plaintiff to establish by a preponderance of the

24  evidence in the case that the negligence of one or more

25  officers, employees, or agents of the corporation was a

1   proximate cause of any injuries and consequent damages

2   sustained by the plaintiff.

3           The defendant denies that it was negligent,

4   and the defendant contends that it did not cause the

5   plaintiff injury because the plaintiff's conduct was the

6   sole cause of his injuries.  The defendant further

7   contends that the plaintiff waived his rights to bring

8   the present lawsuit by signing the acceptance and waiver

9   form of defendant's Workplace Injury Settlement Program

10  and accepting the benefits pursuant to the program.

11          Now, for some more definitions and

12  instructions.  I'm going to give you the definitions

13  that -- and instructions that will guide you.

14          Negligence means the failure to use ordinary

15  care, that is, failing to do that which a person of

16  ordinary prudence would have done under the same or

17  similar circumstances or doing that which a person of

18  ordinary prudence would not have done under the same or

19  similar circumstances.

20          Ordinary care means that degree of care that

21  would be used by a person of ordinary prudence under the

22  same or similar circumstances.

23          Proximate cause means that cause which in a

24  natural and continuous sequence produces an event and

25  without which cause such event would not have occurred.

1         Now, in order to be a proximate cause, the

2    act or omission complained of must be such that a

3    person using ordinary care would have foreseen that the

4    event or some similar event might reasonably result

5    therefrom.

6         Now, there may be more than one proximate

7    cause of an event, but if an act or omission of a

8    plaintiff was the sole proximate cause of the

9    occurrence, then no act or omission of any other person

10   could have been a proximate cause.

11        Now, with respect to the waiver by the

12   plaintiff, Mr. Blackshire, the defendant contends that

13   the plaintiff waived his rights to bring the present

14   lawsuit by signing the acceptance and waiver form of

15   defendant's Workplace Injury Settlement Program and

16   accepting benefits pursuant to the program.  The

17   plaintiff denies that he had actual knowledge of the

18   provisions of the agreement related to the waiver and

19   thus did not voluntarily sign the waiver with knowledge

20   of the waiver's effect.

21        Now, the burden is on the defendant to

22   establish by a preponderance of the evidence in the case

23   that the plaintiff waived his common law right to bring

24   the present lawsuit.

25        Now, waiver is an intentional surrender of a

1    known right.  To establish that the plaintiff waived his

2    right to bring this lawsuit, the defendant must show

3    that, one, the plaintiff voluntarily entered into a

4    waiver with knowledge of the waiver's effect.

5              Two, the waiver was entered into not earlier

6    than the 10th business day after the date of the initial

7    report of injury.

8              And, three, the plaintiff before signing the

9    waiver received a medical evaluation from an

10   emergency -- I mean, from a nonemergency care doctor.

11             Four, the waiver is in writing under the --

12   under which the true intent of the party is specifically

13   stated in the document.

14             And, five, the waiver provisions must be

15   conspicuous and appear on the face of the agreement.

16             Now, in order for a waiver provision to be

17   conspicuous, the waiver provision must appear in a type

18   larger than the type contained in the body of the

19   agreement or in contrasting colors.  In this case, the

20   only elements of -- in dispute are whether a waiver was

21   voluntarily entered into by the plaintiff and whether

22   the waiver was entered into with knowledge of the

23   waiver's effect.

24             I'm going to talk to you about damages.  I'm

25   going to instruct you as to the calculation of damages,

1    should you find that the plaintiff has met his burden on

2    his negligence claim.  If the plaintiff has proven his

3    claim against the defendant by a preponderance of the

4    evidence, you must determine the damages to which the

5    plaintiff is entitled.

6              Now, you should not interpret the fact that

7    I have given instruction about plaintiff's damages, if

8    any, as an indication in any way that I believe that the

9    plaintiff should or should not win this case.  It is

10   your task, first, to decide whether the defendant is

11   liable.  Instructions as to the measure of damages are

12   given for your guidance in the event you should find in

13   favor of the plaintiff from a preponderance of the

14   evidence in the case in accordance with my other

15   instructions.

16             If you find that the defendant is liable,

17   you must award the amount you find by a preponderance of

18   the evidence as full and just compensation for all the

19   plaintiff's damages.  Compensatory damages are not

20   allowed as a punishment against a party.  Such damages

21   cannot be based on speculation, for it is only actual

22   damages, what the law calls compensatory damages, that

23   are recoverable.  However, compensatory damages are not

24   restricted to actual loss of time or money.  They

25   include both the mental and physical aspects of injury,

1    tangible and intangible.  They are an attempt to make

2    the plaintiff whole or to restore him to the position he

3    would have been in if the defendant had not acted

4    wrongfully.  You must not award compensatory damages

5    more than once for the same injury.  The plaintiff is

6    only entitled to be made whole once and may not recover

7    more than he has lost.

8           You're instructed that all damages must be

9    reasonable.  If you find that the plaintiff is entitled

10   to a verdict, you may award only such sums of money, if

11   now paid in cash, that you find would fairly and

12   reasonably compensate him for such damages you find from

13   a preponderance of the evidence in the case that he has

14   sustained as a direct result of the incident in

15   question.

16          If you find that the defendant is liable,

17   you may award the plaintiff money damages.  Should you

18   award money damages, you will consider the following

19   elements of actual damages, if any, and none other.

20          First, damages accrued.  If you find for the

21   plaintiff, he is entitled to recover an amount that will

22   fairly compensate him for any damages that he has

23   suffered to date.

24          Then with respect to future damages.  If you

25   find that the plaintiff is reasonably certain to suffer

1 damages in the future because of his injuries, then you

2 should award him the amount you believe would fairly

3 compensate him for such future damages.  An award of

4 future damages necessarily requires that payment be made

5 now for a loss that the plaintiff will not actually

6 suffer until some future date.  If you should find that

7 the plaintiff is entitled to future damages, then you

8 must determine the present worth in dollars of such

9 future damages.

10          If you make an award for future medical

11 expense, you must reduce it to present value by

12 considering the interest that the plaintiff could earn

13 on the amount of the award if he made a relatively risk

14 free investment.  The reason why you make this reduction

15 is because an award of an amount representing future

16 medical expenses is more valuable to the plaintiff if he

17 receives it today than if he would otherwise have

18 received it in the future.  It is more valuable because

19 the plaintiff can earn interest on it for the period of

20 time between the date of the award and the date he would

21 have incurred the medical expenses.  Thus, you should

22 adjust the amount of any award for future medical

23 expenses by the amount of interest that the plaintiff

24 can earn on that amount in the future.

25          However, you must not make any adjustment to

1   present value for any damages you may award for future

2   pain and suffering or future mental anguish.

3           Now, with respect to personal injury and

4   mental anguish, you may award damages for personal

5   injury that the plaintiff sustained and any pain and

6   suffering and mental anguish that he experienced in the

7   past or will experience in the future as a result of the

8   injury.  No evidence of the value of -- of intangible

9   things such as mental anguish or physical pain or

10  suffering has been or need to be introduced.  You are

11  not trying to determine value, but an amount that will

12  fairly compensate the plaintiff for damages, if any, he

13  has suffered.  There is no exact standard for fixing the

14  compensation to be awarded for these elements of

15  damages.  Any award that you make should be fair in

16  light of the evidence.

17          Now, with respect to medical expenses, you

18  may award the reasonable expenses of hospitalization and

19  medical and nursing care and treatment that Anthony

20  Blackshire has incurred in the past and will incur in

21  the future which were proximately caused by the

22  defendant's conduct.

23          Now, with respect to mitigation of damages,

24  a person who claims damages resulting from the wrongful

25  act of another has a duty under the law to use

1    reasonable diligence to mitigate, that is, to avoid or

2    minimize those damages.  If you find the defendant is

3    liable and the plaintiff has suffered damages, the

4    plaintiff may not recover for any item of damages which

5    he could have avoided through reasonable effort.  If you

6    find by a preponderance of the evidence that the

7    plaintiff unreasonably failed to take advantage of an

8    opportunity to lessen his damages, you should deny him

9    recovery for those damages which he would have avoided

10   had he taken advantage of the opportunity.

11          You are the sole judge whether the plaintiff

12   acted reasonably in avoiding or minimizing his damages.

13   An injured plaintiff may not sit idly by when presented

14   with an opportunity to reduce his damages.  However, he

15   is not required to exercise unreasonable efforts or

16   incur unreasonable expenses in mitigating the damages.

17          Now, the defendant has the burden of proving

18   the damages which the plaintiff could have mitigated.

19   In deciding whether to reduce the plaintiff's damages

20   because of his failure to mitigate, you must weigh all

21   the evidence in light of the particular circumstances of

22   the case using sound discretion in deciding whether the

23   defendant has satisfied its burden of proving the

24   plaintiff's conduct was not reasonable.

25          Now, these instructions are given to you as

1    a whole.  You are not to single out one instruction

2    alone as stating the law, but you must consider

3    instructions as a whole.  You have heard all the

4    evidence in the case.  You've heard argument of counsel.

5              Now, the Court has now given you the charge

6    on the law in the case.  In just a few moments, you're

7    going to retire to the jury room, select one of your

8    members to act as foreperson, and begin performing the

9    function for which you have been chosen and for which

10   you have been empaneled in accordance with the oath that

11   you took as jurors.

12             Throughout this trial, I have admonished you

13   not to discuss the case with each other until it's

14   submitted to you.  Well, now is the time for your -- to

15   begin your discussions.  And you certainly may express

16   an opinion from the evidence that you have heard and use

17   any reasonable means to persuade other members of the

18   jury to your convictions and to your honest opinion.

19   You are to reach a verdict which speaks the truth and

20   which does justice to all parties without favor, bias,

21   or prejudice in any particular, either for or against

22   any party to this lawsuit.

23             Now, in the course of your deliberations, do

24   not hesitate to re-examine your own views and change

25   your opinion if convinced it is erroneous.  But do not

1  surrender your honest conviction as to the weight or the

2  effect of the evidence solely for the -- because of the

3  opinion of your fellow jurors or for the mere purpose of

4  returning a verdict.  The verdict must represent the

5  considered judgment of each juror.  In order to return a

6  verdict, it is necessary that each juror agree thereto.

7  Your verdict must be unanimous.

8          As soon as you've reached the verdict, you

9  will let this fact be known to the officer who will be

10  waiting upon you, and he will report to the Court.  One

11  of our Court Security Officers, I'm sure you have seen

12  them coming in, they will be at the door.  You will let

13  them know.

14          Your verdict will be in the form of

15  questions for you to answer.  You will take these

16  questions to the jury room.  When you've reached a

17  unanimous agreement as to your verdict, you will have

18  your foreperson fill in, sign, and date the form and

19  then advise the security officer that you've reached a

20  verdict.

21          Now, during your deliberations, you may have

22  any of the exhibits which have been offered into

23  evidence and the Court will send them to you upon

24  written request.  If you desire further instructions,

25  your foreperson may make this known in writing, and the

1    Court will try to comply with your wishes.  All

2    communications with the Court must be in writing.  But

3    at no time should you indicate to the Court or to anyone

4    else how the jury is divided in answering any particular

5    question.

6           Any notes that you have taken during this

7    trial are only aids to your memory.  If your memory

8    should differ from the notes, then you should rely on

9    your memory and not the notes.  The notes are not

10   evidence.  A juror who has not taken notes should rely

11   on his or her independent recollection of the evidence

12   and should not be unduly influenced by the notes of

13   other jurors.  Notes are not entitled to any greater

14   weight than the recollection or impression of each juror

15   concerning the testimony.

16          I'm going to now hand these to Mr. Rex Mann,

17   our -- my law clerk.  Follow him to the jury room and

18   begin your deliberations in accordance with my

19   instructions.

20          LAW CLERK:  All rise.

21          (Jury out.)

22          THE COURT:  Please be seated.

23          Anything from the plaintiff at this time?

24          MR. PIERCE:  No, Your Honor.

25          THE COURT:  Anything from the defendant?

```
1              MR. MAYER:  No, Your Honor.

2              THE COURT:  Okay.  Court's in recess pending

3    receipt of a verdict.

4              LAW CLERK:  All rise.

5              (Recess.)

6              (Jury out.)

7              LAW CLERK:  All rise.

8              THE COURT:  Please be seated.

9              All right.  Question No. 1 is -- Jury

10   Question No. 1, quote, on Question 1, if we answer no,

11   do we answer the other questions?

12             The Court's response:  No.

13             Any objection from the plaintiff?

14             MR. PIERCE:  No, Your Honor.

15             THE COURT:  I assume none from the

16   defendant?

17             MR. WORTHINGTON:  No, Your Honor.

18             THE COURT:  All right.  Hand this to them.

19   I couldn't read -- who was that -- I couldn't read the

20   name of the foreperson.

21             MS. ANDREWS:  Clay -- is there a Clay?

22             THE COURT:  Is there a Mr. Clay on there?

23   Sounds like we should anticipate something soon, so keep

24   your seat, you're fine.

25             (Recess.)
```

1          (Jury in.)

2          LAW CLERK:  All rise.

3          THE COURT:  Please be seated.  Mr. Clay, I

4    understand you reached a verdict?

5          JURY FOREPERSON:  Yes, sir.

6          THE COURT:  All right.  If you'd hand that

7    to -- Mr. Mann, if you'd go around and get that for me?

8    Thank you, sir.

9          All right.  Ladies and gentlemen of the

10   jury, I'll just read the question number and your

11   answer.  And I'd ask after I've done that, that you --

12   if this represents your verdict, so we'll have a record

13   here in open court, I'll ask you to stand if it

14   represents your verdict.

15         Question No. 1 is "No."  In accordance with

16   the rest of the Court's instruction, no other questions

17   are answered.  It's signed by Mr. Clay as the

18   foreperson.

19         If that represents your verdict, please

20   stand at this time.  Thank you very much.  For the

21   record, all jurors are standing.

22         Ladies and gentlemen, it's -- I can now

23   discharge you, and I need to give you a couple more

24   instructions.  Number one instruction is you can talk to

25   anybody you want to now about anything that goes on in

1   this courtroom.  It's up to you, but it's strictly up to

2   you whether you talk to anybody or not.  It's your call

3   if you want to discuss it.

4           Now, I can tell you that the rules in the

5   Eastern District of Texas, at least since 1968, since

6   that's when I started in the Eastern District as a

7   lawyer, have been that the lawyers cannot talk to the

8   jurors or about their verdict unless the juror wants to

9   talk to the lawyer.

10          So if you want to say something to these

11  lawyers, let me assure you, they -- they want to hear

12  from you if you want to talk to them, but that's going

13  to be up to you.  And if you're out there on the

14  sidewalk and you see one and you want to say something

15  to him, you'll have to initiate that conversation with

16  them, because they're under -- rules of this court have

17  been, like I said, for a number of years that they can't

18  contact you.

19          You have done your job well.  I appreciate

20  your hard work, and I know that disputes are not easy to

21  resolve.  But that's why we have the 7th Amendment that

22  the jurors want to resolve the factual disputes.

23          So I thank you very much for your service,

24  and at this time, I'm discharging you with that final

25  instruction.  Come with the same great attitude if you

1    win my lottery again in the next few years, okay?  Thank

2    you.

3            You may leave the courtroom at this time.

4            LAW CLERK:  All rise.

5            (Jury out.)

6            THE COURT:  Anything from the plaintiff at

7    this time?

8            MR. PIERCE:  No, Your Honor.

9            THE COURT:  Anything from the defendant?

10           MR. MAYER:  No, Your Honor.

11           THE COURT:  Okay.  Gentlemen, I appreciate

12   your professional conduct, and I enjoyed the case with

13   you.  Thank you.

14           LAW CLERK:  All rise.

15           (Court adjourned.)

16

17

18

19

20

21

22

23

24

25

1                       CERTIFICATION

2

3            I HEREBY CERTIFY that the foregoing is a

4    true and correct transcript from the stenographic notes

5    of the proceedings in the above-entitled matter to the

6    best of my ability.

7

8

9
     SHELLY HOLMES                          Date
10   Deputy Official Reporter
     State of Texas No.: 7804
11   Expiration Date:    12/31/10

12

13

14

15

16

17

18

19

20

21

22

23

24

25